UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO. 08-352 (MLC) |
| v. | : | |
| | : | |
| RAYMOND C. FAUTZ, | : | **MEMORANDUM OPINION** |
| | : | |
| Defendant. | : | FILED:  August 15, 2011 |
| _____ | : | |

APPEARANCES:

Paul J. Fishman, United States Attorney,
Jennifer L. Davenport, Assistant United States Attorney,
for the United States of America.

Anthony J. Fusco, Jr.,
Fusco & Macaluso, LLC, Attorneys at Law,
for defendant, Raymond C. Fautz.

## OUTLINE OF OPINION

PRELIMINARY STATEMENT

I.      FINDINGS OF FACT

      A.      Issuance of the search warrants

      B.      Preparations for search warrant execution

      C.      Events at apartment prior to the arrest

      D.      Events at both premises subsequent to the arrest

      E.      Events during post-arrest transport of defendant

      F.      Indictment and prosecution

II.     CONCLUSIONS OF LAW

      A.      Fourth Amendment:  The search warrants

      B.      Fourth Amendment:  Seizure and arrest of defendant

      C.      Fourth Amendment:  Conduct of the search

      D.      Fifth Amendment:  Pre-arrest statements

      E.      Fifth Amendment:  Post-arrest statements during transport

      F.      Physical evidence:  The firearms and ammunition

CONCLUSION

## PRELIMINARY STATEMENT

A grand jury returned a one-count indictment charging that on or about June 26, 2007, defendant, Raymond C. Fautz, having previously been convicted of a felony, knowingly possessed a loaded .22 caliber Smith and Wesson handgun, in violation of 18 U.S.C. § 922(g)(1). Defendant has filed an omnibus motion seeking to suppress (1) all property, including the charged firearm, seized during the execution of search warrants on that date; and (2) all statements made by defendant allegedly in violation of the Fifth and Sixth Amendments, and all evidence obtained from those statements.

The Court conducted an evidentiary hearing and has considered the arguments of the parties in their briefs and oral argument. This opinion sets forth our rulings on the suppression aspect of the motion pursuant to Federal Rule of Criminal Procedure 12(d). We will suppress defendant's pre-arrest statements, but we will deny the motion as to his post-arrest statements and the physical evidence.[1]

---

[1] The motion papers, cited by docket entry number ("dkt."), are as follows: notice of motion (dkt. 5); defense moving brief (dkt. 5-1); government opposition brief (dkt. 6); government supplemental opposition brief (dkt. 9); defense reply brief (dkt. 10-1); government reply brief (dkt. 11); defense supplemental brief (dkt. 14); defense post-hearing brief (dkt. 35); and government post-hearing brief (dkt. 36). Defendant filed a certification of counsel to authenticate motion exhibits A to Q (dkt. 10-2). Actually, exhibits H to Q were filed with that certification (id.), and exhibits A to G were filed with the defense moving brief (see dkt. 5-1 with dkt. 5-2 through 5-5 attached). Motion exhibit C is a certification of defendant, Raymond C. Fautz, dated September 5, 2008 (dkt. 5-3 at 28-30). A second certification of defendant dated March 27, 2009 is filed separately (dkt. 10-3). The evidentiary hearing was conducted on three separate dates, with transcripts filed (dkt. 19, 21, 31). A total of eight witnesses testified (each was a federal, county or local officer), and certain documents were received in evidence as hearing exhibits. Additional oral argument was presented post-hearing (dkt. 39). We have corrected obvious clerical errors in quoting transcripts, but no changes have been made to the content of testimony.

I.    **FINDINGS OF FACT**

The Court finds the following facts, based upon the court records and the evidence submitted on this motion.  Most of the chronological facts are undisputed.  Such conflicts as arise in the evidence are noted and resolved based upon our evaluation of credibility and the record.

A.    **ISSUANCE OF THE SEARCH WARRANTS**

Defendant, Raymond C. Fautz, previously pled guilty and was sentenced in this United States District Court for violating 18 U.S.C. § 1001 (false statements), a Class D felony, in connection with misbranded parts supplied to United States Department of Defense ("DoD") prime contractors.  United States v. Raymond C. Fautz, Crim. No. 96-179-02 (D.N.J.), Judgment of Conviction filed 3-10-97 (Crim. No. 96-179-02, dkt. 14). He received a sentence of three years probation, with a restitution amount to be paid to the Department of Defense.  (Id., dkt. 14 at 3.)[2]

The instant action commenced with a criminal complaint filed against Mr. Fautz in this Court on June 26, 2007, followed by an indictment filed on May 14, 2008, and a superseding indictment filed on April 9, 2009.  (Complaint, Mag. No. 07-1127, dkt. 1; Indictment, Crim. No. 08-352, dkt. 1; Superseding Indictment, id., dkt. 15.)  The charge

_____

[2]  The co-defendant in that case was a company named Transistor Company, of which defendant was the sole shareholder.  The company pled guilty to the same offense, and was sentenced to probation without a restitution obligation.  Its Judgment of Conviction stated that the company was dormant, so restitution was imposed on Fautz.  United States v. Transistor Co., Crim. No. 96-179-01 (D.N.J.), Judgment of Conviction (Crim. No. 96-179-01, dkt. 16 at 3).

against defendant in this case is that on or about June 26, 2007, in the District of New Jersey, defendant, having been convicted in a federal court of the felony offense in Criminal Action No. 96-179, did knowingly possess ammunition and a firearm, namely one .22 caliber Smith and Wesson Model 34 handgun bearing serial number M157464, loaded with four rounds of ammunition.  (Superseding Ind., dkt. 15.)[3]  The pending suppression motion pertains to the events that surrounded the arrest of Mr. Fautz at his home on June 26, 2007, during the execution of a federally-issued search warrant.

The Department of Defense has an Office of Inspector General, which includes a unit named Defense Criminal Investigative Service ("DCIS").  DCIS maintains offices in various locations around the nation.  At the times relevant to this action, DCIS had an office named the DCIS New Jersey Resident Agency, located in Edison, New Jersey. DCIS Special Agent Zachary P. Hatcher ("Agent Hatcher") was one of the agents assigned to that office.

On June 20, 2007, Agent Hatcher, accompanied by an Assistant United States Attorney, appeared before U.S. Magistrate Judge John J. Hughes at the federal courthouse in Trenton, and presented an Application and Affidavit for Search Warrant, seeking to search two specified premises in Morris County, New Jersey.  The addresses were an

_____

[3]  The original indictment in this case stated that defendant's prior federal felony conviction was imposed in the District of Ohio.  (Dkt. 1.)  The superseding indictment corrected that allegation, stating that he was first prosecuted in the Southern District of Ohio, but the guilty plea and conviction took place in the District of New Jersey, Crim. No. 96-179.  (Dkt. 15.)  See United States v. Raymond C. Fautz, No. 96-179-02 (D.N.J.), docket entry for Consent to Transfer (Rule 20) from S.D. Ohio to D.N.J.  (Crim. No. 96-179-02, dkt. 1).

apartment in Denville and a storage facility in Montville.  The Magistrate Judge

witnessed the signature of Agent Hatcher on the sworn Application and Affidavit, and

issued two search warrants, one for each specified location.  Those matters were sealed

on the docket at the time the search warrants were issued.[4]

Agent Hatcher's search warrant affidavit ("Affidavit") was Attachment B of the

Application.  It was 22 pages long, single-spaced.  (Dkt. 5-2 at 2-3, 5-22.)  The

introductory text stated:

> I am currently involved in an investigation into violations of Title 18,
> United States Code, Section 1001 ("False Statements"), Section 287 ("False
> Claims"), and Section 1343 ("Wire Fraud") ("Specified Federal Offense")
> by Electronic Connections Incorporated ("ECI") and Transistor and
> Electronic Components Inc. ("TEC").  ECI was created by [named
> individual], President of ECI, on December 29, 1994, as a world wide
> independent stocking distributor of transistors, capacitors, tubing, hardware,
> terminal blocks, and electronic connectors for the aerospace, military and
> commercial industries.  Investigation revealed ECI in-fact purchased non-
> conforming, substitute, remarked, military parts from Raymond Fautz
> ("Fautz"), owner of Transistor and Electronic Components Inc. ("TEC")....
> TEC, in this case, manufactured and distributed electronic parts to ECI.
> ECI purchased the subject military parts from TEC and supplied those parts
> and certifications to the DoD.  Investigation revealed that TEC is currently
> operating at [apartment address], Denville, NJ 07834 and maintains a
> storage unit at [storage facility address], Montville, NJ 07045.  This

---

[4] Two sealed Magistrate Judge criminal cases were opened on the docket, because two
premises were specified to be searched.  The search warrant issued for the Denville apartment
was filed in Mag. No. 07-1124, and the search warrant issued for the Montville storage facility
was filed in Mag. No. 07-1125.  The identical Application and Affidavit for Search Warrant was
filed on each docket.  Both of those dockets were sealed when opened, and remain sealed, but
defendant has received copies of all pertinent papers from those dockets in discovery, and has
attached those as motion exhibits.  We will cite primarily to the docket records pertaining to the
search warrant for the residence, because that was the search that gave rise to the current
prosecution and the pending suppression motion.

> Application and Affidavit is submitted in support of a request for a search
> warrant to search [the premises at those two stated addresses].
> ....
> Based upon testing reports, contract files, and other documentation the
> investigation revealed probable cause that through ECI, TEC provided parts
> to the DoD, which were re-branded, re-marked, substitute and non-
> conforming items which cannot be used in the various military applications
> they were designed for and pose a serious safety concern to the applications
> and personnel operating those systems.

(Id. at 6.)

The Affidavit stated that Agent Hatcher had received information from the DoD

Supply Center, Columbus, Ohio ("DSCC"), Counterfeit Material/Unauthorized Product

Substitution group that 56 DSCC purchase orders awarded to ECI valued at $251,711.98

had been tested and were found to contain re-branded, re-marked, substitute and/or non-

conforming military parts.  Of that group of 56 purchase orders, 47 were identified as

critical application items.  (Id. at 7.)[5]  The Affidavit stated that investigation revealed that

between February 26, 2001, and August 21, 2004, ECI entered into approximately 429

contracts with the DoD totaling approximately $1,085,045.39; that TEC supplied all of

the parts on the contracts ECI had with the government; and ECI paid TEC approximately

$858,066.84.  (Id.)

The Affidavit described four of those defense contracts in detail.  The contracts

were for transistors, semiconductors, connector plugs and thyristors [sic] to be used in

---

[5]  "A critical application item is an item that is essential to a weapon system performance
or operation, or the operating personnel as determined by the military services.  Defense Logistic
Agency Instruction .... 3200.1 requires Weapons' Systems ("WS") parts perform as intended one-
hundred percent of the time.  Anything less represents a serious compromise to the safety of
equipment and personnel operating the equipment."  (Id., dkt. 5-2 at 7.)

military Tier I Weapons Systems including the Minuteman Missile, the B-1B Bomber,

and the Nimitz class submarines, and all four contracts were for critical application items.

It stated that the contracts cited the exact parts and exact companies that manufactured

those parts, and ECI responded to the bid specifications by bidding that it would provide

the exact part number manufactured by the exact company cited in the solicitation.  (Id.)

The Affidavit averred:

> The parts supplied to the DSCC resembled the required parts cited in the
> contract.  However, the parts TEC provided to ECI which were then
> supplied to the DSCC were counterfeit parts.  As more fully set forth below,
> the original markings on the parts were removed and a new part number
> was applied.  Based upon the DSCC Electronic Testing Center ... reports,
> the items received from ECI were re-stamped with the part number ... cited
> in the contract.  However, the presence of the original markings on the parts
> were still visible beneath the new applied markings.  Based upon
> investigation, these parts were purchased from Raymond Fautz, TEC.

(Id.)

The Affidavit explained that the investigation to date had included execution of a

search warrant at ECI headquarters, which yielded ECI vendor files and other business

records.  (Id. at 7-8.)  Those ECI records showed that the subject parts were obtained by

ECI from TEC, after ECI had sent TEC the DoD bid specs for each prospective contract

and TEC informed ECI if it could manufacture the part specified in the contract.  (Id. at

11.)  When the contract was awarded to ECI, TEC created the packing slip and any

required Certificate of Conformance ("CoC"), to accompany the parts purchased by ECI

from TEC.  The parts were then purchased directly by ECI from TEC, with the

accompanying packing slips and CoCs supplied by TEC.  (Id. at 11-12.)  DoD testing of

parts under the specified ECI contracts revealed that the parts supplied were deficient,

and they showed evidence of re-branding.  DoD had thus determined that those parts were

not the items requested in the original contracts and were in fact substitute/non-

conforming parts, accompanied by falsified packing orders and/or Certificates of

Conformance.[6]  The warrant-seized ECI records showed that its vendor in each case was

Mr. Fautz's company, TEC.  (Id. at 12-19.)

Agent Hatcher's Affidavit described additional avenues of investigation to date.  It

stated that TEC had a website giving an email link, a local New Jersey phone number, an

800 phone number, a fax number, and a post office box mailing address.  The

investigation had included a search on a federal government registry called Central

Contractor Registry, a central repository of all companies and agencies wanting to do

business with the federal government.  TEC was listed on that registry with the same

phone and fax numbers, and Ray Fautz was listed as the point of contact for TEC.  (Id. at

19-20.)  Those telephone and fax records were obtained from the telephone company and

reviewed by Agent Hatcher.  His interview of a telephone company official revealed that

the telephone line for all those numbers was physically located at the Denville apartment

address specified in the Affidavit.  (Id. at 20.)

---

[6] The Affidavit noted that some of the CoC's supplied by TEC to ECI on the specified DoD parts were signed "Marc Desmond, QC Manager" or in some cases just contained a signature.  However, a Department of Labor query performed on TEC revealed that "Raymond Fautz" was the only employee at TEC with wages being withheld.  (Id., dkt. 5-2 at 12.)

The investigation set forth in the Affidavit also included information obtained from a "cooperating witness that works for a government contractor," describing the procedure followed by Fautz and the cooperator for quoting and obtaining government contracts for Fautz to supply the parts to the cooperator.  (Id. at 20.)  That procedure reportedly used the TEC fax number, oral telephone contact between Fautz and the cooperator, and actual supply of parts by TEC to the contractor for re-supply to the government.  (Id.)

The Affidavit stated that the investigation had progressed in March, 2007, to consensually monitored telephone conversations and faxes at the TEC numbers, between Mr. Fautz and an individual identified by a "source number" ("source person"), under the supervision of DCIS agents.  (Id. at 20-21.)  As that aspect of the investigation progressed into April, 2007, Agent Hatcher provided the source person with various (dummy) DoD Requests for Quotations ("RFQs"), and consensually monitored the ensuing phone and fax communications between them, which included quoted statements in particular conversations with Fautz.  (Id. at 21-22.)  Agent Hatcher's Affidavit said as to some of those quoted exchanges, "[b]ased upon this conversation there is probable cause to believe Fautz re-marked, re-branded, substituted, or otherwise provided non-conforming items to the government for supply to the DoD."  (Id. at 22.)

Investigation had also focused upon Mr. Fautz's storage location as of April, 2007. According to the Affidavit, Agent Hatcher interviewed personnel at the storage facility at

the specified address in Montville, and reviewed its rental and access records for the unit rented there by Fautz and paid for by the TEC bank account.  (Id. at 21.)  Agent Hatcher and DCIS agents by then had commenced physical surveillance of Mr. Fautz, including one occasion when Fautz was inside the storage unit and the agent who witnessed him could see some of its contents.  Those included a large industrial tool, stacked boxes, and a box of what looked to be small round metal parts.  Agent Hatcher's Affidavit stated as follows:  "The unit had no visible home furnishings contrary to Fautz's statement in the customer information record dated May 7, 2003.  I believe there is probable cause to believe that Raymond Fautz is using [the specified storage unit] to conduct fraudulent operations on behalf of Transistor and Electronic Components, Inc. (TEC)."  (Id. at 21.)[7]

The physical surveillance of Mr. Fautz described in the Affidavit continued into June, 2007.  Agent Hatcher had already determined that the specified apartment in Denville, New Jersey, was rented to Mr. Fautz.  (Id. at 8-9.)  Also, the vehicle that the agents surveilled him regularly driving was registered in his name.  (Id. at 21-22.)  On June 12, 2007, during a surveillance session conducted at the apartment premises, Agent Hatcher witnessed that vehicle parked in the covered garage on-site, in the spot designated for the apartment unit rented by Mr. Fautz.  (Id. at 22.)

---

[7] The Affidavit also reported, under the heading "Prior Criminal Conduct," that "on March 14, 1996, in the District of Ohio, Raymond Fautz pled guilty to a violation of Title 18, United States Code, Section 1001 for providing electrical parts to the Department of Defense which were mislabeled, rebranded, or remarked and was sentenced to 5 [sic] years of probation." (Id. at 23.)  See nn.2,3 supra and accompanying text.

11

The Affidavit concluded, as to probable cause, as follows:

> Based on my experience and information that I have obtained from others experienced in such investigations, I believe there is probable cause that the materials described with this affidavit and in the Attachment ... will be found at the premise[s].  Also maintained at the premises are those items which consist of various pieces of computer hardware, software, digital storage media, records, paper and electronic notes and image files.  The aforementioned facts establish probable cause to believe that TEC maintains computer(s) at both its place[s] of business which have been used to commit the Specified Federal Offenses.

(Id. at 23.)[8]

Attachment B to the Application was a continuation of the Affidavit.  In it, Agent Hatcher gave the street address and unit number of each of the two premises to be searched, namely the Fautz apartment in Denville and the rented storage unit in Montville.  All identifying data for both premises was supplied, including physical description of each street location, and description of the precise interior location and exterior appearance of both the apartment and the storage unit.  (Id. at 27-29.)

Attachment A to the Application described the property for which the warrants were sought.  (Id. at 2-4.)  It is quoted verbatim in the margin.[9]

_____

[8]  The Affidavit included sections entitled "Need to Seize Certain Items from the Premises," and "Summary of Relevant Computer and Internet Concepts," in which it explained the justification for seizing computer hardware/software and related manuals for forensic analysis, to find data stored electronically.  (Id. at 23-26.)

[9]  Attachment A to the Application for Search Warrant itemized the following property to be searched for and seized:

> Evidence of violations of federal law, specifically, violations of Title 18, United States Code, Section 1001 (False Statements), Section 287 (False Claims), and Section 1343 (Wire Fraud), including records in whatever form they are kept,

Two search warrants were issued by the Magistrate Judge on June 20, 2007, based upon the foregoing documentation.  (Dkt. 5-3 at 21-24.)  The warrants were identical except as to the premises to be searched.  The first specified the apartment in Denville, and the second specified the storage unit in Montville.  Attached to each warrant was the identical Attachment A, itemizing the property to be seized.  (Id.)  See n.9 supra.  Each warrant incorporated by reference the attached Affidavit.  (Dkt. 5-3 at 21, 23.)

## B.    PREPARATIONS FOR SEARCH WARRANT EXECUTION

The search warrants were presented to and issued by the Magistrate Judge on Wednesday, June 20, 2007.  Each warrant commanded that the search be conducted no later than June 30, 2007, during daytime, defined as between the hours of 6:00 a.m. and

---

electronically or otherwise, specifically described as follows for the period from January 1, 1999 to the present:

Based upon the foregoing, there is probable cause to believe that the following documentary evidence will be found at the TEC premises for the period from January 1, 1999 to the present:

a.  contract and purchase order files, including but not limited to, vendor quotes, buyer worksheets, fax cover sheets, memoranda, correspondence, bills of lading, shipping orders, notes and invoices;

b.  bank records, including but not limited to statements, checks, check registers, wire transfer confirmations, deposit slips;

c.  any and all parts, [including] but not limited to, residual inventory, packing lists, packaging materials, stamps, markers, dies, casts, solutions, solvents, brushes, soldering tools, etching materials, papers, machines, inks, tools, and any other instruments used to modify, alter or re-brand items;

d.  Supplier and vendor invoices, Certificate of Conformance (CoC), DoD Material Inspection and Receiving Reports (DD250), purchase order documentation, payments, and correspondence.  All payment documents, ledgers, checks, and purchase items.

(Id., dkt. 5-2 at 33.)

10:00 p.m.  (Dkt. 5-3 at 21, 23.)  <u>See</u> F.R.Crim.P. 41(e)(2)(A)(i), (ii) (required contents of a warrant include time limit not to exceed 14 days).

DCIS Special Agent Hatcher was the sole lead case agent in charge of this investigation.  (Dkt. 19 at 73; dkt. 31 at 14.)[10]  He signed the Application and the Affidavit in support of the warrants, summarized above.  (Dkt. 5-2 at 2-29; dkt. 5-3 at 1-19.)  The defense procurement fraud investigation to which he was assigned, as described in that Affidavit, had been in progress for about two years at the time those warrants were issued.  (Dkt. 19 at 84.)  Agent Hatcher testified that the purpose of the search was for the procurement fraud scheme that he was investigating.  (<u>Id.</u> at 26, 105-106.)

Agent Hatcher began routine preparations for executing on the search warrants shortly before the warrants were issued.  Those preparations included assembling pertinent information for briefing the law enforcement personnel who would be conducting and assisting with the search.  According to standard practice, an operational plan was developed to be distributed to the law enforcement team.  The plan included a summary of what the case was about, who Mr. Fautz was, what locations were to be searched, and what items were to be seized, with attachments including local maps and directions to the search locations and to local hospitals in case anything went wrong.  (<u>Id.</u> at 16-20.)

---

[10]  The transcripts of the evidentiary hearing on this motion are filed at docket entries 19, 21 and 31.  A total of  eight witnesses testified, including Agent Hatcher on two occasions.  We have reviewed all of that testimony.  Defendant Fautz did not testify, but he submitted two written certifications filed with the motion papers (dkt. 5-3 at 28-30 and dkt. 10-3 at 1-7).  We have also reviewed the motion exhibits and hearing exhibits.  Each of those sources is cited and discussed here as appropriate.

Another of those preparatory steps was to run an NCIC (national criminal records database) search on Mr. Fautz.  Agent Hatcher learned of Mr. Fautz's prior felony by running that NCIC search, shortly before the warrants were issued.  (Id. at 17-22, 108-109.)  That led Agent Hatcher to request a registered firearms history on him from the New Jersey State Police, Firearms Investigative Unit.  The firearms search showed that Mr. Fautz had possessed approximately 12 handguns over a period of time starting in about 1979, and that at or about the time of his prior felony conviction in 1997, he had legally transferred away four of them through a licensed dealer, which left approximately eight firearms with unknown status.  (Id. at 21-26, 106-110.)  The agents did know his age (65) and physical appearance, based on police records and the investigation surveillance.  (Id. at 114-116; dkt. 31 at 22-23.)

A further preparatory step taken by Agent Hatcher, working with his fellow DCIS agents in New Jersey, was to go to the self-storage facility where the storage unit was to be searched, and interview the individuals who worked there.  One of those individuals told the agents some information describing an incident where Mr. Fautz brandished a .22 caliber handgun at one or more individuals while he was in a vehicle in the vicinity of Newark Airport.  (Dkt. 19 at 24-25, 120-123; dkt. 21 at 54-57.)[11]

---

[11]  Agent Melissa Gibson, who accompanied Agent Hatcher in that interview of staff at the storage facility, testified as follows:

> I do remember prior to executing the search warrant going with Agent Hatcher to the self-storage facility and speaking to the employees there who told us that Mr. Fautz had come in to go to the restroom.  He came in, every time he

The information gathered by Agent Hatcher and his fellow DCIS agents in preparation for the search warrant execution did not allow them to know for sure whether Mr. Fautz had weapons in his possession in his home.  (Id. at 26, 110.)  However, they did prepare for the search "thinking that there may be guns at his house."  (Id. at 122-123.)  For that reason, Agent Hatcher arranged for the county sheriff's office to provide Sheriff's Emergency Response Team ("SERT team") support, a term that is synonymous with SWAT team in common parlance [the parties and the Court will use those terms interchangeably].  (Dkt. 21 at 108.)  The SERT team was to be used in addition to the other law enforcement agencies who would contribute personnel to the search warrant execution.  (Dkt. 19 at 17-18, 111-113; dkt. 21 at 108).  Agent Hatcher testified that "the SERT team was used in order to make the entry and secure the premises because we, at that point had no idea what we were going to be encountering."  (Dkt. 19 at 18; see also dkt. 21 at 109 (Carifi testimony); id. at 131 (Wagner testimony).)  He denied that at any time in preparing for, or in executing, the search warrants, he and his fellow DCIS agents intended to make a gun case against Mr. Fautz.  (Dkt. 19 at 116-120, 123, 128, 133; see also dkt. 21 at 59-61.)

---

came to this facility, to go to the restroom, and that on one occasion he told them that he was at Newark Airport and someone attempted to carjack him and that he had brandished a weapon.  So, we had heard this story and we didn't know if it was true, but we had heard the story.

(Dkt. 21 at 54.)  Agent Gibson further testified that in preparation for this suppression hearing, she and the subsequent case agent, Agent Williams, went back to the storage facility and the same story was repeated to them by the staff.  (Id. at 56-57.)

The entry and search teams and local law enforcement support assembled to participate in the search warrant execution consisted of local uniformed Denville police, the county SERT team, and federal agents from the DCIS and the Navy Criminal Investigative Service.  (Id. at 16-18.)  They or their representatives were briefed in advance of the search by Agent Hatcher, as to their respective roles and the appropriate attire and equipment for the process.  (Id. at 17-20, 113.)  The briefing did include the facts that Mr. Fautz was a convicted felon, and that based on the firearms records there was a suspicion that he may have guns.  That topic arose in the context of preparing for officer safety.  (Dkt. 19 at 143-144, 168-170; see also dkt. 21 at 7-8, 53-54.)[12]

### C.    EVENTS AT APARTMENT PRIOR TO THE ARREST

At approximately 7:00 a.m. on Tuesday, June 26, 2007, Morris County SERT commander Sergeant Paul Carifi, having attended a briefing at the DCIS office in Edison, New Jersey, the previous day, briefed his five SERT team members.  (Dkt. 21 at 108-110; dkt. 10-2 at 11.)[13]  After that, the SERT team met with members of the DCIS team headed

---

[12]  Agents Hatcher and Schaeffer were questioned on cross examination as to why the search warrant execution was planned for a time when Mr. Fautz would predictably be at home, rather than a time when he might be out.  That line of questioning was directed to defendant's contention that the actual purpose of the search warrant execution was to establish a gun case against Mr. Fautz, rather than to pursue the DoD procurement fraud investigation.  See Section II.A. infra.  We do not interpret that testimony as supporting defendant's contention, but we cite those portions of the record here, for easy reference.  (Dkt. 19 at 116-119, 169-170, 181-183.)

[13]  We have pieced together the timing of this part of the chronology based upon witness testimony and incident reports in evidence.  Those reports do not align precisely as to timing of events, so we have made our best estimate based on the evidence, as explained infra n.18.

by Agent Hatcher at a predetermined location near the Fautz apartment.  (Dkt. 21 at 110, 128, 130-131; dkt. 10-2 at 11.)  Then they all proceeded to the apartment location, accompanied by four assisting officers from the Denville Police Department.  (Dkt. 21 at 110, 128-129.)  At approximately 8:30 a.m., they were all in their assigned positions inside and outside the apartment building, which was a large condo complex.  (Dkt. 19 at 26-28; dkt. 21 at 127, 129-130.)[14]

The Fautz apartment was on the third floor, and had one door for ingress and egress.  In the hallway immediately outside that apartment, officers arranged themselves so that the SERT team members were all lined up to the left side of the door, while Agent Hatcher stood at the door and knocked and announced that they were federal agents there to execute a search warrant.  (Dkt. 19 at 27-29; dkt. 21 at 111-112.)  It took a few minutes for Mr. Fautz to arrive at the door.  (Dkt. 19 at 29-30.)  He had been awakened by the

---

[14] The SERT entry team consisted of Sergeant Paul Carifi and his five officers from the county sheriff's office.  (Dkt. 21 at 108-110.)  The search team consisted of DCIS case agent Zachary Hatcher and fellow DCIS agents James Schaeffer, Melissa Gibson, Tiffany Linn, Kishara Gant, Angela Lobosco and Gordon Guestella (the latter two from the Long Island, New York office, see n.21 infra), along with two Navy CIS agents.  (Dkt. 19 at 16-34, 144-47; dkt. 21 at 8-13, 88-96; dkt. 31 at 48-54.)  Not all of the federal agents entered the apartment at the same time as the case agent; some of them were assigned initially to "perimeter security," then entered the apartment a few minutes later to begin their respective search duties.  (See, e.g., dkt. 19 at 26-29; dkt. 31 at 48-54.)  Agent Hatcher estimated that a total of ten officers (SERT and then federal officers) made the initial entry into the apartment.  (Dkt. 19 at 34.)  There was also a detail of four local police officers from the Denville Township Police Department, led by Lieutenant Christopher Wagner.  (Dkt. 21 at 127-29.)  They were not assigned to the "tactical operation" of the warrant search.  (Id. at 129.)  Their function, according to Wagner, was simply to help the two other agencies find the location, and to unlock the common exterior door of the condo so those agencies could gain entry to the complex.  (Id. at 129-30.)  There is no evidence that the local police actually entered Mr. Fautz's apartment.  (Id. at 127-32.)

18

knocking, and came to the door clad in an undershirt and sweatpants. (Dkt. 10-3 at 2.)  As soon as he opened the door, the six SERT team members entered, followed immediately by Agent Hatcher within one minute or less, and more of the federal agents behind him by approximately 30 seconds.  (Dkt. 19 at 30, 164, 175; dkt. 21 at 112-113, 120.)

The first order of business for the SERT team was to do a protective sweep of the apartment to make sure no other people were present.  For that purpose, one or two of the SERT team members detained Mr. Fautz from moving about the apartment while they performed their protective sweep, by stationing themselves with him in the open area of the living room, near the kitchen just to the left of the front door inside the apartment. (Dkt. 19 at 34-35, 147-148; dkt. 21 at 9-10, 112-113, 118-123.)  All SERT team members were dressed in black tactical outfits and ballistic helmets.  As they made their entry, two or more of them had weapons drawn, including at least one handgun and an "MP5" submachine gun, in "ready gun" position, pointing at about the knee level.  At least one of the SERT team members detaining Mr. Fautz at that moment had his handgun drawn; another SERT officer may have also been alongside him at that time with an MP5 drawn. (Dkt. 19 at 30, 94-98, 163-166, 174-175; dkt. 21 at 113-119.)[15]

_____

[15]  Mr. Fautz states in his certifications that during this initial SERT team entry, the SERT team had their guns pointing at his head, and he saw a law enforcement agent (described by distinctive appearance) videotaping those events.  (Dkt. 5-3 at 29; dkt. 10-3 at 2-4.)  He also states that he was questioned, threatened, and placed under arrest by the SERT team and handcuffed by them as soon as they entered the apartment.  (Dkt. 10-3 at 2-3.)  Defendant has had access to all participants and all records in the discovery process, and has located no such video sequence or supporting testimony of any agents or officers as to those assertions.  (See, e.g. dkt. 19 at 94-99, 179; dkt. 21 at 70-71, 125; dkt. 31 at 54, 58-60.)  There are video segments of

The apartment consisted of the kitchen/living room area, a master bedroom, a smaller bedroom furnished as an office, and two bathrooms.  (Dkt. 19 at 34-35, 147-148, 173; h'g ex. G-3 (video).)  Agent Hatcher testified that it was standard procedure to "consolidate people to one area," during the initial protective sweep in the search warrant process.  (See dkt. 19 at 14-16, 125.)  He explained the purpose of this step:

> Q      And why can't they wander around the house?
>
> A      For the specific purpose that in standard fraud cases, that we don't want any destruction of documents, we don't want them to lunge at a weapon.  Officer safety, their own safety and the people and the officers that are at the facility.

(Id. at 38; see also id. at 165-167 (Schaeffer testimony).)

The SERT entry team immediately attended to "clearing the residence to make sure there was no one else inside....  For safety reasons."  (Dkt. 21 at 113.)  Sergeant Carifi described that the procedure employed by his SERT team was to detain Mr. Fautz in the front area of the apartment, then "clear the residence," meaning making sure there were no other persons present, and then signal to the other agencies that it was safe to enter.  (Id. at 112-23.)  Key portions of Carifi's direct testimony on that sequence of events may be excerpted as follows:

> Q      [D]id you at all -- when you went in, did you ever stop and talk or converse in any way with Mr. Fautz, or was that ... left up to Mr. Carro and Mr. Cerullo [SERT team members who were guarding Mr. Fautz immediately upon entry]?

---

the before-search and after-search scene at the apartment and the storage unit, but none showing defendant.  (See dkt. 19 at 46-49; dkt. 31 at 58-59; h'g ex. G-3 (video).)  Based upon the record as a whole, we do not ascribe credibility to those statements in defendant's certifications.

A       ....  I did not talk to him....  I proceeded to continue clearing the residence.

Q       Now, when you say clearing the residence, ... your first job in going in is to make sure there's no one else inside the apartment?

A       Yes, to make sure it's safe.

Q       Make it safe for everybody, you guys first and then whoever else is going to follow you, is that correct?

A       Correct.
....
Q       ....  When you're doing this search for other people, you're doing -- the SERT team is doing this, is that correct?

A       Correct.

Q       That's their job, is that correct?

A       Yes.

Q       [T]hey would have to -- and you correct me if I'm wrong -- that the SERT team does the sweep or search for other people and then secures the apartment?

A       Once it's determined that there's no one else in there, we communicate with each other that it's clear and that –

Q       And then what happens?  Then the other agencies, whoever it was, come in?

A       At that time when it was cleared, yes.  They would come in, or they may have just followed us in, just into the doorway....

Q       I want to just get to the point where there were other agents who were part of this search who were not SERT members?

A       Yes.
....
Q       Those would have been federal agents, to your knowledge?

A       Yes.

21

Q      And I want to stick with the other agents for a minute.  The other agents, when they come in, they would not have followed you and the other SERT members to search for other people, am I correct?

A      Correct.

Q      That was the SERT team's responsibility, is that right?

A      Correct.

Q      After the SERT team performs its function and determines that there are no other people and you secure whatever is in the apartment, then you signal that all is clear?

A      I advised them that it was clear.

Q      And at that point, is that the point that you recall when the agents then went in to conduct the search?

A      Yes.

(Dkt. 21 at 119-21.)

Agent Hatcher entered the apartment approximately one minute right behind the SERT team, followed immediately by his fellow agent, DCIS Special Agent James Schaeffer, and other federal agents.  Those other agents, including Schaeffer, followed the SERT team to do their own protective sweep, checking for occupants but also checking for anything visible that would be harmful to the search teams.  (Dkt. 19 at 14-16, 30-34, 145; dkt. 21 at 10, 65-70.)

Meanwhile, Agent Hatcher went directly to Mr. Fautz and spoke to him.  (Dkt. 19 at 31, 34-35.)  By then, the SERT team members guarding Mr. Fautz had holstered their weapons and they were standing off to the side.  (Id. at 98-99.)  Agent Hatcher, who was

22

the first federal agent to approach Mr. Fautz, engaged in a brief conversation with Mr.

Fautz at that moment.  Hatcher identified himself and advised Mr. Fautz that they had a

search warrant for his apartment and his storage unit.  (Id. at 34-35.)  Hatcher also at that

time informed Mr. Fautz a little bit about the case, stating that the agents knew he was

selling parts to DoD, and they believed the parts were counterfeit.  He added words to the

effect of:  "we'd like your cooperation, we'd like to talk to you about this."  (Id. at 35,

138-140.)  Mr. Fautz thereupon asked for an attorney, or for his attorney.  (Id. at 35.)

Agent Hatcher's testimony on this point is quoted in the margin.[16]

---

[16]  This is a representative section of the testimony of Agent Hatcher on the exchange he had with Mr. Fautz on that subject during their initial conversation inside the apartment:

Q       [D]id there come a time ... where Mr. Fautz said "I want to talk to an attorney"?
A       At the house, he requested an attorney.
Q       ....  Now, "at the house" would have been while he was placed under arrest?
A       It was prior to that, yeah.
...
Q       And so you knew that Mr. Fautz had exercised his right to have an attorney present?
A       Yes.
Q       ....  And inside the house, he was not given that opportunity to make a call to a lawyer, or do anything like that, consult with an attorney?
A       He could have consulted with an attorney inside his own house.  He wasn't under arrest at that point....  Mr. Fautz was actually by the window, away from me a period of feet when he told me that he wanted an attorney.  So, at that point, he could have come back and said "I want to call my attorney," and that would have been fine.
Q       ....  Would you agree with me that the people with those guns, the SERT team, never left Mr. Fautz?
A       I mean ... it's a small apartment --
....
A       -- so yeah, ... we had agents or law enforcement officers with Mr. Fautz the entire time, especially since he was arrested.
....
THE COURT:  ....  While being, in effect, guarded by a couple of officers in the apartment, before you informed Mr. Fautz that he was under arrest, you say defendant requested an attorney even before he was arrested?

23

During that initial encounter with Mr. Fautz, Agent Hatcher also had with him, visible in his open investigation folder, the printout of the firearm report indicating all the guns that had been registered to Mr. Fautz. While he was making his first few comments to Mr. Fautz, Hatcher said words to the effect of "we know you like handguns; if you

_____

THE WITNESS: Yes.
THE COURT: And do you remember what he asked?
THE WITNESS: "I want to speak to my attorney." "I'd like an attorney."
THE COURT: He said that to you?
THE WITNESS: To me.
....
THE COURT: And did you respond?
THE WITNESS: I said, "Absolutely. Sure. We're still going to conduct the search warrant. And we're still going to go about our protocol here." And that's it. I mean we were hoping that we could talk, and figure this out, and figure out ... exactly what was going on, meaning interview Mr. Fautz. But that point passed once Mr. Fautz requested an attorney....
....
Q       But when Mr. Fautz said, "I want my attorney," or whatever words he used, that request was not afforded to him while he was in the apartment, is that correct?
A       I don't understand how -- am I supposed to dial the phone number for him?
Q       No.
....
THE COURT: Could he have -- called an attorney?
THE WITNESS: Absolutely.
Q       Absolutely what?
A       He could have called an attorney.... He could have called anybody.
....
Q       Well, did he make the call -- then to his lawyer -- or a lawyer?
....
A       To my knowledge, no.
....
Q       Did he have a cell phone there?
A       I don't know.
Q       Did he have a house phone?
A       I'd have to assume he did.
Q       You don't recall?
A       I don't recall.
Q       And you're telling me that he was not under arrest, that your testimony, at that point or --
A       He's not under arrest at that point.

(Dkt. 31 at 31-37.)

have any here, please let us know." Mr. Fautz answered that question by saying no, there was nothing; there wouldn't be any guns in there. (Dkt. 19 at 44, 134-135.) This part of the conversation occurred before Mr. Fautz invoked his right to counsel, during that initial exchange. (Id. at 43-44, 101-102, 111.) Agent Hatcher testified that he asked that question based upon his training and experience, "especially when you know or you get some information beforehand, the person has had weapons or has possessed weapons in the past. So, it's a normal, rational question that would be asked as soon as you make contact with the subject." (Dkt. 19 at 43.) He said that his purpose in asking that question, during the protective sweep of the apartment, was purely for officer safety, not to elicit any incriminating answers from Mr. Fautz. (Id. at 40-41, 105, 125, 134-140.)

Agent Hatcher testified at length as to his reasons for asking Mr. Fautz, during the initial encounter, about the presence of any guns in the apartment. His testimony on that topic was as follows:

> Q      What was your purpose for asking about guns, period?
>
> A      Our main concern is officer safety, the people in the home aren't hurt. During the search we don't want agents running over any weapons. The main reason that I asked Mr. Fautz [was] because I knew -- I had a suspicion that there was going to be a gun somewhere in the house that was either loaded, unloaded, whatever it may be, that if someone stumbled on it, reached into a drawer, reached into the bottom of a closet, it could go off, it could hurt somebody, whatever the situation may be.
> ....
>         During the normal course of a search they, ... because you conduct your search, it's counter clock[wise] or clockwise and if you come across a gun, somebody stick their hand into places where it could possibly go off, depending on what type of gun it is.

25

The other reason that we obviously ask those questions, is to make sure that if Ray is allowed to move around or, you know, if there's a cooperative agreement, you know, that Ray has been cooperative, the defendant is being cooperative we usually do let him walk around with another agent.  You know, sometimes they cooperate, they point out documents.  You know, it's just sometimes the way it's done.

And so, my concern was that if that situation were to happen, him being allowed to walk around and have accessibility to stuff around the house, it may be an issue....  Doesn't grab a weapon.

(Dkt. 19 at 40-41.)

Agent Hatcher testified, "[t]he questions stopped just after Mr. Fautz requested his attorney."  (Dkt. 19 at 42.)  "At that point, based on my training and experience, once an individual requests an attorney, all questioning stops.  Mr. Fautz kind of walked around the common area a little bit, obviously agitated, upset, you know.  And, so I said there was no, you know, we're not going to talk to you now.  He didn't request an attorney at that point, and that was kind of it and so, I kind of let all the -- the team leader who was on my search warrant one step below me, know he had kind of lawyered up."  (Id. at 35-36.)  Meanwhile, the federal agents were still performing their initial security sweep.  (Id. at 37.)  Mr. Fautz was not under arrest at that time, but he was being watched by Agent Hatcher and one or two of the SERT officers, to prevent him from moving freely around the apartment that was to be searched.  (Id. at 37-39, 94-95, 125.)

According to Agent Hatcher, if Mr. Fautz had wanted to leave at that point, he would have been free to go.  (Dkt. 19 at 37, 101-105.)  On the other hand, Mr. Fautz did not at any time prior to the arrest ask whether he could leave, and there is no evidence that

any of the law enforcement personnel told him that he could do so.  (See, e.g., id. at 105, 128.)  Sergeant Carifi, commander of the SERT team, did testify that until a gun was discovered, Mr. Fautz was not under arrest or handcuffed.  (Dkt. 21 at 125.)  We find that Mr. Fautz was not under formal arrest or handcuffed at that time, although he was being detained by the SERT team as the agents made their initial security sweep of the apartment.

It was just moments later, however (probably seconds later), when Agent Schaeffer brought a holster to Agent Hatcher.  (Dkt. 19 at 39, 100-104.)  In fact, during his security sweep Schaeffer had come across one or more gun holsters in plain view in the closet of the room furnished as an office, and took a holster to Agent Hatcher there in the living room.  (Dkt. 19 at 145-148, 171, 174, 176-178.)  The following testimony of Agent Hatcher describes what happened next:

> A      ....  Schaeffer brought me a holster and so I asked Ray [Fautz] at this point, where are the guns?
>
> Q      Why did you ask that?
>
> A      Because based on training and experience, if there's holsters, there's most likely going to be a gun somewhere.  Once I got the holster from [Agent Schaeffer] and I asked Ray [Fautz] that, Mr. Fautz pointed and said that there was a gun in the black garment bag in his closet.
> ....
> Q      Was a gun found?
> ....
> A      There was a gun found in the black garment bag in the closet.
>
> Q      And was that the location that Mr. Fautz described to you?
>
> A      Yes.
>
> THE COURT:  What closet -- what room is this closet in?
>
> THE WITNESS:  It's his bedroom closet.

27

Q        What happened after this gun was found with respect to Mr. Fautz?

A        Agents said gun, found a gun, and ... I arrested Mr. Fautz.

Q        Why did you arrest him?

A        For being a felon in possession of a handgun.

....

THE COURT:  What did you say when you turned to him?

THE WITNESS:  I said, Mr. Fautz, you're under arrest for being a felon in possession of a handgun, please put your hands behind your back.  He put them behind his back, I put handcuffs on....

....

Q        [D]id you give Miranda rights to Mr. Fautz at this time?

A        I did not.

Q        Did you interrogate him?

A        I did not.

(Dkt. 19 at 39-42; <u>see also</u> <u>id.</u> at 125-127; dkt. 21 at 11-12; dkt. 31 at 24-25.)[17]

_____

[17]  Special Agent Melissa Gibson, who did not recall that the conversation at that point was with Agent Hatcher, did recall that the exchange went as follows:

Q        [A]fter you went to the left [upon entering the apartment after the SERT team and Agent Hatcher], what happened next?

A        So, I started looking through the master bedroom, the closet, basically just kind of looking around to see if I saw any weapons, knives, guns, anything like that.  And then I heard -- and I don't know who said it, but I heard someone say that they had found a holster....  So, at that point, in my mind, I was thinking ... there's probably a gun or guns here.

....

Q        If you could describe what happened.  You were in the master bedroom the last, and then describe, please, the next things that happened....

A        I came back into the living room.  At that point, I knew that there was a holster and so I thought that there was probably a weapon.

28

Agent Hatcher testified that at the moment when he was holding the one holster in his hand and asking Mr. Fautz where were the guns, Hatcher did have reason to believe that there were in fact guns in the apartment.  (Dkt. 19 at 126.)  He did testify, however, that even at that moment, "[i]f he [Mr. Fautz] wanted to get up and walk out, he could." (Id.)  Nor, according to Agent Hatcher, did Mr. Fautz have any obligation to answer his renewed question about the presence of guns when the holsters were found.  (Id. at 126-128.)  On the other hand, Sergeant Carifi, the SERT team commander, testified that while the SERT team was detaining Mr. Fautz during the security sweep, Mr. Fautz was not free to leave the apartment.  (Dkt. 21 at 125.)  That period would include the moment after the holster was found, when Agent Hatcher showed Mr. Fautz a holster and asked him, "Where are the guns?"  We credit the testimony of Sergeant Carifi that although Mr. Fautz was not under arrest at that precise moment, he was still being detained by the SERT officers who were guarding him.  We further find that Mr. Fautz could have

---

Q        Did you find a holster?

A        I did not find a holster, no, but I heard someone say, we found a holster, and at that point I did not -- I don't think I asked, but someone asked, you know, "Is there a gun here?"  Mr. Fautz said, "No," and then he was asked again, you know, there's a holster, are you sure there's not a gun, and he continually said no. And then, after they asked several times, he eventually said, "Yes, there's a gun, it's in my garment bag in the master bedroom."  At that point in time, I went to the master bedroom, looked in the closet.  There were a couple of, like, hanging bags and I felt around the bottom, and on one of them I felt like a bulge and unzipped it a little bit and looked inside and there was a gun.

(Dkt. 21 at 10-12 (bracketed material added); see also id. at 71-74.)

reasonably believed in the circumstances, that from the time that the SERT team entered the apartment and temporarily detained him during their security sweep, he was not free to leave the apartment, although he was not under formal arrest until Agent Hatcher announced that he was under arrest and placed him in handcuffs.

Mr. Fautz was not provided with Miranda warnings at any time, during his initial detention or after his arrest through the time that he was booked after transport to the federal courthouse in Trenton.  (Dkt. 19 at 56, 59-60, 123.)  That was the result of a deliberate decision of the case agent, Special Agent Hatcher, not to administer Miranda warnings.  He stated that consistent with his training and experience, that decision was appropriate because Mr. Fautz had previously asked for an attorney, and Hatcher intended that neither he nor his fellow agents would question the arrestee on any matters relating to the potential charges against him.  (Id. at 56, 123-24, 129, 132-33; dkt. 31 at 11-17, 24-28, 41-47.)  Agent Schaeffer also stated that according to their training, if agents are not looking to question those who are under arrest, the agents do not have to read them their Miranda rights.  (Dkt. 19 at 161-162.)  Agent Hatcher denied that his decision not to administer Miranda warnings, at or after the time of arrest, was because he wanted the arrestee to be verbal and talk.  (See, e.g., dkt. 19 at 129, 131-132.)  We find that uncontroverted testimony to be credible in light of all the facts in evidence.

We find that the police entry into the apartment began at approximately 8:35 a.m., and the arrest occurred at approximately 8:40 a.m.  This is based upon the record of

events leading up to and following the actual arrest.  The post-arrest events are described

below.  The timing analysis is set forth here in the margin.[18]

### D.    EVENTS AT BOTH PREMISES SUBSEQUENT TO THE ARREST

Agent Hatcher had the opportunity to observe Mr. Fautz frequently but not

continuously while in the apartment, both before and after arresting him.  As soon as the

---

[18]  The time estimates of events on the morning of June 26, 2007, based on the testimony and records, are not consistent.  We do, however, find three benchmark notations to be probably accurate.  The Denville Fire and First Aid Department report has handwritten notations of "in service" at 8:49 and "out of service" at 9:50.  (Dkt. 10-2 at 16.)  Ambulance squad member Joseph Giordano testified that those times usually refer to when the ambulance departs and returns to the station, and that it takes about 5 to 7 minutes to make the trip to the address of Mr. Fautz's condo complex.  (Dkt. 21 at 133-134.)  EMT blood pressure readings for Mr. Fautz are recorded at 9:29 and 9:31.  (Dkt. 10-2 at 16.)  The Denville Police Department dispatch report begins at 8:45 with call type: assisting other agencies, and notes that Denville "FAS" (Fire/Ambulance Service, we surmise) was dispatched at 8:50:59.  (Dkt. 10-2 at 13.)  The other notations on that report are inconsistent with this timetable, because they do not show any of the Denville police units arriving at the apartment address until 8:49 (id.), whereas all of the relevant testimony shows the police as being on-site with the agents to provide entry to the building to initiate the search.  (Dkt. 19 at 17-18, 27; dkt. 21 at 128-130.)  We cannot explain that discrepancy, but find the Fire Department timing entries to be more reliable, as corroborated by the corresponding entry in the Police Department report.  Agent Hatcher testified from memory; he took no contemporaneous notes.  (Dkt. 19 at 90-91.)  He estimated that the time between entry into the apartment and leaving it to transport Mr. Fautz was approximately 35-45 minutes.  (Dkt. 19 at 73-74, 86; dkt. 31 at 18-19.)  We think that time estimate is not far off, but is probably slightly short.  Agent Gibson, who took handwritten notes during the transport that included start time and arrival time with odometer readings, showed departure from Denville at 10:08 and arrival in Trenton at 11:35.  (H'g ex. G-6.)  We find that the entry into the apartment occurred at about 8:35; the arrest occurred at about 8:40; the ambulance was sent out at 8:49; and the blood pressure readings were taken as recorded at 9:29 and 9:31.  We find that Agents Hatcher, Schaeffer and Gibson accompanied Mr. Fautz to the transport car, leaving the apartment at about 9:45, to get down to the car and get situated in the car for the ride that started at 10:08.  All of that consumed about one hour actually in the apartment from the time of the arrest, and is consistent with the notations upon which we rely.  These findings are also consistent with Mr. Fautz's first certification, stating that the knock and announce began at his front door at 8:30 a.m. (Dkt. 5-3 at 29; but see dkt. 10-3 at 2 (Fautz second certification), stating the events began there at approximately 8:00 a.m.)

security sweep was completed, during which Mr. Fautz had been arrested, the federal agents began setting up and conducting the warrant search in the apartment, and Agent Hatcher called the Assistant United States Attorney in Trenton to report the arrest. (Dkt. 19 at 36-37, 45-50; dkt. 31 at 19-21, 23-24.) The SERT officers were the ones actually guarding Mr. Fautz during the entire period in the apartment, until Mr. Fautz was escorted from the apartment in handcuffs for transport by the federal agents. (Dkt. 31 at 21.)

The demeanor of Mr. Fautz, as observed by Agent Hatcher in the apartment, was that he was upset and agitated even before the gun was found and he was arrested. (Dkt. 19 at 35-36.) After Mr. Fautz was arrested and handcuffed, according to Hatcher, he remained upset and agitated. (Id. at 89-90, 92; dkt. 31 at 27-28.) "He was constantly talking, constantly, ... he must have said my name about 50 times in the next half an hour, at least.... 'Zach, Zach, Zach, Zach. Take these off, stop, Zach.... Would you do this to your father, Zach, what would you do? Why would you do this? Come on, let me go. Handcuff me in front, my shoulder hurts...' ... constantly chattering throughout the time we were there." (Dkt. 19 at 42.) No physical contact other than handcuffs was used by law enforcement officers on Mr. Fautz at any time before, during or after the arrest. (Id. at 93.)[19]

---

[19] A certification by Mr. Fautz complains that the agents asked him for the combination for the safe installed in his closet, and for the keys to the rented self-storage unit designated in the companion search warrant. He states as follows:

Agent Lobosco came out of my office and asked me "What's the combination for the safe? Give it to me or I will cut it open." I told her I did not know the combination for the safe but that the combination was in my wallet. Other agents got my wallet from my top dresser drawer, brought it to me and I

Hatcher made the decision to summon an EMT to check Mr. Fautz before he was to be transported to the U.S. Marshal in Trenton for booking, a ride of about an hour. (Dkt. 19 at 44-45; dkt. 31 at 21.)  Agent Hatcher saw no medical problem that he could observe, but he did see pill bottles and some other things that made him conclude that he would not feel comfortable having Mr. Fautz leave the house without being seen by an EMT.  Hatcher did this out of concern for potential liability.  (Dkt. 19 at 44-45, 55, 86-87; dkt. 31 at 21-22, 29-30.)[20]

_____

> told them where the combination was for the safe.  Agent Lobosco had keys in her hand which [had] been on my bedroom dresser.  She indicated that she needed the keys for the storage facility and I told her which keys were for the storage area.  She took the two keys for the storage area and left my apartment within approximately the first fifteen minutes with agents and another video camera.

(Dkt. 10-3 at 4, ¶ 11.)

The government has raised no factual dispute on this point.  (See dkt. 19 at 71-77; dkt. 21 at 94-96, 101-102.)  Those questions were appropriate for agents to ask the resident during search warrant execution, to try to avoid unnecessarily damaging his personal property.  See Michigan v. Summers, 452 U.S. 692, 702-03 (1981), discussed in Section II.B. infra.

[20]  Defendant Fautz also states in his certification:

> I have sinus problems and got congested and could not blow my nose.  On several occasions, agents walked me out on my balcony and allowed me to spit out the mucus which collected in my mouth and throat.  On the third or fourth such occasion, the agent with me said "Spit on the rug.  I don't care.  I don't live here."

(Dkt. 10-3 at 4-5, ¶ 13.)

We accept that defendant did engage in spitting mucus over his balcony one or more times while guarded by officers (see, e.g., dkt. 19 at 92-93), but we reject the unsupported characterization of it in defendant's post-hearing brief, where counsel asserts that defendant was "vomiting over the balcony."  (Dkt. 35 at 6.)  We do not find that this episode has constitutional significance in the totality of the circumstances.  See Section II.E. infra.

33

Denville ambulance officer Joseph Giordano testified about the EMT session with Mr. Fautz.  The timing of that session is described <u>supra</u> n.18.  It was after the arrest and before Mr. Fautz was removed from the apartment for transport to Trenton.  Officer Giordano, testifying from memory and from the contemporary ambulance report, confirmed the report summary as follows:

> Mr. Fautz was the subject of an arrest by federal agents.  Prior to the agents transporting their prisoner to Trenton, the agents requested Denville FAS to check on the condition of the patient.  The patient showed signs of anxiety but no signs/symptoms of any medical issues.

(Dkt. 10-2 at 16-17 [same as h'g ex. D-3]; dkt. 21 at 136-147.)  No medical treatment was administered to Mr. Fautz by the ambulance squad, nor were they authorized to treat a patient.  (Dkt. 21 at 135-137.)  The EMT officers did offer Mr. Fautz the opportunity to go to the hospital, and when he refused he was asked to sign the refusal line on the report, for the protection of the ambulance service.  Mr. Fautz signed it with a squiggle while still handcuffed behind his back.  (Dkt. 21 at 136, 147-149; dkt. 10-2 at 17.)

*          *          *

While these post-arrest events involving Mr. Fautz were happening in the apartment, the members of the search team continued moving their equipment in and commenced their methodical warrant search.  (Dkt. 19 at 36-37, 45-47, 99; dkt. 31 at 49-51, 55-56.)  The equipment included a digital micro-cassette video camera, a still photo camera, labels, boxes and inventory forms.  (Dkt. 19 at 36-37, 61; dkt. 31 at 51; <u>see</u> h'g ex. G-3 (video); h'g ex. G-4, G-5 (photos); dkt. 5-4 at 2-17 (inventory forms).)  The

agents put labels in the various rooms, thereby identifying each room for purposes of photographing the contents and inventorying items seized.  (Dkt. 19 at 54.)  For example, Mr. Fautz's bedroom was Room B, the kitchen was Room C, and the room furnished with office equipment was Room G.  (See h'g ex. G-3; dkt. 5-4 at 4-17.)  Agent Hatcher said that at this warrant search and every other one he ever attended, the search was "always done in an orderly fashion because we can't afford to go into a facility and not be able to identify the evidence."  (Dkt. 19 at 45-46.)  Agent Schaeffer testified to the same effect.  (Id. at 155.)

Agent Hatcher testified that in his organization, the standard procedure for videotaping at a search warrant execution was to do a video of the premises pre-search and post-search.  (Dkt. 19 at 36, 48-49; see also id. at 155-156, 178-179 (Schaeffer testimony).)  The procedure was to document the appearance of the area before the agents disturbed it by searching, and at the conclusion of the search.  Hatcher explained:  "That's done for liability purposes, ... to verify we were there, to verify what we saw at the time, verify the rooms that were there, there was no damage to anything, and that was the reason why we do it."  (Id. at 46; see also id. at 179.)  Normally, as in this case, according to Hatcher, the pre-search videotaping begins once the occupants have been removed from the area to be searched, and does not include the initial entry of law enforcement into the premises to execute the warrant.  (Id. at 46-49; see also dkt. 31 at 56-59 (Agent Linn testimony).)

The video and still photographs taken in the apartment include photos of the .22 caliber Smith and Wesson handgun referred to above (which is the firearm charged in the indictment), before it was removed from the hanging garment bag in the closet in Mr. Fautz's bedroom.  (Dkt. 19 at 52-53, 151-153, 173; h'g ex. 3, 4 and 5.)  The video and photos in the apartment began by documenting that scene, before the gun (which was loaded with four bullets) was removed and rendered safe by Agent Schaeffer, and before the comprehensive search of the apartment commenced.  (Dkt. 19 at 53, 148-153, 170-171; dkt. 31 at 56; h'g ex. G-1, 2.)

Agent Schaeffer had 15 years of experience as a DCIS agent and had participated in over 100 warrant searches.  (Dkt. 19 at 142-143.)  He testified that following their routine procedures for looking for the business-related items specified in the warrant, the DCIS agents would have searched the place where that handgun was found.  (Dkt. 19 at 153-154.)  We find that testimony to be credible.  He explained:

> Q      Following your routine procedures with DCIS, would your search of the defendant's residence for the documents and other financials and things that you mentioned, would that have brought you to the closet in the main bedroom?
>
> A      Yes, it would have.
>
> Q      Why?
>
> A      As past experience shows, that we find documents almost anywhere, within a residence location.  We've been on a number of search warrants where people place documents inside bags, coats.  Even components, or items that we're looking for.  The way I've been trained is to search everything and leave nothing unturned.

(Dkt. 19 at 153-154, 167-168; see also dkt. 21 at 15-17 (Gibson testimony).)

36

Agents conducting that search found a second handgun in the dresser drawer in

Mr. Fautz's bedroom.  (Dkt. 19 at 171-172 .)  It is described in the inventory form as a

Baby Hammerless, Ejector Model .22 caliber.  (Dkt. 5-4 at 6.)  That firearm is not

charged in the indictment.  (Dkt. 1.)  The empty holster or holsters that were found upon

initial entry did not fit either of the two .22 caliber guns found in the apartment; but the

.22 caliber Smith and Wesson gun that is the subject of the indictment was in its own

holster inside the garment bag when it was initially discovered.  (Dkt. 19 at 172; dkt. 21 at

14-15; h'g ex. G-5 (photo).)

Other items seized in the search of the apartment included RFQ's and purchase

orders (including some on top of a document shredder machine), emails, Certificates of

Conformance, packing slips, miscellaneous parts and drawings, electronics catalogues,

financial records, mailing supplies, a computer and accessories, and a fax machine with

faxes coming in during the search.  The documents included business records of Mr.

Fautz and TEC, his company.  (Dkt. 5-4 at 4-18.)

The search did progress that same day to the self-storage unit in Montville that was

the subject of the companion search warrant.  The DCIS agents who conducted that

portion of the search were Special Agents Angela Lobosco and Gordon Guestella,

accompanied by two NCIS agents.  (Dkt. 21 at 95-96.)[21]  Mr. Fautz was transported

---

[21] DCIS agents Lobosco and Guestella worked in the DCIS office in Melville, New York,
which is on Long Island.  (Dkt. 21 at 80, 95.)  They were assigned to assist at the execution of the
search warrants in this case.  (Id. at 77.)  Agent Lobosco testified that she participated by
telephone in the briefing by Agent Hatcher the day before the search, and that was when she first

directly from his apartment to the U.S. Marshal in Trenton by DCIS Special Agents Hatcher, Schaeffer and Gibson.  Those agents did not attend the portion of the search that took place at the storage unit.  (Dkt. 19 at 65.)  The storage unit search was completed, and materials were seized and inventoried.  (Dkt. 21 at 103; dkt. 5-4 at 2-3.)  There were no weapons or ammunition at that location.  (Dkt. 19 at 83-84.)

### E.    EVENTS DURING POST-ARREST TRANSPORT OF DEFENDANT

Mr. Fautz was seen by the EMT as described above, and after a brief additional period elapsed (see n.18 supra), he was escorted outside to Agent Hatcher's government vehicle and was transported in handcuffs to Trenton.  Hatcher was the driver, accompanied by Special Agent Melissa Gibson (front seat passenger), and Special Agent James Schaeffer (occupying rear seat with Mr. Fautz).  (Dkt. 19 at 45, 55-57, 157-156; dkt. 21 at 17-18; dkt. 31 at 9-11, 30.)

Mr. Fautz did ask the agents to remove the handcuffs for the ride, indicating that his shoulder hurt.  Agent Hatcher, however, followed agency protocol to handcuff in the

---

became aware of this investigation of Mr. Fautz led by Agent Hatcher.  (Id. at 86-87.)  She had previously interviewed Mr. Fautz as a witness (not a subject) in an earlier, separate investigation of an unrelated company in New York, and in that connection had some written communications with Mr. Fusco representing Mr. Fautz or his then-company.  (Id. at 77-86; h'g ex. D-1, D-2, D-6.)  She stated that other than what she was told about Hatcher's investigation at the pre-search briefing, she knew nothing about his case.  (Dkt. 21 at 86-90.)  She was assigned to take charge of executing the warrant for the storage facility.  (Id. at 90.)  On the day of the search, she entered the apartment after the first wave of DCIS agents entered.  After a few minutes she left with the keys to the storage facility and went there to conduct that search.  (Id. at 91-95.)  Agent Hatcher testified that Agent Lobosco and her colleague from the Long Island office were sent to assist in this search when Hatcher requested that his supervisor ask other supervisors in the region for assistance, because the New Jersey office was small.  Hatcher did not know how those two agents came to be assigned to this detail by the supervisors.  (Dkt. 19 at 69-71.)  We find this testimony by Agents Hatcher and Lobosco to be credible, and that there is no record evidence to the contrary.

back when transporting people.  (Dkt. 19 at 56-57, 93, 158; dkt. 21 at 18-19.)  Hatcher also decided not to remove the cuffs during that transport, based upon his training and experience.  (Dkt. 19 at 56-57.)  Agent Schaeffer, who was in the back seat concentrating on Mr. Fautz's physical behavior, testified that he also concluded that it was appropriate to follow protocol and have the handcuff position in the back.  (Dkt. 19 at 158-59.)

Agent Hatcher testified that by the time Mr. Fautz was placed in the car, he was more relaxed and was no longer so visibly excited or upset, but he did keep asking questions and continued to be very verbal, making statements such as, "Take me out of these cuffs....  What am I, Osama bin Laden?"  (Dkt. 31 at 30-31.)  Agent Hatcher said that type of "banter" from Mr. Fautz continued in the car, very similar during the ride as in the apartment after the arrest.  (Id. at 31; dkt. 19 at 56; see also dkt. 21 at 18 (Gibson testimony).)

At one point during the car ride, Agent Schaeffer used his cell phone and, at Mr. Fautz's request, dialed on it the number Mr. Fautz gave for his attorney.  (Dkt. 19 at 56, 158-159; dkt. 21 at 19.)  Agent Schaeffer held the phone up to Mr. Fautz's ear for that conversation.  (Dkt. 19 at 159.)  In that setting, it was impossible for Mr. Fautz to have a confidential conversation with his attorney.  (Dkt. 21 at 43-44.)

Mr. Fautz states in a certification that approximately 15 minutes into the car transport, the male agent in the back seat opened his phone and dialed defendant's attorney, Mr. Fusco.  He states:  "Mr. Fusco asked me what they were arresting me for,

39

and I said I had a gun I forgot about." (Dkt. 10-3 at 6-7.) That statement is consistent with the contemporaneous notes of Agent Gibson, described below. (H'g ex. G-6.) It is uncontroverted that this conversation between Mr. Fautz and Mr. Fusco was the first communication the two of them had that day.

Mr. Fautz also states in his certification that starting within five minutes of the officers' entry into his apartment, he had asked repeatedly to be allowed to speak to his attorney, including approximately 15 minutes before the ambulance squad came, but he was not allowed to do so during the entire time in the apartment. (Dkt. 10-3 at 4-6.) We do know that there was a functioning telephone line in the apartment, because it was receiving faxes during the warrant search. (Dkt. 5-4 at 11.) It is also undisputed that no call was made by Mr. Fautz to any attorney during the sequence of events in the apartment, even though he invoked his right to counsel in his initial conversation with Agent Hatcher. See n.16 supra and accompanying text.

We can make no finding as to whether Mr. Fautz was actively prevented from calling his attorney while in his home, or whether he could have reasonably believed that he was not being allowed to access a telephone, either while he was being detained initially by the SERT team, or while he was held under arrest in the apartment. Mr. Fautz did not testify. We have not been able to find that his certifications contain completely accurate information. See, e.g., n.15 supra and accompanying text. Agent Hatcher indicated that Mr. Fautz did not ask Hatcher for access to use a telephone. See n.16 supra. Moreover, it

is undisputed that the officers guarding Mr. Fautz in the apartment did allow him to move at least to the balcony at his request, one or more times.  See n.20 supra.  No witness testified that they heard him request to use a telephone in the apartment.

Agent Hatcher recalled that on at least two occasions during the car ride, as Mr. Fautz kept vocalizing to the agents, Hatcher reminded Mr. Fautz that he was in custody and had requested his attorney, and the agents could not talk with him about the case during the ride.  (Dkt. 19 at 56-58, 132-133.)  According to Agent Hatcher, despite those admonitions Mr. Fautz continued to talk spontaneously, both before and after speaking by phone with his attorney.  Agent Hatcher said that the spontaneous statements made by Mr. Fautz in the car were not in response to any questions or statements by the agents.  (Id. at 56-58.)  The other two agents who were in the car have corroborated that testimony by Agent Hatcher, and there is no evidence to the contrary.  (Dkt. 19 at 158-162; dkt. 21 at 19, 25.)

Agent Gibson testified that Mr. Fautz made many statements during the car transport, and not in response to any questioning by the agents.  (Dkt. 21 at 19-20, 23-25.)[22] Agent Gibson wrote down some of those statements, because she had a note pad out for making notations of time and mileage of the trip, per her custom and training.  She stated:

---

[22]  Agent Gibson did say it was possible that someone asked Mr. Fautz some biographical identifying information such as name and date of birth, because agents need to gather that kind of information before they take an arrestee to the U.S. Marshal's office.  She did not recall anyone doing that in this case, but it was possible that was done, because it is normally done.  (Dkt. 21 at 19.)  See n.25 infra.

"Once I wrote down just the initial notes on the mileage, time, and date, he just kept talking.  Mr. Fautz just kept talking and making statements in the car.  Since I had the paper out, I thought, well, let me record some of these statements, so I took notes."  (Id. at 23.)

A copy of Agent Gibson's handwritten notes, on one lined sheet of paper, is in evidence as hearing exhibit G-6.  (Id. at 20-26, 38-46.)[23]  A number of statements by Mr. Fautz, and some by Agent James Schaeffer, were written down by Agent Gibson on that paper, in chronological order as they occurred.  (Id. at 45-46.)  Here we quote verbatim from Gibson's notes:

"I never sold to gov't"

"I sold to distributors"

"I'm not a felon"

10:17 a.m.:  Jim called Atty Fosco -- going to Trenton --

the only reason they're

arresting me is b/c

---

[23]  Defendant challenges the credibility of Agent Gibson's testimony that she made those notes contemporaneously while riding in the transport car.  He contends that it was a "physical impossibility" to make such neat handwritten notes on lined paper, while riding in a moving vehicle.  (Dkt. 35 at 8-9.)  Agent Gibson was confronted about that on cross-examination, and she responded, "I'm telling you that I wrote these notes during the transport as this happened.  That's what I'm telling you."  (Dkt. 21 at 39.)  We have carefully examined the sheet of notes itself and her accompanying testimony, and we find Agent Gibson to be entirely credible on that point.  (See id. at 20-26, 38-46; h'g ex. G-6.)

I had a gun in my home.[24]

Jim -- told atty -- in felony possession

of a firearm

-- taking him to federal courthouse

in Trenton -- AUSA Peter Katz

"I wish I would have never kept that gun"

"that was stupid"

"I hope I didn't get drag into that kid's crap in LI"

"I should have never pleaded guilty"

"Whatever they ask for, I sell them"

"Whatever they tell me to mark it, I mark it"

"I just wish I would have never saved that gun"

(H'g ex. G-6.)[25]

---

[24]  Agent Gibson testified that this sentence, although not in quotation marks in the notes, is a verbatim quote of a statement made by Mr. Fautz to his attorney during the cell phone call in the car.  (Dkt. 21 at 25-26.)

[25]  The other notations on Agent Gibson's note sheet are:  "open heart surgery 1979" and "meds for:  Zocor = cholesterol [space] Ecotine = blood thinner".  Agent Gibson testified:

> [L]ooking at my notes, it's possible that I asked him what Zocor and Ecotrin were for, because he said, "I take Zocor.  I take Ecotrin," just because I don't know what those -- I have it written in my notes that Zocor equals cholesterol, Ecotrin equals blood thinner.  So, I might have said, what are these drugs for because I don't know and I have written it down so.

(Dkt. 21 at 25.)

We do find that the statements of Mr. Fautz quoted above, made by him during the car transport while under arrest, were made spontaneously by him.  We further find that based upon the record, the agents did not make any comments or ask him any questions, or otherwise engage in any behavior during the ride that would have elicited those statements.  (See, e.g., dkt. 19 at 129-132, dkt. 21 at 27-37.)  To the contrary, Agent Hatcher reminded Mr. Fautz repeatedly that he was under arrest and had invoked his right to counsel, and at that point they could not discuss anything about the case with him.[26]

_____

[26]  Agent Hatcher testified on direct regarding his cautionary statements to Mr. Fautz during the transport ride:

Q    Were the remarks that Mr. Fautz made in response to any questions on the part of law enforcement?
A    Absolutely not....  I recall specifically telling Ray that he's asked for an attorney, and the opportunity to speak with us was at the house and we had offered him that opportunity to clear this whole situation up and kind of be forthright with us about what was going on....  I told Ray on a few occasions in the vehicle, that he had requested his attorney, that, you know, we cannot ask him any questions.  He continued to talk.  I mean, it was truly spontaneous....  I remember specifically twice .... telling him that he had requested an attorney and that we can't talk to you....

(Dkt. 19 at 57-58.)  Agent Hatcher likewise testified on redirect:

Q    [W]hat is it that you said to Mr. Fautz?
A    On at least two occasions I told him that he had requested his attorney, we can't talk to him about the case and something beyond that, you know, once we get to court, if you and the attorney want to sit down, there'll be time to sit down after that, but your opportunity to talk to us was passed up as soon as we first went into the house and I spoke to him and he asked for an attorney.
Q    So, you did, in fact, have a chance to reinforce to him that he should not be talking to you or making statements?
A    Right.

(Id. at 132-33.)  Agents Gibson and Schaeffer also testified that Agent Hatcher said that to Mr. Fautz during the transport ride.  (Dkt. 19 at 45-46; dkt. 21 at 15.)

## F.    INDICTMENT AND PROSECUTION

A grand jury returned the indictment in this case on May 14, 2008, approximately

one year after the search warrants were executed on June 26, 2007.  (Dkt. 1.)  The DoD

procurement fraud investigation that was the subject of the search warrants in this case

was still an open investigation when Agent Hatcher testified in the grand jury on May 14,

2008, and it was still an open investigation when he testified at the suppression hearing

on June 30, 2009.  (Dkt. 19 at 135.)  The record does not reflect that any criminal

complaint or indictment charging Mr. Fautz with DoD procurement fraud has resulted

from that investigation.  This prosecution has been litigated vigorously by the parties

since it was filed.  See n.28 infra and accompanying text.

## II.    CONCLUSIONS OF LAW

This Court has jurisdiction pursuant to 18 U.S.C. § 3231.  Our conclusions of law

are set forth below.  To the extent that this portion of the memorandum opinion contains

findings of fact in addition to those expressed above, they shall be deemed to be part of

the findings of fact.[27]

### A.    FOURTH AMENDMENT:  THE SEARCH WARRANTS

We must begin this discussion by outlining the issues raised on the topic of the

search warrants themselves.  Defendant argued, in the brief originally filed with his

suppression motion, that the search warrants issued in this case were "illegal general

---

[27]  The "Conclusions of Law" sections of this opinion generally do not contain citations to
the record except after quoted language.  The record citations are set forth in the "Findings of
Fact" sections supra.

warrants," and were therefore unreasonable under the Fourth Amendment.  (Dkt. 5-1 at

5.)  That brief also asserted that the warrants "were executed in a manner that was general

and unreasonable."  (Id.)  The relief sought, as expressed in that brief, was as follows:

"Based on the foregoing and based upon evidence that will be adduced at an evidentiary

hearing, defendant moves for suppression of all evidence seized during the execution of

the search warrants."  (Id.)

　　　　Defendant further argued, in a supplemental brief filed before any hearing was

ordered by this Court, as follows:

> On June 7, 2007, more than two weeks before the execution of the
> search warrants in this matter, the Government had information in its
> possession, custody and control that Raymond Fautz had purchased twelve
> handguns with serial numbers starting in 1979.  (Ex. H.)
>
> On June 20, 2007, ... Hatcher filed an application for a search
> warrant of the combined residence and home office of Raymond Fautz and
> a storage facility used by Mr. Fautz.  (Ex. A).  The affidavit referred to Mr.
> Fautz's prior conviction from 1996 for a non-violent offense.  Id. Sec. K.  It
> made no mention of the actuality or possibility that Mr. Fautz had weapons
> in his home.

(Dkt. 10-1 at 3.)

　　　　That supplemental brief concluded as follows:

> Magistrate Hughes was never advised that the Government suspected
> that they would find guns on the premises.  It is unknown who made the
> decision to use SWAT teams to execute the search warrants, and the basis
> for the decision.
>
> All in all, the defense will contend that the Government's conduct
> was outrageous.  At the very least, a factual dispute has been raised which
> warrants that the Court hold a hearing as to whether or not the search was
> reasonable and was executed in a reasonable manner.

(Id. at 8.)

Oral argument on the motion was conducted on February 26, 2009.  Defense counsel argued with respect to the warrants that they were general and overbroad, and resulted in exploratory rummaging through the home.  (Dkt. 34 at 3-10, 19-20.)  Upon direct inquiry from the Court, defense counsel stated that defendant also contended that although discovery was not complete so their evaluation was continuing, defendant at that time was also contending that the warrants were not based upon probable cause because the company that was being investigated for defense procurement fraud was not Mr. Fautz's company [TEC], but rather the government contractor company itself [ECI], so any alleged fraudulent statements were not made by Mr. Fautz.  (Id. at 11-12.)  The government responded to all of those asserted grounds regarding the warrants at oral argument that day.  (Id. at 12-19.)

This Court made an oral ruling, at the close of oral argument that day, that the warrants were valid and supported by probable cause.  (Id. at 20-23.)  Nothing we have seen during the subsequent litigation of this case has changed our view on that issue, and we will reiterate that ruling in this section.

When we had finished rendering that oral ruling, we directed the parties to complete their discovery and provide supplemental briefing concerning the events during the search warrant execution itself.  This was ordered so that the Court could determine whether an evidentiary hearing was necessary about those events.  (Id. at 23-30.)

Ultimately we did grant defendant's request for an evidentiary hearing.  The hearing began on June 30, 2009 (dkt. 19), continued with additional testimony on August

47

19, 2009 (dkt. 21) and April 30, 2010 (dkt. 31), then was the subject of additional briefing (dkt. 35, 36), and culminated in oral argument on March 18, 2011.  (Dkt. 39.)[28]

We stated at the outset of the evidentiary hearing that the scope of the hearing would be limited to certain specified topics, and the parties indicated that was their understanding as well:

> [A]s I see it, please correct me if I'm wrong, the evidentiary hearing is to get the chronology of events on the day of the search warrant execution. Everything that everybody can remember that would have any significance to the seizure of the weapons.  I know that two weapons were seized even though only one is in the indictment.  And the statements by the defendant. He made some statements while in his home and then he made some statements later, while in the patrol car being transported to processing.
>
> And, I think that the legal issues pertain to the reasonableness of the execution of the search warrant for Fourth Amendment purposes, and Fifth Amendment issues concerning the statements made by Mr. Fautz, whether arising under the Fifth Amendment itself for voluntariness or as potential violations of Miranda.  Is that an accurate summary of our agenda today, as you understand it?
>
> [Gov.]:  Yes, it is.
>
> [Def. counsel]:  Your Honor, it is.  And I want to preface my remarks by saying, those are the issues.

(Dkt. 19 at 4-5.)

Defense counsel has purported to raise a <u>Franks</u> issue after the evidentiary hearing, whereas <u>Franks</u> was never cited or invoked in defendant's pre-hearing motion papers and briefs.  Here is how defendant's post-hearing brief introduces that topic:

---

[28]  The parties have stipulated that there is no Speedy Trial Act problem to date in this case.  (Dkt. 38.)  The delays in completing the motion practice were caused by unavailability of witnesses and counsel at various times, and the fairly extensive record and briefing.

48

We chose to brief the Franks issue as a courtesy to the Court and to our opposing counsel.  However, we will gladly file and argue the motion at the convenience of the Court.  In the motion we intend to present the same legal argument as follows.  [Arguing Franks issue, discussed infra.]

(Dkt. 35 at 47, citing Franks v. Delaware, 438 U.S. 154 (1978).)

Needless to say, this Court was surprised to see a Franks issue being raised at the end of all this motion practice, instead of at the beginning as is the usual and proper procedure.[29]  However, since defendant acknowledges in the above-quoted statement that he has in effect obtained the full evidentiary hearing that he would have gotten if he had requested and we had granted a Franks hearing, we will also address the substantive Franks issue he has raised.  The government is not prejudiced, because it responded to the Franks issue in its post-hearing brief.  (Dkt. 36 at 13-17.)

This section of our memorandum opinion deals with the warrants themselves -- the probable cause for issuance of the warrants, the scope of the warrants, and the Franks

_____

[29]  A defendant is entitled to a Franks hearing only if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."  Franks, 438 U.S. at 155-56.  "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained....  [I]f these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.  On the other hand, if the remaining content is insufficient, the defendant ... is entitled to his hearing.  Whether he will prevail at that hearing is, of course, another issue."  Id. at 171-72.  Defendant in this case never requested a Franks hearing, so this Court had no opportunity to pass upon whether he had made the required threshold showing to be entitled to such a hearing.  If we had, based upon what we now see as defendant's arguments under Franks, we would not have granted such a request.  We would still have conducted the evidentiary hearing on the issues that we specified at the outset of the hearing, and upon which we are making factual findings in this opinion.

issue as now expressed by defendant.  In the next two sections we discuss the Fourth

Amendment issues involving the execution of the search warrants.  We reach the Fifth

Amendment issues in the following two sections of the opinion, and address the

"inevitable discovery" issue at the end.

*          *          *

The Fourth Amendment provides that "no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be

searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Probable cause

is established if there is a fair probability that contraband or evidence of a crime will be

found in a particular place.  Illinois v. Gates, 462 U.S. 213, 235 (1983).

Our Court of Appeals has recently summarized the principles applicable in

reviewing a magistrate judge's probable cause determination, in United States v. Stearn,

597 F.3d 540 (3d Cir. 2010).  There the Court stated:

> Probable cause is a "fluid concept" that "turn[s] on the assessment of
> probabilities in particular factual contexts."  [Citing Gates]  Id. at 232 ....
> When presented with an application for a search warrant, the magistrate
> must "make a practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit ... there is a fair probability that
> contraband or evidence of a crime will be found in a particular place."  Id.
> at 238 ....  Probable cause can be, and often is, inferred from "the type of
> crime, the nature of the items sought, the suspect's opportunity for
> concealment and normal inferences about where a criminal might hide
> [evidence]."  Jones, 994 F.2d at 1056 (citation and quotation omitted).
> Because probable cause is a "practical, nontechnical conception," we are
> concerned with "the factual and practical considerations of everyday life on
> which reasonable and prudent men, not legal technicians, act."  Gates, 462
> U.S. at 231 ... (citation and quotation omitted).

Id. at 554.

50

> The role of a reviewing court is not to determine probable cause <u>de novo</u>, but to determine whether "the magistrate had a substantial basis for concluding that probable cause existed." <u>Id.</u> at 238 ... (citation and quotation omitted).

<u>Id.</u>

The reviewing court must give "great deference" to the probable cause determination of the magistrate judge. <u>United States v. Hodge</u>, 246 F.3d 301, 305 (3d Cir. 2001) ("The Court need not determine whether probable cause actually existed, but only whether there was a substantial basis for finding probable cause. (quotations omitted). The inquiry is limited to the facts that were before the issuing judge, and 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" <u>Id.</u> (quotation omitted)). When reviewing for probable cause, the court must look to the four corners of the affidavit and warrant. <u>United States v. Jones</u>, 994 F.2d 1051, 1055 (3d Cir. 1993).

The Fourth Amendment requires all warrants to "particularly describ[e]" the place to be searched and the ... things to be seized." U.S. Const. amend. IV. Thus, the particularity requirement prohibits general warrants. "General warrants violate the Fourth Amendment because they essentially authorize 'a general exploratory rummaging in a person's belongings.'" <u>United States v. Yusuf</u>, 461 F.3d 374, 393 (3d Cir. 2006), quoting <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 467 (1971). "When a warrant is accompanied by an affidavit that is incorporated by reference, the affidavit may be used in construing the scope of the warrant." <u>United States v. Johnson</u>, 690 F.2d 60, 64 (3d

51

Cir. 1982) (citations omitted); accord Groh v. Ramirez, 540 U.S. 551, 557-58 (2004).

Likewise, the Fourth Amendment prohibits an overly broad warrant, which is one that

"'describe[s] in both specific and inclusive general terms what is to be seized,' but

'authorizes the seizure of items as to which there is no probable cause.'"  Yusuf, 461 F.3d

at 393 n.19 (citation and quotation omitted).

We have held, in an oral opinion applying the above legal principles, that the

affidavit submitted in support of the warrants issued by Magistrate Judge Hughes provided

that highly experienced judicial officer with a substantial basis for finding probable cause.

We have also examined the form of the warrants for lack of particularity and for

overbreadth, and found the warrants sufficiently particular and limited to the probable

cause showing to satisfy the Fourth Amendment standard.  (Dkt. 34 at 20-23.)  Here is our

reasoning, as expressed at that time, which we expressly adopt and reissue now:

> This is a 22-page, single-spaced probable cause affidavit that details an extremely thorough criminal investigation into suspected defense procurement fraud and related false statements and false claims.  The primary target of the investigation is the defendant contractor, which is a company that goes by the initials ECI, Electronic Connections, Inc., and the supplier to that contractor is alleged to be Mr. Fautz's company, and Mr. Fautz personally, his company going by the name of Transistor and Electronic Components, Inc.

> Here I incorporate by reference the contents of this affidavit as well as the arguments of the government here at oral argument.  And I have personally reviewed carefully the content of this affidavit and I find that it is thoroughly supportive of the Magistrate Judge's decision here to authorize the requested two search warrants, one search warrant for the storage facility, and the other for the home office of the defendant.  There was probable cause for this search warrant, I find.

The second allegation in defendant's motion ... under the Fourth Amendment here is that the search warrant itself is either a general search warrant, or an impermissibly overbroad search warrant based upon the probable cause that was shown.  This argument also the Court rejects on the merits.

We have reviewed the itemization of materials that are authorized by the warrant to be seized....  [T]hat authorization, we find, is properly within the scope of the alleged crimes being investigated and the factual parameters of what the investigation to date had developed in the way of evidence and need for additional evidence.

The specification in the warrants is identical in both warrants and is found on one page.  It is to the point and it specifies the location of the place to be searched on the prior page.  It specifies three suspected crimes that are under investigation; namely, false statements, false claims, and wire fraud.  The underlying affidavit specifies this to be defense procurement wire fraud.  It states that, "Records in whatever form they are kept, electronically or otherwise, specifically described here, for the period from January 1, 1999 to the present, shall be searched for and seized."

The benchmark date of January 1, 1999, as established in the affidavit, is the date on or about when the contractor, ECI, began obtaining defense procurement contracts.  The affidavit sets forth transactions between TEC, Mr. Fautz's company, and ECI from approximately 2001 forward, but there is certainly a sufficient basis in this affidavit for the investigators to be searching for a link back in time prior to 2001, in the January 1, 1999 time period, to see whether there were such supply transactions going on at that time as well.

The specification of items to be searched for and seized are materials that are specifically identified in the supporting affidavit as materials that would be evidence of transactions between ECI and Mr. Fautz and his company that fall within the scope of the investigation.  Some of those would be financial records, yes, but they would be financial records showing the financial results of ... orders and sales.  Others would be the contract and the purchase order files themselves, bills of lading, shipping orders, notes and invoices, the parts themselves, or evidence of similar parts that had been sold previously, and instruments used to modify, alter, or re-brand items.  This falls squarely within the assertions within the search warrant.  And also supplier and vendor invoices and any ... Department of Defense materials, Certificates

of Conformance or inspection reports, checks, and purchase items for obtaining those parts.

I see nothing general or overbroad so as to render this search warrant constitutionally defective. This is in contrast to the search warrant that was at issue in the Eastern District of Pennsylvania, Fleet Management Ltd. case cited by the defendant, found at 521 Fed.Supp.2d 436. In that case, the court pointed out that the overbroad parts included that the warrant authorized search and seizure of any and all data from three seized computers, and then gave including, but not limited to, targeted types of data. It also failed to specify any alleged federal crimes that were being investigated, with specificity. It gave the nature of the wrongs, but no citations to alleged federal crimes. [W]e have all of those features satisfied in the warrant that was issued here.

(Id. at 20-23.)[30]

This brings us to defendant's post-hearing assertion that evidence seized pursuant to the warrants must be suppressed on Franks grounds. The Supreme Court stated in

---

[30] Defendant also argued, without analysis, that "the problem [with the search warrants] was exacerbated by the fact that they were searching not only a place of business, but a personal residence of an individual." (Dkt. 5-1 at 5.) We rejected that argument as undeserving of comment at the time, and hereby adopt the government's briefing argument, which we find to be a correct statement of the relevant facts and law, as follows:

"[T]o find probable cause to search, there needs to be a fair probability that contraband or evidence of a crime will be found in a particular place." U.S. v. Burton, 288 F.3d 91, 103 (3d Cir. 2002) (quoting Gates, 462 U.S. at 238). As the Third Circuit has held, this inquiry focuses on the relation of criminal conduct to a particular location, not on the activities of any particular person. Burton, at 103 (citing United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993)). Agent Hatcher's affidavit is replete with references to the business operations of TEC and the location of those operations, both [the residence and the storage unit]. Moreover, the telephone line that the defendant uses to conduct business (and the telephone line on which the consensually monitored conversations were conducted) is physically located at [the residence]. The fact that the defendant resides and conducts business in the same location does not alter the Court's probable cause analysis. Magistrate Judge Hughes determined that there was a "fair probability" that evidence of a crime would be found at the two subject locations. See Burton, at 103.

(Dkt. 6 at 10-11, bracketed material added.)

54

Franks that "there is, of course, a presumption of validity with respect to the affidavit

supporting the search warrant."  438 U.S. at 154.  It held that the presumption of validity

may be overcome in the following carefully defined circumstances:

> [W]e hold that, where the defendant makes a substantial preliminary
> showing that a false statement knowingly and intentionally, or with reckless
> disregard for the truth, was included by the affiant in the warrant affidavit,
> and if the allegedly false statement is necessary to the finding of probable
> cause, the Fourth Amendment requires that a hearing be held at the
> defendant's request.  In the event that at that hearing the allegation of
> perjury or reckless disregard is established by a preponderance of the
> evidence, and, with the affidavit's false material set to one side, the
> affidavit's remaining content is insufficient to establish probable cause, the
> search warrant must be voided and the fruits of the search excluded to the
> same extent as if probable cause was lacking on the face of the affidavit.

Franks, 438 U.S. at 155-56.

Defendant argues that a Franks violation exists in this case because "the

government intentionally misled Magistrate Judge Hughes in this case when applying for

the search warrant."  (Dkt. 35 at 47.)  This argument, as expressed in his post-hearing

brief, is as follows:

> It is the position of the defense that the search warrants issued for the
> defendant's apartment and storage facility were issued based on a "ruse" by
> the government.  More specifically, the request for seizure by the
> government was totally unnecessary.  The agents merely had to serve a
> subpoena or written request by letter on the defendant and his attorney and
> they would have received everything they asked the court for.  The
> testimony is uncontradicted that defendant and his attorney fully cooperated
> with Agent LoBosco's investigation of Globe Electronics in New York in
> 2005.  The defendant met with agent LoBosco without his attorney in New
> York City.  Furthermore, defendant's attorney also cooperated with agent
> LoBosco and agent Lynn, which is evidenced by the exchange of
> correspondence.  (Ev. Ex. D-1, D-6.)

The defense submits that the government's case against the defendant in Agent Hatcher's investigation of ECI was, to say the least, very weak. The defendant's company, TEC, was doing business with ECI in exactly the same manner as it did with agent LoBosco's investigation of Globe Electronics in New York. Regarding that case, Agent LoBosco testified that defendant was merely a witness. For some reason, the same conduct in New Jersey resulted in search warrants against the defendant's corporation. To this date, neither defendant nor his corporation have been charged criminally in agent Hatcher's investigation.

The defense further argues that the real reason for applying for a search warrant was to conduct a search for guns with the defendant present so he could be charged with the federal crime of possession of a weapon by a convicted felon. The agents and the U.S. Attorney's office realized that the only crime they could make against the defendant was a possible gun case. They knew of the defendant's past conviction and a court order requiring him to dispose of all his weapons. When the government found that, on paper at least, only four of the twelve guns were disposed of, they put the above plan into action.

(Dkt. 35 at 3-4.)

The government intentionally misled Magistrate Judge Hughes in this case when applying for the search warrant, which constitutes a reckless disregard for the truth which should render the warrant invalid under Franks, 438 U.S. 154 (1978)....

The government's filing for the warrant constituted a scheme to retrieve incriminating evidence against the defendant. The defendant in this case has a prior conviction for giving false statements. As a result of this conviction the defendant was required to surrender all guns in his possession. The defendant lawfully owned several guns that would have required forfeiture. Records reflect that defendant only surrendered 4 of the 12 guns he lawfully owned. The government was aware that the defendant did not surrender all of these guns as required. The government was growing increasingly frustrated with its inability to build a case against the defendant's company TEC. It should be noted that the defendant fully and voluntarily cooperated with a similar investigation in New York. Materials were retrieved in that matter via subpoena, which would be the appropriate avenue to retrieve similar materials for TEC. The government only applied

for a search warrant for the documents of TEC because they knew it was operated out of the defendant's residence and they would likely recover a firearm which they could criminally charge the defendant for.

Misrepresenting to Magistrate Hughes what the motivation [was] for the application of warrant certainly constitutes a reckless disregard for the truth, and also renders the warrant prima facie invalid as proscribed by the Fourth Amendment. The Fourth Amendment provides.... A search is rendered reasonable by the lawful application and granting of a search warrant or one of the many exceptions provided for warrantless searches. However, it is impossible for a search to be "reasonable" with regards to the Fourth Amendment if the applicant intentionally misled Magistrate Judge Hughes. A reckless disregard for the truth in the warrant's application must render a warrant unreasonable.

The appropriate remedy for the execution of an invalid search warrant is to suppress the fruits of its execution. In this case, the invalid warrant should result in the suppression of all the evidence (statements and physical evidence) recovered as a fruit of the illegal search.

(Id. at 47-49.)

Defendant thus appears to argue that because the search warrant execution in this case was not followed by an indictment for defense procurement fraud, and because the officers who applied for the search warrants were aware that he was a convicted felon who had previously owned guns and had apparently not surrendered them all, then the application for the warrants without mentioning suspected guns must have been motivated by an intent to misuse the warrants to find guns at his home and prosecute him for that. "The government only applied for a search warrant for the documents of TEC because they knew it was operated out of the defendant's residence and they would likely recover a firearm which they could criminally charge the defendant for." (Id. at 47.)

57

According to defendant's theory, this "ruse" was an intentional misrepresentation or concealment of the government's true motivation and was used to mislead the Magistrate Judge into issuing the warrants.  (Id. at 3-4.)

A defendant challenging the truthfulness of factual statements made in an affidavit of probable cause supporting a search warrant must make a "substantial preliminary showing," just to obtain a hearing.  Franks, 438 U.S. at 171.  We are of the view that on these arguments, defendant has not made the requisite threshold showing that would have entitled him to a Franks hearing.  See n.29 supra.

Even when a defendant obtains a Franks hearing -- or, we surmise, as in this case he argues a Franks claim after a full evidentiary hearing on the circumstances surrounding the issuance and execution of the warrant -- the defendant must meet an exacting standard.  The Third Circuit summarized its interpretation of Franks most recently in Yusuf, as follows:

> At the hearing, the defendant must ultimately prove by a preponderance of the evidence ... :  (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination.

Yusuf, 461 F.3d at 383 (citations omitted).

Addressing the first prong, we see that there may be two alleged misstatements or omissions implicated in defendant's argument here.  First, the hearing record does establish that the affidavit omitted the facts indicating to Agent Hatcher that defendant might

58

possibly have guns in his residence or storage unit.  This omission will be analyzed under the materiality prong, below.  Second, defendant asks this Court to find as a fact that the government's actual motivation in applying for the warrants had nothing to do with its defense procurement investigation but was just to catch defendant with a gun.  We cannot so find, based upon this record.  Agent Hatcher was repeatedly asked that very question during the hearing, and he denied having had any such motivation.  He firmly testified that he obtained these warrants for the purpose of his assigned DCIS defense procurement fraud investigation, and there is absolutely no conflicting evidence in the record.  We find his testimony, in light of all the evidence, to be entirely credible on this point.

This Court declines to infer the fanciful scheme that defendant accuses against these agents, because we do not find it a reasonable inference based on the totality of circumstances reflected in the record.  We would add only that defendant cites no case, and we have found none, where the "factual statement" scrutinized under a Franks analysis was the subjective motivation of the investigating officer, rather than objective investigative facts such as events and observations.  See generally LaFave, *Search and Seizure* § 1.4(e) at 128 (West 2004) ("[I]f police obtain a search warrant to search X's premises for evidence of crime A, which ... they would have done in any event, the search is not illegal merely because the police suspect they might find evidence of crime B."). Cf. United States v. Johnson, 63 F.3d 242, 245-48 (3d Cir. 1995) (examining "pretext" contention in relation to police traffic stop).  Therefore, we find that defendant has not

met his burden on the first prong as to the affiant's alleged "motivation" for seeking

warrants.[31]

Turning to the second prong, the rule is that "where an omission, rather than a

misrepresentation, is the basis for the challenge to the affidavit, the court should ask

whether the affidavit would have provided probable cause if it had contained a disclosure

of the omitted information."  United States v. Frost, 999 F.2d 737, 743 (3d Cir. 1993),

citing United States v. Calisto, 838 F.2d 711, 716 (3d Cir. 1988).  An omission is "made

with reckless disregard for the truth when an officer recklessly omits facts that any

reasonable person would know that a judge would want to know" in evaluating the

warrant application.  Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000).  In conducting

this analysis, we must examine the "totality of the circumstances" as set forth in the

affidavit.  United States v. Ritter, 416 F.3d 256, 262 (3d Cir. 2005).

Here, we conclude that the fact that the officers had reason to suspect that defendant

had guns in the premises to be searched would not have altered the probable cause

analysis to be performed by the Magistrate Judge.  Agent Hatcher's 22-page affidavit

---

[31]  We reject defendant's suggestion that this investigation should not have proceeded by search warrant because a subpoena or letter request would have sufficed, based upon the cooperative attitude displayed by defendant and his attorney in a DCIS investigation in New York.  (Dkt. 35 at 3.)  First, there is no evidence that Agent Hatcher or his AUSA knew of the New York investigation when they applied for these warrants.  See n.21 supra.  Second, Mr. Fautz was a target of this investigation, not a mere witness as he had been informed was his status in New York.  Moreover, it is clear that where, as here, a fraud investigation has developed to the point where probable cause exists to seek evidence by way of a search warrant, law enforcement has a legitimate interest in preventing concealment or destruction of that evidence.

described the extensive investigation and facts that established the probable cause basis to search those premises for evidence of defense procurement fraud.  Any information indicating that there might also be guns remaining in defendant's possession after his prior felony conviction ten years earlier would have been, in our view, "a fact not material to the magistrate's task."  Calisto, 838 F.2d at 715.  Accordingly, we hold that defendant has not met his burden on the second prong of the Franks test as to that omitted information.

Summarizing the rulings in this section, we have concluded that (1) the search warrants were based upon probable cause as set forth in the supporting affidavit; (2) the warrants were neither general nor overbroad; and (3) defendant has not proven by a preponderance of the evidence that the presumption of validity of the warrants has been overcome under the standards set forth in Franks.

## B.  FOURTH AMENDMENT:  SEIZURE AND ARREST OF DEFENDANT

Defendant's next challenge is to the Fourth Amendment reasonableness of the execution of the search warrants, focusing specifically on the events during the search warrant execution at his home/office.  The Fourth Amendment prohibits "unreasonable searches and seizures" of persons, as well as their papers and property.  U.S. Const. amend. IV.  In this section we discuss the Fourth Amendment issues concerning the conduct of the officers in relation to defendant himself.  In the next section we address his remaining contentions regarding how the officers performed the physical search of the apartment under the warrant.

The applicable burden of proof on a suppression motion begins with the defendant, who must establish a factual basis for a suppression hearing. <u>United States v. Voigt</u>, 89 F.3d 1050, 1067 (3d Cir. 1996). Once the defendant makes that showing and the court grants the request for a hearing, the burden rests upon the government to prove, by a preponderance of the evidence, that the challenged evidence is admissible. <u>See</u> <u>United States v. Matlock</u>, 415 U.S. 164, 177 (1974); <u>Johnson</u>, 63 F.3d at 245.[32]

"'The Fourth Amendment protects people, not places.'" <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968), quoting <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967). Defendant's position that he was improperly detained during the warrant execution assumes that his person was "seized," for Fourth Amendment purposes, at the outset of his encounter with the officers. (<u>See</u> dkt. 35 at 5-6.) On this point we agree.

"A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" <u>United States v. Brown</u>, 448 F.3d 239, 245 (3d Cir. 2006). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." <u>Id.</u> (internal citations omitted). We conclude that when defendant opened his door to the officers who were knocking on it, and the SERT team led the officers in with weapons

---

[32] We will apply the same burden and standard of proof to analyze the suppression issues in the subsequent sections of this opinion.

drawn and surrounded him while he stood there in submission, a seizure of his person

occurred within the meaning of the Fourth Amendment.

The next question is whether that seizure of defendant's person was

"unreasonable," in violation of the Fourth Amendment, during his initial detention by the

officers when the search began.  As we understand his arguments, defendant contends

that (1) the officers should not have detained him, but should have conducted the search

when he was not at home; and (2) the show of force was excessive and unreasonable

because he was a 65-year old man with no history of violence or violent crime who was

living alone.  (Dkt. 35 at 6, 46.)

The Supreme Court has consistently held that as a general rule, "an official seizure

of the person must be supported by probable cause, even if no formal arrest is made."

Michigan v. Summers, 452 U.S. 692, 696 (1981), citing Dunaway v. New York, 442 U.S.

200, 207-09 (1979).  As Justice Brennan explained in Dunaway, however, with the advent

of Terry the Court recognized that in limited circumstances, a "seizure" will not be

considered synonymous with "arrest" under the Fourth Amendment.  Dunaway, 442 U.S.

at 207-08.  "Terry for the first time recognized an exception to the requirement that

Fourth Amendment seizures of persons must be based on probable cause."  Id. at 208-09.

One way in which Terry departed from traditional Fourth Amendment analysis was that

"it defined a special category of Fourth Amendment 'seizures' so substantially less

intrusive than arrests that the general rule requiring probable cause to make Fourth

Amendment 'seizures' reasonable could be replaced by a balancing test."  Id. at 209-10.

63

Terry itself "approved this narrowly defined less intrusive seizure on grounds less rigorous than probable cause, but only for the purpose of a pat-down for weapons."  Id. at 210.

Supreme Court jurisprudence in this area has been expanded to encompass detention of persons in the vicinity of a lawful search warrant execution under a variety of circumstances.  See Los Angeles County, California v. Rettele, 550 U.S. 609 (2007) (per curiam); Muehler v. Mena, 544 U.S. 93 (2005); and Summers, supra.  The government argues that the initial detention of defendant in this case was a reasonable seizure of his person, pursuant to Summers and its progeny.  (Dkt. 9 at 4.)  We agree, and will explain.

The landmark case was Summers in 1981.  Mr. Summers was a homeowner who had walked out the front door and down the steps of his home when police officers arrived to execute a search warrant for narcotics.  They asked him to open the door, but he had left his keys inside.  They detained him while they forced open the door, then they brought him inside the house and detained him along with the seven other occupants while they conducted the search, which revealed two bags of suspected narcotics.  Upon determining that he was the owner of the house, they formally arrested him.  He contended that his detention was an unreasonable seizure of his person in violation of the Fourth Amendment, and the Court saw the issue as "whether the officers had the authority to require him to re-enter the house and to remain there while they conducted their search."  452 U.S. at 694.  The Court noted that in such a situation, "the detention represents only an incremental intrusion on personal liberty when the search of a home

64

has been authorized by a valid warrant." Id. at 703.  It identified several relevant law

enforcement interests under the facts presented, stating:

> Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.  Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers.  Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.  The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation....  Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present.  Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

Id. at 702-03.

The Summers case, arising in the context of a search warrant for narcotics, resulted

in this holding:  "Thus, for Fourth Amendment purposes, we hold that a warrant to search

for contraband ... founded on probable cause implicitly carries with it the limited authority

to detain the occupants of the premises while a proper search is conducted."  Id. at 705.

The Summers Court stated that it did not decide whether the same result would be

justified if the search warrant merely authorized a search for evidence.  Id. at 705 n.20.

The Court added:  "Although special circumstances, or possibly a prolonged detention,

might lead to a different conclusion in an unusual case, we are persuaded that this routine

detention of residents in a house while it was being searched for contraband pursuant to a

valid warrant is not such a case."  Id. at 705 n.21.

The next case in this line was <u>Mena</u>, decided in 2005.  Ms. Mena was asleep in her bed at 7:00 a.m. when a SWAT team entered her bedroom and placed her in handcuffs at gunpoint.  The SWAT team also rounded up and handcuffed the other three individuals found on the property.  They detained all four occupants, still handcuffed, for two to three hours in the converted garage while officers executed a search warrant at the house.  The warrant was based upon suspicion that at least one member of a gang involved in a drive-by shooting lived at the house and that individual was armed and dangerous, and the warrant authorized a broad search of the house for weapons and evidence of gang membership.  <u>Mena</u>, 544 U.S. at 95-96.  At the end of the search, which did reveal evidence but none implicating Ms. Mena, she was released.  <u>Id.</u> at 96.  She sued for damages under 42 U.S.C. § 1983, claiming that both her detention and the force and length of the detention violated her Fourth Amendment rights.  <u>Id.</u> at 96-97.[33]  The Supreme Court ruled that her detention in handcuffs during the entire search was reasonable.  <u>Id.</u> at 100.

Explaining its rationale in <u>Mena</u>, the Court stated:

> Mena's detention was, under <u>Summers</u>, plainly permissible.  An officer's authority to detain incident to a search is categorical; it does not depend on the "quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." [citing <u>Summers</u>, 452 U.S. at 705 n.19].  Thus, Mena's detention for the duration of the search was reasonable under <u>Summers</u> because a warrant existed to search [the house] and she was an occupant of that address at the time of the search.

---

[33]  Ms. Mena's Section 1983 action also included a claim that the officers had needlessly destroyed her property during the search.  That claim survived a motion for summary judgment and went to trial, but was not at issue in the Supreme Court.  <u>Mena</u>, 544 U.S. at 97.

66

Inherent in <u>Summers</u>' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention.  <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 396 ... (1989)....  Indeed, <u>Summers</u> itself stressed that the risk of harm to officers and occupants is minimized "if the officers routinely exercise unquestioned command of the situation."  452 U.S., at 703....

The officers' use of force in the form of handcuffs to effectuate Mena's detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion.... The detention was thus more intrusive than that which we upheld in <u>Summers</u>....

But this was no ordinary search.  The government interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises....

.... The duration of a detention can, of course, affect the balance of interests under <u>Graham</u>.  However, the 2- to 3-hour detention in handcuffs in this case does not outweigh the government's continuing safety interests.

<u>Id.</u> at 98-100.

The <u>Summers</u> line of Supreme Court decisions culminates in <u>Rettele</u> in 2007.  Mr. Rettele purchased a house in September and moved into it with his girlfriend and her 17-year old son.  Three months later, seven sheriff's deputies knocked on their door at 7:15 a.m, to execute a search warrant for documents and computer files used in a suspected fraud and identity-theft crime ring.  When the teenager answered the door, the officers entered and ordered him to lie face down on the ground.  The deputies next entered the master bedroom with guns drawn and ordered the two adults to get out of their bed and show their hands.  The occupants protested that they were not clothed, and they attempted without success to cover themselves as they got out of the bed.  They were both held

naked at gunpoint for one to two minutes, while the deputies searched their room for

suspects and a gun, before they were permitted to dress.  Within three to four minutes

they were allowed to leave the bedroom and sit on the living room couch.  It was then that

the deputies realized they had made a mistake.  The occupants were all Caucasians, and

the deputies knew that the four suspects were African-Americans, one of whom was a

registered gun owner.  Mr. Rettele had purchased the house, and the probable cause to

search it developed before he bought it, but the investigating officers did not know that

the house had been sold to him.  When they realized their mistake, the deputies

apologized and left the house.  Mr. Rettele and his housemates sued under 42 U.S.C.

§ 1983, ultimately claiming that the deputies had executed the search in an unreasonable

manner.  Rettele, 550 U.S. at 610-12.

The Court ruled in Rettele that there was no Fourth Amendment violation.  First it

stated that "[t]he deputies, who were searching a house where they believed a suspect

might be armed, possessed authority to secure the premises before deciding whether to

continue with the search."  Id. at 613.  It observed that the presence of some Caucasians

when the deputies first entered the residence did not eliminate the possibility that the

suspects were there as well.  Id.  Next, it ruled that "the orders by the police to the

occupants, in the context of this lawful search, were permissible, and perhaps necessary,

to protect the safety of the deputies.  Blankets and bedding can conceal a weapon, and one

of the suspects was known to own a firearm, factors which underscore this point....  The

deputies needed a moment to secure the room and ensure that other persons were not close by or did not present a danger." Id. at 614.  Nor was there any accusation that the detention was prolonged, a fact also noted by the Court.  Id. at 615.  The Court even expressed conciliatory sentiments when it stated in closing:  "Officers executing search warrants on occasion enter a house when residents are engaged in private activity; and the resulting frustration, embarrassment, and humiliation may be real, as was true here.  When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, however, the Fourth Amendment is not violated."  Id. at 615-16.

Our Court of Appeals recently reviewed the Summers line of cases, in United States v. Allen, 618 F.3d 404 (3d Cir. 2010), cert. denied, 131 S.Ct. 2093 (2011).  Mr. Allen was a security guard at a bar named Trinkle's, which was located in a high-crime area and known to have patrons with histories of drug activity, firearm possession, and engaging in violence.  He was on duty in front of the bar at 8:00 p.m., when a SWAT team of police arrived to execute a search warrant to collect evidence inside the bar.  There had been a recent murder and police had information that the persons involved had retreated to Trinkle's, so police got a warrant to collect the bar's security videos that could be used to identify the murder suspect.  No Trinkle's owner or staff member was a suspect in the homicide.  The SWAT team, wearing armor and with guns drawn, secured the premises inside and outside the bar.  They ordered Allen and the other individuals standing outside to lie face down on the sidewalk with their hands in front of them.  The police explained that the individuals would be detained just long enough to ensure the officers' safety and

for the officers to gather the materials in the warrant.  During that detention, Mr. Allen

volunteered that he had a firearm, and the police searched him and seized the gun, asking

if he had a permit.  When he responded that he only had an expired permit, he was

arrested.  He moved for suppression of his statements to police and the seized firearm, on

the ground that his detention violated his Fourth Amendment rights.  Id. at 405-06.  The

District Court ruled against him and the Third Circuit affirmed, stating:  "[B]ased on the

Supreme Court's treatment of Summers in its decision in Rettele, the officers were

permitted to detain those outside Trinkle's during the execution of the search warrant.

Accordingly, given that Allen's detention was legal, and given [the District Court's]

factual finding that Allen volunteered to police that he had a firearm before being

searched, the Court did not err when it denied Allen's motion to suppress."  Id. at 406.[34]

Reviewing the Summers-Rettele teachings as compared to the detention situation

in Allen, the Third Circuit in Allen came to the following conclusions:

> Summers itself is largely off point:  it relied heavily on the fact that
> the warrant authorized a search for contraband, which meant that there was
> reason to believe that crimes were taking place in the home, which in turn
> allowed the detention of its resident....  This reasoning does not apply here,
> where the search warrant merely sought evidence of a crime at a public
> establishment and that evidence was unrelated to any of the individuals then
> present there.
> ....

---

[34]  Our summary of Allen in this section focuses on the Fourth Amendment detention of his person, not the Fifth Amendment issue regarding Allen's statement to police while detained. We discuss Mr. Fautz's pre-arrest statements to the agents in Section II.D. infra.

In addition, the detention of Allen did not advance an orderly completion of the search, as there was no indication that Allen even knew where the videotapes were located....

The only law enforcement interest relevant to our case, and indeed the only part of the <u>Summers</u> Court's reasoning that is applicable to the facts here, is minimizing the risk of harm to the officers.  Indeed, the District Court relied solely on this interest in denying Allen's motion to suppress.  We conclude that it was correct to do so because, per <u>Rettele</u>, in certain situations safety concerns alone may authorize a brief detention of the occupants of an establishment during execution of a search warrant, and the distinction between a search for contraband and a search for evidence is largely immaterial.
....

.... Finally, just as the brief duration of the detention in <u>Rettele</u> was deemed reasonable under the circumstances, the detention here was just long enough for the police to ensure their safety and collect the evidence they sought.
....

<u>Rettele</u> ... counsels that protecting the safety of the agents alone can justify a reasonable detention of an individual during execution of a search warrant.

<u>Id.</u> at 408-10, distinguishing <u>Leveto v. Lapina</u>, 258 F.3d 156 (3d Cir. 2001).

Applying these principles to the totality of the circumstances in our case, we observe salient features drawn from each of the foregoing precedents involving detaining individuals while executing valid search warrants.  Here, as in <u>Summers</u>, <u>Mena</u>, and <u>Rettele</u>, the person who was detained actually resided at the house to be searched.  Likewise, as in <u>Summers</u>, the orderly completion of the search could be facilitated if that resident was present, because his self-interest might induce him to open locked doors or containers to avoid damage to his property and delay in completing the search.  <u>See</u> n.19 <u>supra</u>.  Similarly, as matters evolved, the initial detention of defendant prior to his formal arrest was very brief, five minutes or less, as in <u>Rettele</u>; but his detention for the

71

reasonable duration of the entire search would have been permissible under <u>Summers</u>, <u>Mena</u> and <u>Allen</u>.  Most significant, of course, is the officer safety concern that prompted the use of a SWAT team and detaining defendant with drawn guns at the outset of the encounter.  The fact that the warrant was for evidence of a non-violent crime would not be dispositive, according to <u>Rettele</u>.  Rather, the fact that the police expected to encounter a suspect who owned a registered gun, as in <u>Rettele</u>, would justify use of drawn weapons and immobilizing anyone found at that location, suspect or not.

The police in this case had documented information that the suspect, Mr. Fautz, was the registered owner of not one gun but eight guns, and despite being a convicted felon he had not taken required legal steps to dispose of the weapons.  Based upon those facts and given the other factors favoring his detention enumerated above, we have no difficulty concluding that the seizure and initial detention of Mr. Fautz, by a SWAT team with weapons drawn and subsequently holstered, was reasonable under the Fourth Amendment.  We similarly find no merit to his contention that the agents should have scheduled the search at a time when he was not at home, or that they should have excused him to leave while they completed the search.  <u>See, e.g.</u>, <u>Allen</u>, 618 F.3d at 410 n.3 (rejecting argument that risk of harm to officers was created by timing of search); <u>Summers</u>, 452 U.S. at 702-03 (emphasizing legitimate reasons to have resident at home during warrant search); <u>see also</u> n.33 <u>supra</u> (describing liability claim against police in <u>Mena</u> for damaging occupant's property).  We hold that the actions of the officers in

72

detaining Mr. Fautz with a show of force, from the time they entered the apartment until he was lawfully arrested on probable cause as a felon in possession of a firearm approximately five minutes later, were reasonable and did not constitute an illegal *de facto* arrest under the Fourth Amendment.[35]

*          *          *

We have thus held that defendant was not under arrest for <u>Fourth Amendment</u> purposes until the moment of his formal arrest.  This ruling does not, however, address the separate question whether he was "in custody" for <u>Fifth Amendment</u> purposes before that moment.

It is now well settled that a person can be both "in custody" under the Fifth Amendment, and thus entitled to Miranda warnings before interrogation, but not "under arrest" for Fourth Amendment purposes.  In other words, a person can be lawfully "seized" but not "arrested" under the Fourth Amendment, while they are <u>simultaneously</u> "in custody" for Fifth Amendment Miranda purposes.  This recognition has been expressed in a well developed body of case law, based upon guidance by the Supreme Court in <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984).  There, in ruling upon a <u>Terry</u> situation, the Court stated that "if a motorist who has been detained pursuant to a traffic

---

[35]   Based on the evidence adduced at the hearing, defendant does not contend that the officers lacked probable cause to arrest him when they discovered the .22 caliber Smith and Wesson handgun in the closet in his bedroom.  <u>See</u> <u>United States v. Butts</u>, 704 F.2d 701, 703 (3d Cir. 1983), citing <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964) (Fourth Amendment standard for probable cause to arrest).  Instead, he makes all the other arguments in favor of suppression addressed in this opinion.  (Dkt. 35.)

stop is subject to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Id. at 440.

This concept has been explained and applied in cases involving both Terry stops and lawful searches with and without warrants. See, e.g., United States v. Hargrove, 625 F.3d 170, 179 (4th Cir. 2010) (detention during search warrant execution at a home), petition for cert. filed, No. 11-5287 (U.S. Mar. 8, 2011); United States v. Revels, 510 F.3d 1269, 1272-77 (10th Cir. 2007) (same); United States v. Mittel-Carey, 493 F.3d 36, 37-40 (1st Cir. 2007) (same); United States v. Newton, 369 F.3d 659, 671-77 (2d Cir. 2004) (valid warrantless search of parolee's home); United States v. Perdue, 8 F.3d 1455, 1463-66 (10th Cir. 1993) (Terry stop); United States v. Smith, 3 F.3d 1088, 1096-99 (7th Cir. 1993) (Aldisert, J., by designation) (same); United States v. Elias, 832 F.2d 24, 26 (3d Cir. 1987) (same); United States v. Bautista, 684 F.2d 1286, 1291 (9th Cir. 1982) (same); United States v. Santiago, 2008 WL 4483803, at *3 n.5 (E.D. Pa. Oct. 3, 2008) (detention during warrant search of vehicle). "Although some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which Miranda was designed to operate." Revels, 510 F.3d at 1274.

We address the Fifth Amendment issues concerning the statements Mr. Fautz made to law enforcement agents, prior to his formal arrest, in Section II.D. infra.

### C.   FOURTH AMENDMENT:  CONDUCT OF THE SEARCH

Defendant argues that the agents executed the physical search of the apartment in an unreasonable manner.  (Dkt. 35 at 46-47.)  The government asserts that they did not ransack the residence or engage in exploratory rummaging, but searched in an orderly and careful manner, looking only in those places where the items described in the search warrant could be found.  (Dkt. 9 at 1-2.)  We conducted the evidentiary hearing to test these competing contentions, and our findings of fact on this issue are set forth in Section I.D. supra.  Here we address the legal issues concerning the reasonableness of the physical search of defendant's home/office.

The execution of federal search warrants is governed by Federal Rule of Criminal Procedure 41, 18 U.S.C. § 3101 et seq., and a body of case law that has interpreted the Fourth Amendment.  Rule 41 details timing, inventory, receipt, and return requirements.  Title 18 U.S.C. § 3109 sets forth the statutory "knock and announce" requirement.  The manner of the execution of the search warrants in this case comported with the statutory dictates of Rule 41 and 18 U.S.C. §  3109, and defendant does not contend otherwise.

"The general touchstone of reasonableness which governs Fourth Amendment analysis ... governs the method of execution of the warrant."  United States v. Ramirez, 523 U.S. 65, 71 (1998) (citing Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977)); United States v. $92,422.57, 307 F.3d 137, 153 (3d Cir. 2002).

First, defendant takes issue with the fact that images in the videotape of the apartment search depict innocent items such as family photos and reading books on

shelves.  (Dkt. 35 at 47.)  The agents explained that the purpose of the videotaping was to protect themselves against potential claims of liability for damage or disruption to personal property.  In our view, those images were consistent with the officers' stated purpose of documenting that the orderly condition of the apartment was not disturbed during the search.  Similarly, defendant objects to the video documentation of the contents of his safe, including money and jewelry.  (Id.)  Here again, the agents testified that this was done to avoid claims of liability for loss of valuables, and we credit that testimony.  None of those personal or valuable items shown in the video were seized in the search.  Finally, in this line of argument defendant states that personal and corporate tax returns (an item not specifically listed in the warrants) were seized and later returned to him.  (Id.)  We find no prejudice to defendant in that fact, and determine that it was reasonable for officers to take those as possibly falling within the scope of the financial records authorized by the warrants, and then returning them upon further consideration.

Defendant's objections to the seizure of the firearms and ammunition found in his apartment flow through all of the arguments in his suppression motion.  (Dkt. 35.)  We summarize and rule on those arguments in Section II.F. infra.

### D.    FIFTH AMENDMENT: PRE-ARREST STATEMENTS

This section addresses defendant's Fifth Amendment challenge to the statements he made in the apartment, which we have found were made prior to his formal arrest. The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To protect that right, the

76

Supreme Court in Miranda v. Arizona ruled that police may not conduct a custodial interrogation without first administering the now-familiar Miranda warnings, which include the right to remain silent and the right to the presence of an attorney. 384 U.S. 436, 479 (1966); accord Dickerson v. United States, 530 U.S. 428, 443-44 (2000) (revisiting and reaffirming Miranda). In general, if a suspect is not so warned, and does not thereafter make a knowing and voluntary waiver of those rights, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief. See Michigan v. Harvey, 494 U.S. 344, 350 (1990); cf. Harris v. New York, 401 U.S. 222, 224-26 (1971) (holding that statements obtained in violation of Miranda may be admitted for impeachment purposes). Both inculpatory and exculpatory statements fall within the ambit of Miranda. 384 U.S. at 444. "A defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant received appropriate warnings, or an exception applies." United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999).

The Supreme Court, in Edwards v. Arizona, 451 U.S. 477 (1981), "superimposed a 'second layer of prophylaxis,'" in protection of the Fifth Amendment rights of a person in custody. Maryland v. Shatzer, 130 S.Ct. 1213, 1219 (2010), quoting McNeil v. Wisconsin, 501 U.S. 171, 176 (1991). Edwards held:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [He] is not subject

77

to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges or conversations with the police.

451 U.S. at 484-85.[36]

"The Edwards rule is not a constitutional mandate, but judicially prescribed prophylaxis." Shatzer, 130 S.Ct. at 1220 (citations omitted). The Supreme Court decided in 2000, in its Dickerson ruling, that although the Miranda rule is also prophylactic, it has "become embedded in routine police practice where the warnings have become part of our national culture." 530 U.S. at 443. It thus held, in the face of a congressional enactment clearly intended to overrule Miranda legislatively, that "Miranda announced a constitutional rule that Congress may not supersede legislatively." Id. at 444. In so holding, however, it expressly preserved exceptions to Miranda already recognized in its jurisprudence. Id. at 441. The two exceptions it cited were Harris, supra, and the public safety exception announced in New York v. Quarles, 467 U.S. 649 (1984) (plurality). Id. Courts have held that just as Miranda does not apply where the Quarles public safety exception is met, the rule in Edwards is similarly subject to that exception. See, e.g., Trice v. United States, 662 A.2d 891, 895 (D.C. App. 1995); United States v. Mobley, 40 F.3d

---

[36] The Supreme Court has observed that the Sixth Amendment right to counsel is not the basis of the Miranda/Edwards line of cases. The Court has succinctly explained that the Sixth Amendment right prohibits officers from deliberately eliciting incriminating evidence from defendant after a formal charge has been filed. In contrast, the "right to counsel" at issue at the "in custody" stage addressed in Miranda and its progeny is based on the Fifth Amendment, and the two are not to be conflated because "the policies underlying the two constitutional protections are quite distinct." Rhode Island v. Innis, 446 U.S. 291, 300 n.4 (1980).

78

688, 692-93 (4th Cir. 1994); United States v. DeSantis, 870 F.2d 536, 540-41 (9th Cir. 1989).

Defendant's first challenged statement ("first statement") was exculpatory, to the effect that there were no guns in the apartment.  If admissible, such a statement could be treated as a false exculpatory statement tending to show consciousness of guilt.  See United States v. Kemp, 500 F.3d 257, 296 (3d Cir. 2007).  His second challenged statement ("second statement"), that there was a gun in the garment bag in his closet, clearly was inculpatory.  That second statement was made after defendant told Agent Hatcher that he wanted to speak to an attorney.  We will refer to the first statement and the second statement as his "pre-arrest statements."

We have found as a fact that the first statement and the second statement were made before defendant was formally arrested.  See Sec. I.C. supra.  But that is not the end of the inquiry.  In this section we address the related doctrines under Miranda, Edwards and Quarles, and how they apply as to those statements in this case.  In section II.E. infra, we discuss the third set of statements defendant challenges in this motion  ("post-arrest statements"), which are those statements he made to the agents while he was being transported to the courthouse for booking.

Warnings pursuant to Miranda are required only if a suspect is both in custody and subjected to custodial interrogation.  Thompson v. Keohane, 516 U.S. 99, 102 (1995).  See United States v. Jacobs, 431 F.3d 99, 104 (3d Cir. 2005), citing Miranda, 384 U.S. at

444-45.   The ultimate inquiry for "in custody" status, for Fifth Amendment purposes, is whether there is a "restraint on freedom of movement of the degree associated with a formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983); Leese, 176 F.3d at 740.  The test for "in custody" is "how a reasonable man in the suspect's position would have understood his situation."  Berkemer, 468 U.S. at 442.

"Interrogation," for Fifth Amendment purposes under Miranda, is defined as "not only express questioning, but also ... any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  "An incriminating response is 'any response -- whether inculpatory or exculpatory -- that the prosecution may seek to introduce at trial.'"   United States v. Brownlee, 454 F.3d 131, 146 (3d Cir. 2006), quoting Innis, 446 U.S. at 301 n.5 (emphasis in original).

The government acknowledges that defendant did not receive Miranda warnings before making his pre-arrest statements, and that those statements were made by defendant in response to direct questioning by Agent Hatcher as to whether there were any guns in the apartment.  The government argues, however, that (1) defendant was not "in custody" when he made his pre-arrest statements; and (2) even if he was in custody, the questioning was within the "public safety" exception to Miranda that was announced in Quarles.  (Dkt. 36 at 6-8.)

Defendant argues that he was in custody for Fifth Amendment purposes when he made the pre-arrest statements, and he asserts that the public safety exception does not apply in the circumstances here.  (Dkt. 35 at 35-40.)  We agree that defendant was "in custody" for Fifth Amendment purposes when he made those statements.  We have wrestled with the issue of whether the public safety exception applies, and have scoured the existing case law on the subject for useful guidance.  We believe that this is a difficult case on that issue, but we find in favor of defendant as to the pre-arrest statements, for reasons that we will explain.

We have already ruled that defendant was lawfully "seized," for Fourth Amendment purposes, when the law enforcement officers made their "knock and announce" entry into the apartment and detained him by surrounding him with armed SERT team members.  See Sec. II.B. supra.  We have further ruled that his detention during that initial security sweep of the premises, incident to commencing execution of a lawful search warrant, did not constitute an unlawful arrest under the Fourth Amendment.  Id.  But as we have explained, the courts have made it clear that a person can simultaneously be not under an unlawful arrest for Fourth Amendment purposes, yet be "in custody" under Miranda's Fifth Amendment rules.  Id.  We now turn briefly to address the latter question.

The question of whether defendant was "in custody" for Miranda purposes at the time he made his pre-arrest statements is easily answered in the affirmative.  "Where, as

81

here, the individual has not been openly arrested when the statements are made, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so.'" Leese, 176 F.3d at 743 (internal quotations and citations omitted).  We consider five factors under this test:  "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's physical movement; and (5) whether the suspect voluntarily submitted to questioning." United States v. King, 604 F.3d 125, 138 (3d Cir. 2010) (citing United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006)), cert. denied, 131 S.Ct. 1467 (2011).

Applying those five factors, we find that the totality of circumstances favors the defendant on this issue.  Here we focus only on the approximately five minutes of events that transpired from the moment the officers entered the apartment until defendant was formally arrested after the gun had been discovered.

First, Agent Hatcher told defendant that they were there to execute a search warrant, and explained that the focus of the search warrant was on suspected defense procurement fraud.  He also indicated to defendant that they were aware that he had firearms in the past, and asked whether there were any in the apartment.  No officers told

defendant that he was under arrest at that time; nor did they tell him he was free to leave. Second, the location was his own home, but at that time the entire premises was visibly subject to the unquestioned command of the officers, both those inside the apartment and those awaiting entry in the hall.  Third, the interrogation prior to both the first statement and the second statement was very brief, so that favors the government's position. However, the fourth and fifth factors of this inquiry also favor defendant.  Although we have found as a fact that defendant was not handcuffed or physically touched at all by the police as they entered the apartment, we have found that he was effectively prevented from moving by the SERT team surrounding him, both initially when they entered with weapons drawn and immediately thereafter when they continued to detain him with weapons holstered.  Further, his responses to the agent's questions indicated that he did not want to be questioned.  At first he answered the gun question in the negative and invoked his right to counsel.  When the questioning resumed briefly as soon as the holster was found, he again repeatedly answered in the negative before admitting that a gun was in the closet.[37]

Based upon these facts, we find that a reasonable person in defendant's situation at the time the gun questions were posed to him would have concluded that his freedom of movement was restrained to the degree associated with a formal arrest.  Beheler, 463 U.S.

---

[37]  This finding does not imply that we also find that defendant's pre-arrest statements were obtained in violation of his Fifth Amendment due process right against coerced confessions. See n.52 infra.

at 1125.  See United States v. Colonna, 511 F.3d 431, 433-36 (4th Cir. 2007) (search

warrant execution at suspect's home by numerous armed officers; suspect was "in

custody" when not physically restrained but questioned under circumstances where

reasonable person would believe his freedom was curtailed to a degree associated with

formal arrest); Revels, 510 F.3d at 1270-77 (same); Mittel-Carey, 493 F.3d at 37-40

(same).  See also Newton, 369 F.3d at 669-72 (discussing Beheler test).  Therefore we

conclude that defendant was "in custody," for purposes of Miranda and Edwards, from

the moment the officers entered the apartment until he was handcuffed and placed under

formal arrest when the gun in the closet was found.[38]

The Supreme Court announced in Quarles that under the circumstances presented

in that case, "overriding considerations of public safety justify the officer's failure to

provide Miranda warnings before he asked questions devoted to locating the abandoned

weapon."  467 U.S. at 652.  There, police were approached by a young woman who told

them she had just been raped by a man whom she described, and that the man had just

entered a nearby supermarket and was carrying a gun.  Officers entered the supermarket

and quickly spotted defendant, who matched the description, and he began to run when he

saw them.  One officer, chasing him with the officer's gun drawn, saw him turn the

corner at the end of an aisle, then lost sight of him for several seconds.  Upon regaining

---

[38] Our ruling on this point is reinforced by similar holdings in the Quarles cases
discussed infra that involved search warrant executions in private settings.  In each of those
cases, the predicate to the Quarles discussion was that defendant, although not necessarily under
formal arrest, was "in custody" for Miranda purposes when defendant was interrogated by police.

sight of him, the officer ordered him to stop.  That officer frisked him and discovered that he was wearing an empty shoulder holster.  After handcuffing him, the officer asked him where the gun was.  Defendant nodded in the direction of some empty cartons and responded, "the gun is over there."  The officer retrieved a loaded revolver from one of the cartons, then formally placed him under arrest.  Id. at 651-52.

The Court agreed that defendant was "in custody" for Fifth Amendment purposes when he was questioned about the location of the gun, because he was surrounded by at least four police officers and was handcuffed when that question was asked.  Chief Justice Rehnquist, writing for the plurality, stated that Miranda warnings were not, however, required at that moment:

> We hold that on these facts there is a "public safety" exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved.  In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer.

Id. at 655-56.

The Quarles plurality opinion observed that at the moment of the police question about the location of the gun, "there was nothing to suggest that any of the officers were any longer concerned for their own physical safety."  Id. at 655.  Nevertheless, the danger persisted:

85

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded at the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety:  an accomplice might make use of it, a customer or employee might later come upon it.

Id. at 657.

Danger to the public was not the only danger recognized in Quarles.  The opinion expressly noted that "public safety" would include officer safety in an appropriate case. "We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect."  Id. at 659 (emphasis added).

The public safety exception, established in Quarles in 1986, is the only exception to Miranda that permits police officers intentionally to delay administering Miranda warnings while interrogating a suspect who is "in custody."[39]  Quarles was a plurality decision, heavily debated by the Court when it was issued.  It was criticized by commentators at the time.[40]  It was reconfirmed in Dickerson, and has now been on the

---

[39] See United States v. McLaughlin, 126 F.3d 130, 134 n.4 (3d Cir. 1997), abrogated on other grounds, United States v. Fiorelli, 133 F.3d 218 (3d Cir. 1998); see also Rorie A. Norton, Matters Of Public Safety And The Current Quarrel Over The Scope Of The Quarles Exception To Miranda, 78 Fordham.L.Rev. 1931, 1939 (2010).

[40] See Norton, supra note 39, at 1934 n.25.

books for 25 years.  Predictably, a considerable body of case law has developed under the Quarles ruling.[41]

Our Court of Appeals has not had occasion to issue a reported decision under Quarles.  See United States v. Duncan, 308 Fed.Appx. 601, 611 n.8 (3d Cir. 2009) (Chagares, J., concurring).  Some appellate opinions have articulated principles or a test for the application of Quarles.[42]  Others have suggested factors to aid in the decision-making.[43]  The Third Circuit panel that issued the recent non-precedential decision in Duncan debated these issues in three filed opinions, taking divergent views.

We have taken a different tack in attempting to follow the teachings of Quarles in this particular case.  Although we have certainly looked at the rationales employed by the appellate courts that have interpreted Quarles, we have actually broken the cases down into fact patterns, to see what the courts did, along with what they said.  Viewing the legal landscape that way, it seems to us that most of the appeals decisions we have studied are consistent in their outcomes, and faithful to Quarles, based upon the facts found by the trial courts.

---

[41]  Electronic research showed approximately 1,200 case law references to Quarles when we last checked.

[42]  See, e.g., United States v. Estrada, 430 F.3d 606, 612 (2d Cir. 2005); State v. Stephenson, 796 A.2d 274, 279 (N.J. App. Div. 2002); People v. Attebury, 624 N.W.2d 912, 917 (Mich. 2001).

[43]  See, e.g., United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007); Duncan, 308 Fed.Appx. at 611 (Chagares, J., concurring).

There are those who believe that one or more circuit splits have developed, due to ambiguities in Quarles itself.[44]  We need not address whether the case law reveals a generalized circuit split between "broad" and "narrow" interpretations of the public safety exception.  In our view, most of the cases appear to be fact-driven and to fit well within the Quarles framework.

We are constrained, however, to acknowledge that on the very issue presented by the facts in our case, there is at least the beginning of a circuit split.  That issue is whether, if there are no other circumstances indicating immediate or impending danger to the police or the public at the time the questioning is conducted, a reasonable suspicion that the premises or vehicle where the encounter takes place contains firearms that the officers may encounter or mishandle is sufficient to justify custodial interrogation of an unmirandized suspect on the limited issue as to whether there are firearms present.

Put simply, the question is whether a concern that officers may encounter or mishandle a hidden weapon in the course of conducting lawful police function at the premises or in relation to a stopped vehicle (as distinguished from physical frisk or search of a human being) is alone sufficient to fall within the public safety exception.  Our review indicates that at present, the Eighth Circuit appears to be the only federal circuit court expressly ruling in the affirmative.  See United States v. Liddell, 517 F.3d 1007 (8th

_____

[44]  See, e.g., Norton, supra note 39, at 1947-60.

88

Cir. 2008).  Other courts have rejected that approach.  See, e.g., Mobley, 40 F.3d at 693.

We will address that problem as we lay out the relevant case law.

All of the cases we discuss in this survey involved police questions that elicited answers about firearms, rather than other hazards such as bombs, explosives, or hypodermic needles.[45]  Nor do we address police questions about "other people" as a potential hazard.  See, e.g., United States v. Ross, 2006 WL 938535 (E.D. Pa. Apr. 4, 2006) (approving such question and collecting cases).

Most of the cases that we have selected to describe and analyze have facts similar to the instant case.  That is, they involved police encounters with individuals in private settings, where firearms were suspected or discovered.  See discussion infra.

Other fact patterns that typically arise under Quarles, which we will not discuss in detail except where noted, fall into the following general categories:  (1) the "missing gun" scenario, similar to Quarles itself, where police respond to indications of a crime involving a weapon that is in an unknown location that may be accessible to the general

---

[45]  See, e.g., United States v. King, 182 Fed.Appx. 88, 91 (3d Cir. 2006) (suspected methamphetamine lab); United States v. Khalil, 214 F.3d 111, 115-116, 121 (2d Cir. 2000) (pipe bombs); United States v. Webster, 162 F.3d 308, 332 (5th Cir. 1998) (pat-down question concerning needles); United States v. Carrillo, 16 F.3d 1046, 1049-50 (9th Cir. 1994) (same). We have tried to separate "needle" questions from the focus in this case, which is firearms, but we acknowledge that the cases do not always make that distinction.  See, e.g., United States v. Luker, 395 F.3d 830, 831-34 (8th Cir. 2005) (collected infra n.47); United States v. Reyes, 353 F.3d 148, 154 (2d Cir. 2003) (collected infra n.48).

public;[46] (2) Quarles rulings involving police encounters with occupants of motor

vehicles;[47] and (3) other police encounters with individuals in close physical proximity to

---

[46] See, e.g., United States v. Brown, 449 F.3d 154, 159 (D.C. Cir. 2006), abrogated in part on other grounds, Dean v. United States, 129 S.Ct. 1849 (2009); Dyson v. United States, 815 A.2d 363, 364-69 (D.C. App. 2003); Allen v. Roe, 305 F.3d 1046, 1048-51 (9th Cir. 2002); Trice v. United States, 662 A.2d 891, 892-97 (D.C. App. 1995); Edwards v. United States, 619 A.2d 33, 34-37 (D.C. App. 1993); Fleming v. Collins, 954 F.2d 1109, 1110-14 (5th Cir. 1992) (en banc); United States v. Lawrence, 952 F.2d 1034, 1035-38 (8th Cir. 1992); State in Interest of A.S., 227 N.J. Super. 541, 543-48 (N.J. App. Div. 1988); cf. United States v. Padilla, 819 F.2d 952, 960-61 (10th Cir. 1987) (possible victims in bullet-riddled house).  In all of these cases, courts held the public safety exception applied.  We have found no contrary appellate rulings on similar facts.

[47] See (where public safety exception found to apply to limited questioning by police in motor vehicle situation):  United States v. DeJear, 552 F.3d 1196, 1198-99, 1201-02 (10th Cir. 2009) (police made investigatory stop of three occupants in parked car in known drug area; person in driver's seat attempted to stuff something into the seat and initially refused to show his hands; police then pointed firearms at all three occupants and they did raise their hands, but court held that did not eliminate danger that any of them might gain access to a weapon within their reach; officer's question what suspect had been stuffing was justified under public safety exception); Duncan, 308 Fed.Appx. at 602-06 (police on city street made investigatory stop of defendant who was in driver's seat of parked car; they observed defendant attempting to hide open beer bottle and shoving a shiny silver object into his jacket pocket; defendant exited the vehicle without having been asked to do so and made furtive movements; police felt a handgun-shaped object in his jacket pocket during pat-down; question whether the object was a gun was justified); Liddell, 517 F.3d at 1008-10 (police on open roadway made traffic stop, determined that driver was barred from driving, and arrested him; search of car incident to arrest revealed gun under front seat; question concerning "anything else in there we need to know about ... [t]hat's going to hurt us;" held justified); Luker, 395 F.3d at 831-32, 833-34 (police on open roadway made traffic stop and determined that driver was DWI and was known for methamphetamine use; question concerning "anything in [the] vehicle that shouldn't be there or ... they should know about;" held justified); United States v. Fox, 393 F.3d 52, 56-57, 59-60 (1st Cir. 2004) (facts essentially similar to Hoyer, infra) (vacated as to sentencing issue in view of United States v. Booker, 543 U.S. 220 (2005));  United States v. Johnson, 95 Fed.Appx. 448, 449, 452 (3d Cir. 2004) (police on city street made investigatory stop of defendant who was in driver's seat of parked car, following victim's report that defendant had earlier pointed a gun and threatened victim; police question, either immediately before or during initial frisk, whether he had a gun, was justified); United States v. Kelly, 991 F.2d 1308, 1310-11, 1313 (7th Cir. 1993) (facts essentially similar to Hoyer); United States v. Brady, 819 F.2d 884, 885-88 (9th Cir. 1987) (crowd was gathering around open car with keys in ignition while officer arrested suspect; police question whether he had guns in car was justified); State v. Hoyer, 506 N.E.2d 1190, 1191-92

the officers, including frisks incident to investigative stops or arrests.[48]

It is likely that some of the vehicle searches described in the above vehicle-related cases might not occur in the future under the Supreme Court's narrowing Fourth Amendment ruling in Arizona v. Gant, 129 S.Ct. 1710, 1721 (2009).  Gant did not cite or discuss Quarles, and is generally beyond the scope of this opinion.  It may, however,

_____

(Ohio App. 1986) ("[F]acts indicat[ing] to an officer that a gun is ... in an unattended automobile, which is subject to intrusion by vandals or thieves," justify public safety exception; police found bullets in arrested driver's pocket; officer's question, where the gun was, held justified);

but see (where public safety exception not applied):  United States v. Raborn, 872 F.2d 589, 595 (5th Cir. 1989) (held that gun found in truck search incident to defendant's arrest was admissible under inevitable discovery doctrine; no mention whether defendant's statement that gun was in truck was sought to be suppressed; dicta observed that public safety exception would not apply [on question of admissibility of the gun] because officers had seized the truck and only police officers had access to it); cf. United States v. Melvin, 2007 WL 2046735, at *3, *10 (4th Cir. July 13, 2007) (not a gun issue, but did involve statement by arrested defendant; parked truck that he was known to use was already being taken by police to a secure impound lot; no public safety exception justified officer's question concerning his control over the vehicle).

   [48]  See, e.g., United States v. Jones, 567 F.3d 712, 713-15 (D.C. Cir. 2009); United States v. Smith, 210 Fed.Appx. 533, 533-35 (7th Cir. 2006); United States v. Reyes, 353 F.3d 148, 149-55 (2d Cir. 2003); United States v. Lackey, 334 F.3d 1224, 1225-28 (10th Cir. 2003); United States v. Shea, 150 F.3d 44, 48 (1st Cir. 1998); United States v. Knox, 950 F.2d 516, 517, 519 (8th Cir. 1991); United States v. Edwards, 885 F.2d 377, 379-81 (7th Cir. 1989); United States v. Santiago, 2008 WL 4483803.  Likewise in these cases, courts held the public safety exception applied and we have found no contrary appellate rulings on similar facts.  See also Andersen v. Thieret, 903 F.2d 526, 531 (7th Cir. 1990) (habeas review; dicta concerning Quarles).  Cf. United States v. DeSumma, 272 F.3d 176, 178, 181 (3d Cir. 2001) (where officers arrested, handcuffed and patted down defendant while executing an arrest warrant when he was in club parking lot and pat-down detected no weapons, unmirandized question whether he had any weapons or firearms in his possession would not be justified under public safety exception, the court stating in dicta, "so far as the record here reflects, the arresting agents were not advised that the defendant was any more dangerous or violent than a person accused of a typical Ponzi scheme[,] ... [t]he government furnished no evidence that there was any basis for fear of the public's safety or the officers' well-being." Id. at 181.).

provide some further insight into how Quarles should be applied in the motor vehicle

context.  See nn.49,50 infra.

We now turn to the case law under Quarles in situations where police are required

to go to private or quasi-private premises, such as a home or hotel room, and during those

encounters they elicit unmirandized statements that are alleged to fall under the public

safety exception.  These cases fall into two basic fact patterns.

First are those cases where in addition to the person who makes the challenged

statement, there are other individuals present when police ask their questions, or the

police do not yet know whether there are other individuals present or likely to arrive

while police are on-site.  We will call those the "multiple occupant" cases.

Second, as in the instant case, are those where the police make entry and are able

to determine that only one individual is there, and police have the location secured from

others entering when they ask their questions.  Those we will call the "sole occupant"

cases.

Multiple Occupant Cases

All of the following "multiple occupant" cases have held that the public safety

exception applied to defendants' statements about weapons in response to police

questions, and we have found no contrary appellate authority on similar facts.  The stated

rationales under Quarles have varied, and have certainly discussed additional factual

details.  Notably, however, the presence or reasonably feared presence of other occupants

92

on the premises, who might injure themselves or the officers or others if they gained

access to a weapon, was a factor that was expressly relied upon in each ruling.

United States v. Simpson, 974 F.2d 845, 846-47 (7th Cir. 1992) (domestic disturbance
call to apartment; husband had left with a pistol after threatening child and aiming it at
her; after he returned without the pistol and officers detained [but did not cuff] him in
living room, wife showed police boxes of ammunition in his dresser; women and children
as well as officers were present; question if he owned any weapons was justified under
public safety exception).

People v. Simpson, 76 Cal.Rptr.2d 851, 856-57 (Cal. App. 1998) (drug search warrant
execution at private home; defendant was lured away from the home and detained off-site
before officers entered, but officers did not know who else might be present in or around
the house when warrant was served; question if there were any guns or weapons on the
property was justified).

United States v. Williams, 181 F.3d 945, 947-50, 953-54 (8th Cir. 1999) ("no knock"
night search warrant execution for drugs; defendant, who looked frail and elderly but was
known to have once been charged with unauthorized use of a weapon, was handcuffed
and placed upright in bed upon six officers' entry into his bedroom; question "is there
anything we need to be aware of?", to which defendant answered there was a gun in the
closet, was justified). One ground of the ruling was, "[a]lthough Williams' hands were
cuffed behind his back when the officers asked him if they needed to be aware of
anything else, the officers could not have known if any armed individuals were present in
the apartment or preparing to enter the apartment within a short period of time." Id. at
953-54. The other ground of the ruling was the danger to officers if they happened upon
weapons unexpectedly or mishandled them, in conducting the search. Id. at 954. We
discuss the latter point infra.

United States v. Reilly, 224 F.3d 986, 989-90, 992-94 (9th Cir. 2000) (arrest warrant for
armed bank robbery; police apprehended defendant in front room of two-room motel unit
where officers expected another couple to arrive to join him; defendant made furtive
gestures toward his waistband even when face down on floor with officers' guns pointed
at him; motel unit was not secured at the time; question "where is the gun?" was justified).

United States v. Talley, 275 F.3d 560, 561-65 (6th Cir. 2001) (arrest warrant for
defendant at his home; officers knocked and announced but occupants did not come to
door; officers could hear several individuals running up and down the stairs; officers
apprehended defendant upon entry but could see other "shadowy figures" moving around

before they could complete security sweep; officer saw pistol magazine and bullets in plain view; question "where is the gun?" was justified).

United States v. Young, 58 Fed.Appx. 980, 981-82 (4th Cir. 2003) (per curiam) (search warrant execution for evidence of currency counterfeiting; defendant and two other men were present when police entered the home; police immediately ordered defendant to the floor and handcuffed him, asking prior to frisking him whether he had any "sharp objects, knives, needles or guns;" he responded that there was a gun in the bedroom; at that time the premises had not been secured; question was justified because even though defendant was cuffed, "the officers could reasonably have believed that there might be other armed individuals present in the home, especially since two other people were with Young when the police entered the home.").

Newton, 369 F.3d at 663-64, 677-79 (authorized search of parolee's home on reports that he had threatened a family member and kept a gun there; defendant was handcuffed for officer security upon entry, but at least three other individuals were present; question whether he had any "contraband," to which he indicated there was a gun in a shoe box, was justified; the hostility in the volatile domestic situation and "the possible presence of other persons in the apartment who might reach the gun before officers could seize it supported a public safety inquiry." Id. at 678 n.7.).

United States v. Phillips, 94 Fed.Appx. 796, 798-801 (10th Cir. 2004) (vacated as to sentencing issue in view of United States v. Booker, 543 U.S. 220 (2005)) (search warrant execution at a house suspected of selling illegal drugs; upon entry the officers ordered everyone in the living room to get on the floor, "secured the residence," then gave defendant a copy of the warrant and asked if there were any drugs or weapons in the house, to which defendant answered that there was a shotgun in the bedroom; question was justified, "the fact that the other residents of the house were secured did not completely eliminate the risk that a weapon hidden somewhere could pose a danger to one of them or to the police." Id. at 801 n.2).

United States v. Martinez, 406 F.3d 1160, 1162-63, 1165-66 (9th Cir. 2005) (domestic disturbance call to house; wife was upset in front yard, husband was yelling inside the house, and young boy was also inside; officer saw weapons in living room in plain view while attempting to manage the situation; question about weapons was justified under public safety exception).

United States v. Estrada, 430 F.3d 606, 608-14 (2d Cir. 2005) (Sotomayor, J.) (arrest warrant on probation violations; as officers were attempting to handcuff defendant, and before the apartment had been secured, they asked whether there were any guns in the

apartment; features that made the question justified included the fact that another person was present in the apartment, which "contributed to and compounded the threat the officers faced, making their concern for their safety objectively reasonable."  Id. at 613.).

United States v. Newsome, 475 F.3d 1221, 1222-25 (11th Cir. 2007) (arrest warrant on shooting charges; police believed that defendant and a woman were in motel room; upon entry police immediately secured defendant with handcuffs; question they asked him while conducting security sweep, if there was "anything or anyone in the room that [they] should know about," was justified.  "At the time the question was asked, the officers had reason to suspect that Newsome was with another person and did not know if anyone else was hiding in the room or bathroom.  The officers reasonably believed they were in danger, and acted accordingly to protect themselves and other motel guests in making the arrest."  Id. at 1225.).

United States v. Ball, 282 Fed.Appx. 126, 127 (3d Cir. 2008), affirming 2003 WL 22016793 (E.D. Pa. June 10, 2003) (parole agents arrested defendant on reasonable suspicion of drug-related parole violations and searched his person, car and apartment; he was present in handcuffs when the apartment was searched, and so was his fiancee who was not restrained; when police found ammunition and a gun-cleaning kit in the apartment, they asked defendant where the guns were located; district court ruled that public safety exception applied because of need to protect themselves and the fiancee (even though defendant himself was handcuffed); court of appeals ruled that was not clear error, although "reasonable minds might differ on that point given the facts of this case."  Id. at 128.).

United States v. Are, 590 F.3d 499, 505-07 (7th Cir. 2009) (arrest warrant on drug charges;  police saw wife and young children present during initial security sweep of the home; defendant was handcuffed and was asked whether there were any weapons in the house, which caused police to locate gun in bedroom; features that made the question justified included that the wife and children were not secured, and others might be present.  The court said:  "It is conceivable that one of them could have retrieved the gun and attempted to use it against the officers and agents as they took [defendant] away.  And even when a quick protective search of a residence is conducted, the potential presence of an undisclosed but dangerous individual with access to a weapon cannot be discounted."  Id. at 506-07.).

Cf. United States v. Antwine, 873 F.2d 1144, 1145-47 (8th Cir. 1989) (suspected bank robbery conspirator brandished a gun at the door when undercover officers came to arrest him; after making the arrest outside the house, one of the officers entered and made a "protective search" to determine if other persons were there; when he observed a boy age

11 and a small girl whom the officers were planning to leave behind, the officer searched the house just long enough to find the gun and take it.  The court said it was "guided by Quarles" in ruling that the seized gun [a Fourth Amendment issue] would not be suppressed.  Id. at 1146-47.).

See also United States v. Williams, 483 F.3d 425, 426-30 (6th Cir.  2007) (arrest warrant on rape and robbery charges; police found defendant in a boarding house; the suppression hearing testimony of defendant and police conflicted as to what occurred, and district court failed to make factual findings regarding circumstances of police question if there were other persons present or weapons; case remanded with instructions that if facts were that defendant was seated outside his room and handcuffed when the question was asked, the public safety exception would not apply.  Conversely, it could apply if the officers had an objectively reasonable "belie[f] that someone other than police could access the weapon and inflict harm with it."  Id. at 429.).

Sole Occupant Cases

The following cases that we have grouped as "sole occupant" situations on residential premises, have divided into two categories, with commensurately opposite outcomes.  If the defendant himself had retained some physical freedom when the police asked a safety question, courts have ruled that limited questioning about weapons, and the resulting statements, were justified under the public safety exception.  See, e.g., DeSantis, Brutzman, and Attebury, infra.  On the other hand, if the defendant was firmly under the control of the officers when the question was asked, such that there was no reasonable fear that he could reach a weapon, whether that control was achieved by handcuffing or any equivalent exercise of police authority, Quarles has been held not to apply to defendants' answers indicating the presence of weapons.  See all other cases cited here as sole occupant cases, infra.

96

DeSantis, 870 F.2d at 537-41 (police went to defendant's apartment to arrest him when court revoked his bail pending appeal; initial security sweep showed he was the sole occupant; when told he was arrested, but when not yet handcuffed, he asked if he could change his clothes in adjoining bedroom; police question whether there were any weapons in bedroom, before allowing him into bedroom, was justified by public safety exception).

State v. Stevenson, 784 S.W.2d 143, 144-45 (Tex. App. 1990) (police dispatched to defendant's home on report of a shooting; they observed two victims lying on the ground outside, and defendant who was obviously elderly, unarmed, and made no dangerous moves; he was the sole occupant and was constantly guarded by police; their question where was the gun was not covered by the public safety exception. "Here, we have a man's private residence which is not open to the public at large.... there were no other persons around who could have gained access to the gun." Id. at 145.).

Mobley, 40 F.3d at 690-93 (crack cocaine search and arrest warrant execution at defendant's apartment; officers knocked and announced at 8:30 a.m. and defendant (who answered the door naked and unarmed) was secured by agents against the wall while other agents determined in security sweep that he was the sole occupant; he was allowed to dress under surveillance; as the officers were about to lead him away from the apartment they asked if there were any weapons there that could endanger the officers executing the search warrant; public safety exception did not apply to that question).

United States v. Brutzman, 1994 WL 721798, *1-*2 (9th Cir. Dec. 28, 1994) (search warrant execution for evidence of postal wire/mail fraud at defendant's combined home and office; [the record does not mention any other persons present, and indicates that defendant was neither arrested nor restrained throughout a three-hour search]; police were aware that defendant had a prior felony conviction; police question while securing the premises at outset of search warrant execution, whether there were any firearms present, was justified under public safety exception).

State v. Koren, 654 N.E.2d 131, 132-33 (Ohio App. 1995) (arrest warrant on bank robbery charges; defendant was in his home when officers knew he was there alone; they apprehended and surrounded him and he submitted; pat-down search revealed bullets in his pocket; police question "where's the gun that goes with these bullets?" was not justified under public safety exception so as to allow gun into evidence [no discussion regarding admissibility of the defendant's response leading to finding a gun, but the ruling would exclude such a statement]).

Attebury, 624 N.W.2d at 913-18 (arrest warrant for defendant for threatening his wife with a handgun; he was naked in the shower when officers entered and announced his

arrest, but they did allow him to rummage in his dresser drawers to get dressed; police question whether there were weapons in the home, asked while he was accessing dresser drawers and getting dressed, was justified by public safety exception.  [We grouped this in "sole occupant" cases because although police testified that they did not know whether others were present when they asked the question, the court relied on defendant's potential access to weapons, rather than others' possible presence, in making its ruling.]).

State v. Stephenson, 350 N.J. Super. 517, 518-30 (N.J. App. Div. 2002) (police dispatched to motel on report that man who had threatened to shoot someone was there; police entered defendant's motel room and he was the sole occupant; they began to question him about the alleged threat and he became agitated, then they asked him if he had a gun and he said not on his person, but he became more nervous when they patted him down and found no gun; then they asked "where is the gun?" but defendant did not reply, so they handcuffed him; then they asked him to cooperate and tell where the gun was or they would get a search warrant, and defendant admitted that a gun was in the nearby dresser; the investigatory on-the-scene questioning and pat-down were justified, but the public safety exception did not apply to the post-handcuffing question).

United States v. Braithwaite, 458 F.3d 376, 377-78, 382 (5th Cir. 2006) (search warrant execution for evidence of check and identity card counterfeiting at a house; defendant and live-in girlfriend were handcuffed as soon as agents found them on-site; while the search was in progress, agents asked defendant, "where are the guns, where are the rest of the guns in the house?" and "you need to tell me, are there any guns in the house?"; public safety exception did not apply.  [We grouped this with "sole occupant" cases because the only two occupants were detained in handcuffs during the search, which was the basis of the court's ruling.]).

United States v. Jackson, 544 F.3d 351, 353-60 (1st Cir. 2008) (police went to an apartment to question defendant, who was suspected of having acquired a stolen gun; they surrounded defendant and took him outside the house, then readily obtained consent from the only other occupant to search; questions to defendant regarding location of the gun were not justified under the public safety exception.  "The gun, stuffed inside a cereal box in the refrigerator, was clearly outside the reach of Jackson, who was not even in the apartment and, in any event, was surrounded by a number of police officers.  The mere fact that a gun was involved is not sufficient."  Id. at 360 n.9.  [We grouped this with "sole occupant" cases because the only other occupant was clearly no threat and immediately assisted police by consenting to the search.]).

*          *          *

The Quarles circuit split that we perceive, such as it is, can be observed by comparing the Eighth Circuit's decision in Liddell, supra, 517 F.3d 1007 (8th Cir. 2008), with that of the Sixth Circuit in Williams, supra, 483 F.3d 425 (6th Cir. 2007).  The latter decision is not to be confused with an earlier Eighth Circuit decision also named Williams (no relation, we presume), 181 F.3d at 953-54 (8th Cir. 1999), relied upon in Liddell.

The Liddell panel decision broadly declared, over a very critical concurrence, in a routine single-occupant vehicle stop situation that led to an arrest, that "the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient public safety basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search."  Liddell, 517 F.3d at 1009-10.  In so holding, it relied mainly upon its own earlier Williams decision, 181 F.3d at 953-54, ("the Eighth Circuit Williams case") which we have summarized above as a multiple-occupant premises arrest situation.

As we see it, Liddell was actually an expansion upon the reasoning of that Eighth Circuit Williams case, because that Williams decision could have rested entirely upon its first stated ground for finding the public safety exception satisfied.  That ground was that when the officers asked their question during their initial confrontation with defendant, at night in his bedroom, they did not yet know whether there were others present or likely to come into the apartment.  181 F.3d at 954.

99

The concurring opinion by Circuit Judge Gruender in Liddell pointed out precisely that the Eighth Circuit Williams decision had the "mishandling by officers" rationale as an alternative ruling that "neglected the Supreme Court's requirement of exigent circumstances" in Quarles. Liddell, 517 F.3d at 1010. Judge Gruender only concurred in Liddell because he felt bound by what he regarded as settled law in the circuit. He expressed his disagreement, however, as follows:

> [T]he Quarles Court did not indicate that the inherent danger of a trained police officer discovering a weapon by itself was sufficient to justify the application of the exception. As I read Quarles, the public safety exception to Miranda applies only when (1) an immediate danger to the police officers or the public exists, or (2) when the public may later come upon a weapon and thereby create an immediately dangerous situation. Therefore, the public safety exception would not apply to situations where officers could happen upon a weapon "unexpectedly or mishandle[ ] them in some way," unless some evidence of exigency is presented.

Id. at 1011-12, quoting Williams, 181 F.3d at 954.[49]

We will not here discuss the list of cases that Judge Gruender's concurring opinion cited as indicating a possible circuit split. See Liddell, 517 F.3d at 1012. All of those

---

[49] Judge Gruender, concurring in Liddell, analyzed the facts there as follows:

The record in this case does not establish the existence of exigent circumstances. Here, the police had removed Liddell from his vehicle, handcuffed him, conducted a pat-down search, and placed him in their patrol car.... Because Liddell was arrested for driving while barred, there was no immediate danger that Liddell would be allowed to return to his car where he might have access to a hidden weapon. Furthermore, there was no evidence that the officers could not safely impound and tow Liddell's car in order to conduct a search of it at a later time.... The public safety concern was not related to any exigent circumstances but rather limited to the fact that the officers might have unexpectedly encountered or mishandled a weapon hidden in Liddell's vehicle.

517 F.3d at 1012.

cases are cited in our collections of <u>Quarles</u> progeny by fact pattern, <u>supra</u>.  Instead, we will go directly to the Sixth Circuit <u>Williams</u> decision, 483 F.3d 425 (2007), which was among those cited by Judge Gruender and is the most current and most explicit in its disagreement with the <u>Liddell</u> panel's reasoning.

The Sixth Circuit <u>Williams</u> decision is one that we have collected as a "multiple occupant" premises case, because it occurred in a boarding house and the circumstances were not clear from the record below.  <u>Williams</u>, 483 F.3d at 430.  When the circuit court remanded the case for further factual findings, it gave guidance to the district court as to how it interprets <u>Quarles</u>, stating:

> For an officer to have a reasonable belief that he is in danger, at minimum, he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that <u>someone other than police might gain access to that weapon</u> and inflict harm with it.  The public safety exception applies if any only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

<u>Id.</u> at 428 (emphasis added; citations omitted); <u>accord</u> <u>DeJear</u>, 552 F.3d at 1201-02.

*          *          *

As previously mentioned, the Third Circuit has not yet had occasion to render a reported decision interpreting <u>Quarles</u>.  We have read all Third Circuit citations to <u>Quarles</u>, published and unpublished, and have found no case where the issue presented by the circuit split described above has arisen.  Nevertheless, we are confident that our Court of Appeals will continue to take a narrow approach to the "narrow exception" to <u>Miranda</u>

101

announced in Quarles.  467 U.S. at 658.  See, e.g., Duncan, 308 Fed.Appx. at 606

(vehicle situation; "this is a close case given the narrowness of the exception"); United

States v. McLaughlin, 126 F.3d 130, 134 n.4 (3d Cir. 1997) (rejecting government

argument for another exception to the Fifth Amendment; "the Fifth Amendment admits

no such limitation (except in one narrow circumstance where the privilege against self-

incrimination embedded in the Miranda warning is overcome by the public's interest in

safety, see ... Quarles.")), abrogated on other grounds, United States v. Fiorelli, 133 F.3d

218 (3d Cir. 1998).

We believe that the Third Circuit will take the view that the danger of officers

encountering or mishandling a weapon, during an encounter on private premises, will not

alone support application of the public safety exception.  Thus, if the premises have been

determined by the officers to have a sole occupant, or even if there is more than one

occupant, but the police have achieved complete physical control over all occupants and

can foreseeably maintain that control as long as necessary, any "safety" questioning of the

occupants does not fit within the public safety exception even if police have reasonable

grounds to fear that they will encounter a weapon while performing their functions at the

premises.[50]

---

[50]  The facts of the present case do not require us to venture a prediction on whether a
similar rule should apply to the motor vehicle situation, which has some of its own exigencies.
However, we make note of the recent Supreme Court decision in Gant, 129 S.Ct. 1710 (2009).  It
appears that Gant may lend support to the view that if the police have secured the defendant in
their patrol car and he is not likely to re-enter his vehicle, and even if they have grounds to search
the vehicle, the danger that they might find a weapon in searching his vehicle will not justify an

102

Applying this principle to the facts as we have found them from the record, we conclude that defendant's pre-arrest statements must be suppressed. We have found that those statements were obtained by custodial interrogation without Miranda warnings. We now find that although the questions he was asked about weapons in the apartment were narrowly limited to that subject, and although the officers had reasonable suspicion that there were weapons on the premises, those questions were not justified by the public safety exception because when the questions were asked, the police had determined that he was the sole occupant and they had him firmly in their control and could foreseeably prevent him from accessing any weapons while they conducted their warrant search.

"The test under Quarles -- whether police questioning is necessary to protect the public or police from an immediate danger -- is straightforward, and entails a 'snapshot' look at the situation facing an officer at a moment in time, under the totality of the circumstances....  [T]he Quarles test ... require[s] necessity, urgency and immediacy." Duncan, 308 Fed.Appx. at 606 n.3. The evidence in this case shows that at the moment the police entered defendant's apartment to commence their search, they already had the exterior of the apartment secured from anyone entering or leaving. As soon as they entered, their initial protective sweep determined that defendant was the sole occupant of the premises. We assume that they could see he was not armed, because they did not

unmirandized question to defendant about weapons in the vehicle under the public safety exception. See n.49 supra. As to the issue of hypodermic needles, we decline to comment. See n.45 supra.

103

attempt to frisk or touch him in any way.  From the moment they entered, they also had

defendant stopped and surrounded by armed officers in an open area of the living room

where he could not reach anything, and he submitted to that show of police authority

without making any furtive or erratic gestures.  He had been "reduced to a condition of

physical powerlessness."  Quarles, 467 U.S. at 675 (Marshall, J., dissenting).  It was only

then that Agent Hatcher asked defendant the first safety-related question, which elicited a

vague and exculpatory answer ("the first statement").  Next, when the continued

protective sweep produced an empty holster in a bedroom, defendant was still firmly in

the control of the officers when he was re-questioned about any weapons in the apartment

and he made the incriminating second statement.

Agent Hatcher testified that he had two reasons for asking the questions about

whether there were any weapons in the apartment.  First, for the safety of the officers who

had to conduct the search, so that they did not unexpectedly encounter a weapon.  Second,

for everyone's safety if the agents later decided to allow defendant to move about the

apartment to assist them by pointing out where items listed on the search warrant could be

found.  Under our reading of Quarles, those reasons, whether alone or in combination, are

not sufficient for the exception to apply.  The first reason would be acceptable in the

Eighth Circuit, as discussed above, but we think not in our circuit.  The second reason

lacks immediacy and necessity, because the officers had defendant in their control and

they could choose whether to escort him around the apartment during the search.  If they

104

had fears that he might access a weapon under those circumstances, the objectively reasonable choice would be to refrain from attempting to enlist his cooperation with the search.  It was not, therefore, objectively reasonable for them to question him about weapons for that stated reason.

We find entirely credible the testimony of Agent Hatcher that his purpose and intent in asking the weapon questions was to protect the safety of the officers, rather than any investigatory motivation.  Indeed, even if an officer did have a partially investigatory purpose, that would not prevent application of the public safety exception in an appropriate case.  The test is an objective one.  "Whatever the motivation of individual officers in such a situation, we do not believe that the doctrinal underpinnings of Miranda require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety."  Quarles, 467 U.S. at 656.

This case, however, does not present an objective basis for concern for the officers' safety at the moment the questions were asked, other than the definite risk that officers might encounter a gun while conducting the warrant search.  As we have held, that is not sufficient in our view to satisfy the public safety exception.  Of course if the officers had confronted a different situation when they first made entry into the apartment, such as unknown or multiple unsecured occupants, or an unruly and aggressive occupant, coupled with a basis to suspect that guns were present, that would justify such questioning under Quarles.  See, e.g., Reilly, 224 F.3d at 989-90, 993.  It is

105

just that in this case, the first few moments in the apartment were sufficient for the officers to obtain unquestioned control of the premises and its sole occupant.  From that moment forward, the exigent nature of the situation had been neutralized by the officers. "When the danger inherent in a confrontation has passed, so has the basis for the [public safety] exception." Fleming, 954 F.2d at 1114.  See Quarles, 467 U.S. at 659 n.8 (distinguishing Orozco v. Texas, 394 U.S. 324 (1969), on facts indicating no exigency).

For these reasons, we hold that the Quarles public safety exception does not apply to defendant's first and second (pre-arrest) statements in response to custodial interrogation, and Miranda requires that those statements be suppressed.  Likewise, Edwards requires suppression of the second statement, because that was obtained after defendant had invoked his right to counsel.

*          *          *

It may seem strange, at first blush, to say that the agents who suspected guns on the premises could detain the occupant by force for the officers' safety under the Fourth Amendment, but they could not question him about those very guns for their safety under the Fifth Amendment unless the Quarles standard of necessity, urgency and immediacy was met.  The essential answer to that question lies in the different purposes underlying the two constitutional guarantees in such circumstances.  Judge Aldisert of our Third Circuit, sitting by designation in the Seventh Circuit, has aptly explained this difference as follows:

106

> The purpose of permitting a temporary detention without probable cause or
> a warrant is to protect police officers and the public.  Terry....
> Jurisprudentially speaking, we are saying that the temporary seizure of the
> person is reasonable, and therefore a warrant is not necessary....
> Reasonableness for Fourth Amendment purposes always depends on a
> variety of circumstances....
>
> ....
>
>         The purpose of the Miranda rule, however, is not to protect the
> police or the public.  "[T]he basis for [the] decision was the need to protect
> the fairness of the trial...," and "[t]here is a vast difference between those
> rights that protect a fair criminal trial and the rights guaranteed under the
> Fourth Amendment."  Accordingly, a completely different analysis of the
> circumstances is required.  The inquiry is much narrower.  The number of
> relevant factors is severely limited.  Police officers have much less
> discretion than in Fourth Amendment cases.

Smith, 3 F.3d at 1097.

To us, therefore, it stands to reason that the Quarles public safety exception -- an

exception that permits a law enforcement officer deliberately to ask questions related to

safety only, of a person who is "in custody" for Fifth Amendment purposes, without

advising that person of Miranda rights and obtaining a knowing and voluntary waiver -- is

necessarily a narrow exception.  That narrow exception to a person's Fifth Amendment

rights, as protected by Miranda, is not to be conflated with the broad authority conferred

on law enforcement under Terry and Summers and their Fourth Amendment principles to

detain by reasonable force that same person, whether or not the person is "in custody"

within the meaning of Miranda.  Indeed, under the Summers line of cases the Supreme

Court has ruled that officers may routinely take physical command of the occupants of

premises while police execute a valid search warrant.  The notion that they may question

the occupants just as routinely is not suggested by <u>Quarles</u> and its progeny.  Rather, for the public safety exception of <u>Quarles</u> to override a person's Miranda rights, a genuine situation of exigency must exist.[51]

### E.    FIFTH AMENDMENT:  POST-ARREST STATEMENTS DURING TRANSPORT

We have held, in Section II.D. above, that defendant's first and second pre-arrest statements must be suppressed under <u>Miranda</u>, and his second pre-arrest statement is also subject to suppression under <u>Edwards</u>, because the public safety exception does not apply based upon the facts as we have found them.  The evidence shows that defendant also made a series of incriminating post-arrest statements while he was in the agents' vehicle being transported to the U.S. Marshal's office for booking, at a time when he had not yet received Miranda warnings (again, "the post-arrest statements").  Here we address defendant's motion to suppress those post-arrest statements.

The government argues that all of the post-arrest statements were spontaneous and volunteered by defendant, and were not in response to any interrogation by the agents.  (Dkt. 36 at 9-11.)  Therefore, argues the government, the post-arrest statements should not be suppressed even if the pre-arrest statements must be suppressed as not covered by

---

[51]  Our reading of this <u>Quarles</u> jurisprudence persuades us that the portion of the DCIS Special Agent Manual pertaining to the public safety exception under <u>Miranda</u> may fall short in providing agents with sufficient clarity, at least in certain "sole occupant" situations such as this case.  Defendant placed portions of that Manual in evidence, under consent protective order, to register his criticism of those instructions.  (Dkt. 31 at 4-5; h'g exs. D-7, D-8, D-9; <u>see</u> dkt. 35 at 40.)  We agree that the "Personal and Public Safety Questions" text should be reviewed by the agency for better conformity to this case law.

the Quarles public safety exception.  (Dkt. 39 at 24.)  Defendant argues that the words

and conduct of the agents both before and during the transport ride were reasonably likely

to, and did, elicit the post-arrest incriminating statements from him, so those statements

were also the result of "interrogation" in violation of Miranda and Edwards.  (Dkt. 35 at

4-5, 35-40.)[52]

Miranda instructs that "[i]f the individual states that he wants an attorney, the

interrogation must cease until an attorney is present."  384 U.S. at 473.  The Court in

Miranda observed that "[b]y custodial interrogation, we mean questioning initiated by law

enforcement officers after a person has been taken into custody ...."  Id. at 444.  Again we

refer to the landmark decision in Rhode Island v. Innis, 446 U.S. 291 (1980), which

provided this definition of "interrogation":

> We conclude that the Miranda safeguards come into play whenever a
> person in custody is subjected to either express questioning or its functional
> equivalent.  That is to say, the term "interrogation" under Miranda refers
> not only to express questioning, but also to any words or actions on the part
> of the police (other than those normally attendant to arrest and custody) that

---

[52] Defendant does not argue that the evidence would support a ruling that his pre-arrest
statements were constitutionally "involuntary" under Fifth Amendment due process standards.
(Dkt. 35.)  Instead, he relies on the Miranda bright line rule of exclusion for those pre-arrest
statements, and in Section II.D. above, we have ruled in his favor on those grounds.  Therefore,
we do not reach the question whether the pre-arrest statements were coerced and involuntary, in
violation of his Fifth Amendment due process rights.  It could be posited that analysis of the
admissibility of the post-arrest statements might change if the pre-arrest statements were
constitutionally "involuntary," even if the post-arrest statements were spontaneous and not the
product of interrogation.  See, e.g., United States v. Abdulla, 294 F.3d 830, 835-36 (7th Cir.
2002).  We are aware of no appellate authority directly on point, however, and the parties have
cited none.  Therefore, we analyze the post-arrest statements based on the arguments presented
by the parties, and our own review of the case law.

the police should know are reasonably likely to elicit an incriminating response from the suspect.

Id. at 301.

The focus of that definition, stated the Innis Court, is twofold:

The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

Id. at 301-02 (emphasis in original).

Innis arose on the following facts. Three officers were transporting defendant to the police station, in the police vehicle, after his arrest on the street. When he was arrested he had received his Miranda warnings and invoked his right to counsel. During the brief ride to the station, one officer commented to another officer that there was a school for handicapped children nearby, and he feared that one of them might find the missing murder weapon and hurt themselves. The other officer responded that they should continue to search for the weapon and try to find it. Defendant interrupted their conversation and told them to turn around the car so he could show them where the gun was located. The Court held that defendant was not "interrogated" within the meaning of

110

Miranda, because he "was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." Id. at 302-03.

The Innis Court emphasized two corollary points drawn directly from Miranda. First, volunteered statements of any kind are not barred by Miranda or the Fifth Amendment itself.  Second, the Miranda safeguards are not required where a suspect is in custody but is not subjected to interrogation.  Here are those points, as expressed in Innis:

> This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation.  As the Court in Miranda noted:

> "Confessions remain a proper element in law enforcement.  Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated*....  Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."  Id., at 478 ... (emphasis added).

> It is clear therefore that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.

Id. at 299-300, quoting Miranda, 384 U.S. at 478.

The admissibility of volunteered statements under the Fifth Amendment was emphasized in Edwards, decided just one year after Innis.  There, defendant was named in a sworn complaint and arrested on a warrant.  He initially participated in a mirandized interview by police, but after some interrogation he invoked his right to counsel and the questioning ceased.  The next day, January 20, despite his objection, he was subjected to a

111

renewed mirandized interview when told by his jailor that "he had" to meet with the detectives.  Edwards, 451 U.S. at 478-79.

Those facts prompted the Edwards prophylactic rulings that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation [and] ... an accused ..., having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Id. at 484-85 (emphasis added).  The Court explained the latter point as follows:

> In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel.  Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial.  The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation.  Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.  Rhode Island v. Innis ... makes this sufficiently clear.

Id. at 485-86, citation and footnote omitted.

The Supreme Court applied Innis and Edwards to allegedly volunteered statements of a defendant in custody in Arizona v. Mauro, 481 U.S. 520 (1987).  Defendant Mauro

was a murder suspect in custody at the police station, where he was advised of his

Miranda rights and he told the officers that he did not wish to make any more statements

without having a lawyer present.  All questioning then ceased, and defendant did not

thereafter waive his right to have a lawyer present.  Then Mrs. Mauro, who had been

questioned in another room in the station, asked if she could speak to her husband.  The

police tried to discourage her.  They finally yielded to her demands, but advised Mr. and

Mrs. Mauro that they could speak together only if an officer was present in the room to

observe and hear what was going on.  The meeting then took place and was recorded by

the attending officer, who asked no questions except whether they had someone to talk to

about taking care of their child, and whether they were finishing speaking with each

other.  The prosecution was permitted to play the tape at trial to rebut his defense that he

was insane at the time of the crime.  Id. at 521-23.

The Court held that the officers' actions in Mauro were not the "functional

equivalent" of police interrogation.  It stated:  "We think it is clear under both Miranda

and Innis that Mauro was not interrogated....  Detective Manson asked Mauro no

questions about the crime or his conduct.  Nor is it suggested -- or supported by any

evidence -- that Sergeant Allen's decision to allow Mauro's wife to see him was the kind

of psychological ploy that properly could be treated as the functional equivalent of

interrogation."  Id. at 527.  "Mauro was not subjected to compelling influences,

psychological ploys, or direct questioning.  Thus, his volunteered statement cannot

113

properly be considered the result of police interrogation." Id. at 529. In so holding, the

Mauro Court quoted with approval from Oregon v. Elstad, 470 U.S. 298 (1985), "'[F]ar

from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not

coerced, are inherently desirable....'" Mauro, 481 U.S. at 529, quoting Elstad, 470 U.S. at

305, quoting United States v. Washington, 431 U.S. 181, 187 (1977).

The case at bar presents the situation of an initial set of statements that we have

excluded under Miranda/Edwards, and then a subsequent set of statements that must also

be analyzed for possible suppression. Elstad held, in the context of a first unwarned

statement and a subsequent warned statement clearly obtained by police interrogation,

that although the first statement had to be suppressed, "when the alleged 'fruit' of a

noncoercive Miranda violation is neither a witness nor an article of evidence but the

accused's own voluntary testimony," the Wong Sun exclusionary rule does not apply.

Elstad, 470 U.S. at 308, distinguishing Wong Sun v. United States, 371 U.S. 471 (1963).

Instead, the test in those circumstances is solely whether the subsequent statement is

knowingly and voluntarily made. "Though Miranda requires that the unwarned admission

must be suppressed, the admissibility of any subsequent statement should turn in these

circumstances solely on whether it is knowingly and voluntarily made." Elstad, 470 U.S.

at 309. In determining whether the subsequent confession was voluntary under Elstad, a

court "must examine the surrounding circumstances and the entire course of police

conduct." Id. at 318.

114

Elstad involved a "subsequent statement" that was a mirandized written confession under police interrogation, signed by defendant. Id. at 300-02. The square holding of Elstad is that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id. at 318.

Elstad did not address the scenario of an unwarned subsequent confession that may have been spontaneous and voluntary. Several circuits have ruled that the "voluntariness" test selected in Elstad should also apply to unwarned "subsequent statements" that were volunteered by defendant rather than being the product of custodial interrogation. See United States v. Pettigrew, 468 F.3d 626, 633-39 (10th Cir. 2006); Abdulla, 294 F.3d at 835; Medeiros v. Shimoda, 889 F.2d 819, 823-25 (9th Cir. 1989), summarized infra. We are aware of no contrary authority.

The time-honored rules for determining whether a statement is "voluntary" under Fifth Amendment analysis have been summarized in the Third Circuit as follows:

> Statements made to a law enforcement officer are inadmissible into evidence if the statements are "involuntary." Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973); see also Colorado v. Connelly, 479 U.S. 157, 165 (1986) (involuntary confessions violate the Due Process Clause of the Fifth and Fourteenth Amendments). A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker. Schneckloth, 412 U.S. at 225; United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994) . If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary. Schneckloth, 412 U.S. at 225-26. A suspect's background experience, including prior dealings with the criminal justice system, should be taken

115

into account in the voluntariness inquiry.  See Oregon v. Bradshaw, 462
U.S. 1039, 1046 (1983) (plurality); United States v. Velasquez, 885 F.2d
1076, 1086 (3d Cir. 1989).  A necessary predicate to a finding of
involuntarinesss is coercive police activity.  Connelly, 479 U.S. at 167.
Further, there must be some causal connection between the police conduct
and the confession.  Id. at 164.  The burden is on the Government to
establish, by a preponderance of the evidence, that a challenged statement
was voluntary.  Lego v. Twomey, 404 U.S. 477, 489 (1972).

United States v. Jacobs, 431 F.3d 99, 108-09 (3d Cir. 2005).

*          *          *

It can be a daunting task -- for a lawyer or a court -- to sift through the vast body of

case law on "voluntariness" of confessions, and find cases focusing specifically on

allegedly spontaneous and voluntary confessions, the "volunteered" confessions referred

to in Miranda.  We have made an effort in that direction, to give factual context to the

decision we must make on this issue.  We have located an instructive sampling of federal

court citations, in addition to Mauro itself, that are summarized briefly here.  The fact

patterns of these cases fall into several readily identifiable categories that we have

separated for present purposes into five groups.[53]

The existence or lack of prior Miranda warnings in the cases described below was

not a determinative factor in any of the cases where statements were held admissible,

despite the fact that each of the defendants was in custody, or arguably in custody.

Indeed, in most of these cases the Miranda warnings had not yet been administered when

the statements were made.  The pivotal issue in each situation (other than the Fifth

---

[53]  We do cite unpublished opinions in this summary because we are comparing fact
patterns and the governing legal principles were not in dispute.

Amendment voluntariness of the statement) was whether the defendant's statement was made under "interrogation."

The first group examines a statement made by a suspect before any other confession.  In each of the following cases, the statement was held to be admissible.[54] See Ball, 282 Fed.Appx. at 128 (while defendant watched police look at a stack of twenty dollar bills during search at his residence, he said "[t]hat's not real money."); United States v. Brown, 261 Fed.Appx. 371, 374 (3d Cir. 2008) (while defendant was being arrested for marijuana that police observed in partially open backpack, he blurted out that there was a gun in the backpack); United States v. McCarty, 475 F.3d 39, 45 (1st Cir. 2007) (while defendant was detained in handcuffs during search warrant execution at his home, officers discovered shotgun behind the couch where he was seated and he made statements as officers retrieved and inspected the gun); United States v. Richardson, 427 F.3d 1128, 1132-33 (8th Cir. 2005) (similar to Innis; while police were transporting defendant to station and stopped to verify a location while discussing the evidence between themselves, he stated without prompting that he was responsible for the drugs but not the gun), vacated in part on other grounds, 439 F.3d 421 (8th Cir. 2006); United States v. Hendricks, 116 Fed.Appx. 684, 687-88 (6th Cir. 2004) (while defendant was detained with others on apartment floor and officers made safety search for missing gun, when one

---

[54]  When we say that a statement was held to be "admissible" in this summary, we refer only to the Fifth Amendment issues that were decided in the opinion.  If there were other issues, such as admissibility under evidence rules, those are not addressed here.

officer called to the other officers that gun was found, defendant stated "that's my gun.");

United States v. Crowder, 62 F.3d 782, 784-86 (6th Cir. 1995) (while defendant was

seated handcuffed in patrol car while officers performed consent search of his house for

missing gun, without success, defendant "pecked" at the police car window and told

officer, "I will tell you where the gun's at."); United States v. Benton, 996 F.2d 642, 643-

44 (3d Cir. 1993) (defendant was arrested on suspicion of having just discarded gun used

in reported robbery, and was cuffed and seated in patrol car when officer retrieved the

gun from doorstep where officer had seen defendant bend down; defendant asked officer

why he was being arrested; officer replied that he had seen defendant bend over, and that

defendant was going to be charged; defendant stated that no one had seen him throw

away the gun); Lawrence, 952 F.2d at 1035-37 (similar to Innis; while defendant under

arrest was being transported to station, defendant informed officer that he had thrown

away a gun while running from the police, stating, "I don't give a ___ about you, but I

don't want some little kids to find it."); United States v. Calisto, 838 F.2d 711, 713, 716-

18 (3d Cir. 1988) (while defendant was under arrest in his home, and had been

mirandized and invoked his right to silence, he heard police saying they found

methamphetamine and men's and women's clothing in same room of his house and

talking about needing to get an arrest warrant also for his daughter; he stated, "Don't lock

my daughter up.  She has nothing to do with that stuff.  That's mine.  I'm the one you

want."); United States v. Morris, 2008 WL 5188826, at *5-*6 (W.D. Pa. Dec. 8, 2008)

(defendant pretrial detainee used prison telephone to make incriminating statements, where prominent notices advised inmates that all calls were subject to monitoring and recording); United States v. Fogle, 515 F.Supp.2d 474, 480-81, 491 (D.N.J. 2007) (while detained for vehicle stop, defendant watched police retrieve gun from search of his car's passenger compartment, then stated that it was his and he was in the military but did not have a permit); United States v. Fromal, 733 F.Supp. 960, 962-64, 968-69 (E.D. Pa. 1990) (defendant arrestee was being interrogated after waiving Miranda rights, but when he heard that police were in the process of obtaining search warrant for his car he blurted out, "Oh, my God, ... you might find a gun in the trunk of my car," not in response to any police question); see also United States v. Fioravanti, 412 F.2d 407, 412-14 (3d Cir. 1969) (while defendant was under arrest and detained in holding area with another individual whom he thought was a fellow arrestee but who was actually an undercover agent, defendant made incriminating statements; he thought that he was conversing with a fellow partner in crime, not a policeman).

The following two cases in this first group show a contrary result, based on the facts.  See United States v. Brownlee, 454 F.3d 131, 134-36, 145-48 (3d Cir. 2006) (while defendant was handcuffed in back seat of police car, before being transported to station, defendant initiated conversation with officer and officer engaged in the conversation with him, gradually directing it to the subject of the crime; that was held to be "interrogation;" case remanded for new trial); United States v. Elias, 832 F.2d 24, 24-26 (3d Cir. 1987)

119

(while detained for vehicle stop, defendant watched police observe much cash and a bag
containing multiple smaller bags appearing to contain white powdery substance in
defendant's open briefcase; officer asked defendant what was in the bag, and he stated
"That's my personal coke;" that was held to be "interrogation;" case remanded for
findings whether he was in custody at the time).

     The second group examines a subsequent statement made by a suspect after he
invoked his right to counsel, where no police interrogation occurred after he invoked the
right to counsel but defendant made a statement within hearing of the officers.  The facts
in Arizona v. Mauro, supra, 481 U.S. 520 (1987), well illustrate this situation.  As
described above, the defendant in Mauro invoked his right to counsel and all police
questioning ceased.  He then volunteered statements to his wife, in the presence of the
police, and those statements were held admissible.  Id. at 521-23.  See also United States
v. Bonner, 2010 WL 1628989, at *1-*6 (M.D. Pa. Apr. 20, 2010) (First statement was
under police interrogation after Miranda warnings, but was later held inadmissible as
involuntary because of defendant's partial intoxication and detectives' deceptive
comment that defendant was not a target of their particular investigation.  Subsequent
statements were volunteered by defendant during extradition transport ride, despite fact
that his right to counsel had been invoked before start of the transport ride and despite the
officer's explanation to defendant during the ride that they could not talk to him about the
case.  Those subsequent statements were held admissible.).

<u>The third group examines a subsequent statement made by a suspect, after having made an initial statement in response to interrogation, where the first statement is later held admissible under the *Quarles* public safety exception to *Miranda*.</u>  In each of these cases, the subsequent statement was held to be admissible as not the product of "interrogation."  <u>See</u> <u>United States v. Shea</u>, 150 F.3d 44, 47-49 (1st Cir. 1998) (First statement was answer to police question whether defendant had any guns or needles; held admissible under <u>Quarles</u>.  Subsequent statements held admissible as volunteered:  While he was being arrested, defendant was heard saying he should have gone home and asking how the agents knew he was there.  As he was being placed in car for transport to FBI office, defendant stated:  "What am I going to get for bank robbery, forty years?  I'll be out when I'm seventy."  En route to the FBI office, defendant asked the agents, "What do you got me for, a stolen jeep?"); <u>Andersen v. Thieret</u>, 903 F.2d 526, 527-29, 531-32 (7th Cir. 1990) (habeas review) (First statement was answer, in police car en route to station, whether defendant had a gun that his mother reported he had; held "arguably proper" under <u>Quarles</u>.  Subsequent statements, also in police car, held admissible as volunteered:  After an interval of silence, defendant blurted, "I stabbed her"; the arresting officer asked, "Who?"; defendant responded, "Cathy."); <u>United States v. Seibert</u>, 779 F.Supp. 366, 367-69 (E.D. Pa. 1991) (First statement was answer to police question whether defendant had guns in his home; held admissible under <u>Quarles</u>.  Subsequent statement held admissible as volunteered:  After an unspecified lapse of time, defendant spontaneously stated that he had been given the gun in order to protect himself from the "Pagans" motorcycle gang.).

121

The fourth group examines a subsequent statement made by a suspect, after having made one or more initial statements in response to interrogation, where the initial statement is later held inadmissible under *Miranda* (or not offered by the prosecution).  In all but the last-cited of these cases, the subsequent statement was held to be admissible as not the product of "interrogation."  See United States v. Melvin, 2007 WL 2046735, at *8, *10 (4th Cir. July 13, 2007) (First statement was answer to police question whether there was anything the agents needed to know about in his truck that was already being towed to impound lot; held inadmissible as not within Quarles exception.  Defendant made a series of volunteered statements both before and after that, including during the transport to court after his formal arrest.); United States v. Pettigrew, 468 F.3d 626, 631-38 (10th Cir. 2006) (Defendant's first statement was answer to police question that was later held inadmissible under Miranda; prosecution did not offer his second statement. Subsequent statement was volunteered soon after arrest, while police were administering blood alcohol test; defendant stated, "I saw it at the last minute.  I hit it and took off."); United States v. Cole, 315 F.3d 633, 634-37 (6th Cir. 2003) (First statement was answer to police question regarding whose gun it was that they had seen discarded as vehicle stopped; held inadmissible under Miranda.  Subsequent similar statements, and arguments that he was being treated unfairly, were volunteered while being booked at police station and while being transported in police car to jail; court rejected argument that the subsequent statements were "one continuous statement" with the initial inadmissible

122

statement.); Abdulla, 294 F.3d at 832-37 (First statement in answer to a police question was arguably inadmissible under Miranda, but harmless error to admit in view of subsequent admissible statements.  Defendant's next two statements, including a repeat of his first statement, were made spontaneously within 20 minutes, while agents stood with defendant during customs inspection of his baggage.  His next similar incriminating statements were made spontaneously during the 30-minute ride to the FBI office, including "I robbed a bank, everyone knows I robbed a bank."); Shimoda, 889 F.2d at 821-25 (habeas review) (First statement was answer to police question during vehicle stop; held inadmissible under Miranda.  Subsequent similar statements were volunteered 30 minutes later, after arrest and booking, while defendant was being treated for laceration, including "I killed that ___ ....  Good for him.  I hope he's dead."); Samora v. United States, 406 F.2d 1095, 1099 (5th Cir. 1969) (First statement in answer to police interrogation was not offered by prosecution for lack of adequate Miranda warnings. Subsequent statements were volunteered after defendant was taken before judicial officer and was given adequate Miranda warnings; immediately following the hearing he volunteered statements incriminating himself and exculpating his companion.); United States v. Vue, 2010 WL 2650624, at *1-*8 (W.D. Pa. July 1, 2010) (First two statements were not offered by prosecution.  Subsequent statements were volunteered during transport, including "You guys didn't give me enough time to get to my AK....  I have guns all over the place."); United States v. Daniels, 2010 WL 2163844, at *1-*5 (E.D. Pa.

May 27, 2010) (First and third statements were held inadmissible under Miranda; second and fourth statements were volunteered, including "Watch it, it [the gun] has a head in it. It's mine...; and "I knew you were going to find them [the baggies containing drugs] anyway."); United States v. Barnes, 2005 WL 1899502, at *1-*4 (E.D. Pa. Aug. 8, 2005) (First statement was answer to police question whether there were weapons or contraband in the house; held inadmissible as not within Quarles exception.  Subsequent statements were volunteered a few minutes later, when defendant saw police remove cocaine and gun from basement safe and he stated that he had just finished "cooking some product" in the kitchen, and the product was currently sitting on top of the microwave.); contra United States v. Falu, 1998 WL 961891, at *1-*6 (E.D. Pa. Dec. 21, 1998) (Similar to Brownlee; first statement was answer to police interrogation during search warrant execution; held inadmissible under Miranda.  Subsequent statement, during booking at station, was initiated by defendant but officer directed the conversation to the subject of the crime; that was held to be "interrogation.").

We have located one case that we have assigned to a fifth group, for analytical purposes only.  The fifth group examines a subsequent statement made by a suspect after he invoked his right to counsel, where police interrogation resumed without counsel present.  The facts in Burgess v. Dretke, 350 F.3d 461 (5th Cir. 2003) were as follows. Police were on the lookout for defendant as a suspect in the disappearance of his former girlfriend, who was last seen alive on November 12 and was reported missing that same

day.  Two days later, police found him driving the victim's car and arrested him on

outstanding warrants.  They provided Miranda warnings and he made some initial

statements under interrogation, but he soon invoked his right to remain silent and requested

to speak with a lawyer.  Police questioning ceased at that time.  When they arrived at the

courthouse (and before formal charges or initial appearance), defendant was again

mirandized, again invoked his Fifth Amendment rights, and requested to speak with an

attorney named Thomason.  Mr. Thomason met privately with defendant, then informed

the police that he would not be representing defendant.  Here is what happened next:

> The police told Thomason that they urgently needed to locate [the missing
> victim] and requested that he determine whether Burgess would disclose
> where she was.  Thomason agreed and again spoke with Burgess privately.
> Thomason returned shortly with a piece of paper containing written
> directions describing the location of [victim's] body.  The police, who were
> unfamiliar with the area described in the note, asked Thomason if Burgess
> would agree to show them the location.  Thomason again consulted with
> Burgess, and Burgess agreed to assist the police discover her body.  With
> Burgess's assistance, police officers searched the area identified in the
> written directions for many hours until they finally located [it].

Id. at 464-65.

Defendant Burgess allegedly made several highly incriminating statements during

the many-hour trip with police in which he led them to the victim's body.  An officer

testified at a pretrial hearing that defendant said, "I didn't mean to hurt her.  You know, I

just snapped."  "I didn't mean to kill her.  I just snapped."  Id. at 470 and n.24.

The Burgess court, on habeas review, made the discovery that although one of

defendant's habeas issues was that the trial court erred in admitting those statements, the

125

statements had never been admitted at trial.  Nevertheless, the court of appeals stated the

following in dictum:

> Although the state at the pretrial hearing attempted to portray these
> statements as voluntary, spontaneous, and uncoerced, and thus admissible
> under Edwards, it is possible that these statements constituted an ongoing
> violation of his Fifth Amendment right to counsel because Burgess had still
> not been provided counsel at the time of the search.

Id. at 470 and n.25, citing Edwards, 451 U.S. at 484-85 ("... unless the accused himself

initiates further communication, exchanges, or conversations with the police").

*          *          *

A fair summary of this body of jurisprudence, under Miranda, Innis, Edwards and

Mauro, takes us back to the declaration of Chief Justice Warren, writing for the Court in

Miranda:  "Volunteered statements of any kind are not barred by the Fifth

Amendment...."  384 U.S. at 478.  To determine whether a statement was "volunteered"

by a person in custody and therefore admissible under the Fifth Amendment, the first

question is whether when the statement was made, the person was responding to any

words or conduct on the part of the police (other than those normally attendant to arrest

and custody) that the police should have known were reasonably likely to elicit an

incriminating response from the suspect.  Innis, 446 U.S. at 301-02.  If the answer to that

question is yes, the statement must be suppressed.  If the answer is no, the statement is

admissible unless it was "involuntary" within the meaning of the Fifth Amendment.   See

Mauro, 481 U.S. at 520.

Defendant begins his attack on admissibility of his post-arrest statements by invoking the "fruit of the poisonous tree" doctrine.  First he contends, in effect, that the post-arrest statements (as well as the pre-arrest statements) should be suppressed as "fruit of the poisonous tree" of a search and arrest conducted in violation of the Fourth Amendment.  (Dkt. 35 at 46-47.)  It is correct that the Wong Sun exclusionary rule would apply to confessions obtained in violation of the Fourth Amendment.  See Elstad, 470 U.S. at 305-06 ("The Wong Sun doctrine applies ... when the fruit of the Fourth Amendment violation is a confession.")  We have, however, ruled that there was no Fourth Amendment violation in this case, with respect to the search warrant itself, or the reasonableness of the search, or the initial detention of defendant at the outset of the search, or the existence of probable cause to arrest defendant for firearm possession.  See Sections II.A.-C. supra.  Second, defendant contends that the Wong Sun exclusionary rule should apply to his pre-arrest and post-arrest statements because his Sixth Amendment rights were violated after he invoked his right to counsel at the outset of the search.  (Dkt. 35 at 44-45.)  This argument is baseless, because it is well established that the Sixth Amendment right to counsel (as distinguished from the Fifth Amendment right to counsel) does not attach prior to the initiation of formal judicial proceedings.  See Innis, 446 U.S. at 300 n.4; Elstad, 451 U.S. at 480 n.7; Edwards, 451 U.S. at 485-86 ("The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation."); n.36 supra.  See also Michigan v. Jackson, 475 U.S. 625 (1986)

(transposing <u>Edwards</u> prophylactic rule to Sixth Amendment context).  Therefore,

defendant's reliance on <u>United States v. Feliz</u>, 20 F.Supp.2d 97 (D.Me. 1998), <u>aff'd</u>, 182

F.3d 82 (1st Cir. 1999), a Sixth Amendment decision, is misplaced.  Third, to the degree

that defendant seeks a <u>Wong Sun</u> analysis to be applied to a <u>Miranda/Edwards</u> violation

under the Fifth Amendment (dkt. 35 at 44), that argument is not available under the

current law in this circuit.  <u>See</u> <u>Daniels</u>, 2010 WL 2163844, at *4 (reviewing precedent).

Defendant's primary Fifth Amendment argument urges that all of the actions of

law enforcement leading up to, as well as including, the transport ride, should lead to a

finding that his post-arrest statements during the ride were the product of "interrogation,"

rather than volunteered statements.  (Dkt. 35 at 4-5.)  He emphasizes that defendant was a

65-year old man with a heart condition who had been roused from his sleep by agents and

a SWAT team bursting in with guns pointed and verbal shouting; the fact that an EMT

team was called to examine him; the fact that he was in pain from the handcuffs and the

agents refused his requests to be cuffed in front; and his "upset, agitated and rambling"

demeanor throughout the post-arrest period in the apartment, even before entering the car.

(<u>Id.</u> at 6.)  These, he points out, were existing circumstances that were known to the

officers at the outset of the transport ride.  (<u>Id.</u>)  He also asks the Court to infer, from the

cautionary statements made by Agent Hatcher in response to his monologue in the car,

that the agents in the car were "taunting" him as punishment for having asked for his

attorney in the apartment, by telling him that they gave him the chance to "clear this

whole situation up" at the apartment.  (Id. at 39-40.)  Finally, he argues that it was

provocative conduct for the agents to allow him to speak on the cell phone with his

attorney during the transport ride, as they listened, after denying his requests to talk to his

attorney while he was in his apartment, "where there could have been some privacy."  (Id.

at 6.)[55]  The government submits that the record shows that defendant's statements during

the transport ride were voluntary and spontaneous, and were not the product of any words

or actions by the agents that they should have known were reasonably likely to elicit an

incriminating response from him in the circumstances.  (Dkt. 36 at 9-11.)

     We conclude that on this record, the government has met its burden to prove by a

preponderance of the evidence that defendant's post-arrest statements were both

spontaneous and voluntary, and were not the product of "interrogation" as defined in

Miranda and Innis.  As explained below, we do make this ruling based upon the "totality

of the circumstances," both before and during the transport ride itself.

     The first issue is whether the statements were in response to "interrogation," or

whether they were spontaneous.  It is true that the initial entry of the officers for the

search warrant execution was tumultuous, from defendant's standpoint, and certainly

upsetting.  But after the very brief initial verbal exchanges between Agent Hatcher and

defendant, and the discovery of the holster and then the gun which resulted in defendant's

---

    [55]  We have not been able to find as a fact that any agents denied defendant the
opportunity to speak with his attorney by phone from the apartment.  (See Section I.E. supra.)
We set forth and address defendant's argument to that effect here, for the sake of completeness.

arrest, the tone of the entire search was quiet and orderly.  From the moment of his arrest, during the remaining time in the apartment, the agents directed no communications to defendant other than those necessary to ensure a careful search of his apartment and storage area with no damage to his property.  Defendant did direct a fairly steady stream of complaints to the officers after his arrest, but there is no evidence that they heard him make any further incriminating statements while there.

We have found as a fact that the summoning of an EMT crew to examine defendant at the apartment, before the transport ride, was prompted by Agent Hatcher's observation of a lot of medications on the counter and his concern for liability if defendant was not in physical condition for the hour-long ride to the courthouse.  We have rejected defendant's contention that the EMT exam was caused by defendant becoming "sick" or undergoing any physical deterioration there.  See n.20 supra and accompanying text.  The EMT exam report described defendant as anxious but with no signs of any medical issues, and the examining officer observed him to be "perfectly coherent and normal." (Dkt. 21 at 141.)  Defendant remained in the handcuffs throughout that exam, and the EMT officer noted no signs of improper restraint of his hands.  (Id. at 149; dkt. 10-2 at 16-17.)  At the end of the EMT exam, defendant refused the offer to be taken to the hospital for observation or treatment.

Defendant cites no authority, and we are aware of none, holding that during a period necessary to arrange to transport an arrestee to the booking station, the suspect is entitled

to a telephone conversation with his attorney, let alone a private conversation with counsel. Miranda requires that once a suspect in custody invokes his right to counsel, all questioning must cease until counsel is "present." 384 U.S. at 473. We have held that defendant's incriminating statement after he invoked his right to counsel at the outset of the search must be suppressed because, in our view, the public safety exception did not cover that questioning in the circumstances. It does not follow, however, that when he was under arrest the officers were required to interrupt their work conducting the search, and arranging for his transport to the U.S. Marshal, to accommodate his request to speak to counsel when they did not question him, and did not intend to question him, about either the subject of the search warrant or the subject of his arrest. Nor would it even have been feasible to provide defendant with "privacy" to confer with his attorney by phone at the apartment once he was under arrest. He was necessarily under constant guard, and no conversational privacy would have been possible during that time in the home.

The few remaining events surrounding the post-arrest statements occurred during the transport ride itself. Those facts are that defendant initiated a series of statements before, during, and after his cell phone conversation with his attorney, all within the hearing of the three agents who were transporting him. Before the cell phone call, defendant's statements included "I never sold to the government;" and "I'm not a felon." During the cell phone call with his attorney, defendant stated, "The only reason they're arresting me is because I had a gun in my home." After that call, defendant continued

with additional statements including, "I wish I would have never kept that gun; that was stupid," and "I just wish I would have never saved that gun."  (H'g ex. G-6.)

The record shows only three types of communications from the agents to defendant during the transport ride.  None of those communications asked defendant about the crime or his conduct.  See Mauro, 481 U.S. at 27.  First, Agent Gibson asked him some questions about his medical needs and prescriptions.  (Dkt. 21 at 25.)  We find that those were clearly in the nature of "booking" questions, not intended nor reasonably likely to provoke incriminating responses.  See Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (plurality) (Miranda does not extend to "routine booking" questions asked to secure "biographical data necessary to complete booking or pretrial services.").  Second, Agent Schaeffer acquiesced to defendant's request to telephone the attorney by dialing the number and holding his own cell phone for defendant.  See, e.g., Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983) (plurality) ("There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine....  Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in Edwards.")  We conclude that granting defendant's request for a phone call with his attorney, in full hearing of all the officers, was not an act that the officers should reasonably have known would result in defendant volunteering information about his guilt.  Cf. Mauro, 481 U.S. at 526-27 (agent sitting in on

132

conversation between defendant and spouse).  Third, we have the cautionary remarks of Agent Hatcher, which he made at least twice to defendant during the ride, when he heard defendant talking about the subject of his case without any prompting from the agents. We find that testimony credible and further find that it did not constitute "taunting" or any other conduct by the agent that was reasonably likely to elicit further incriminating statements from defendant.  See, e.g., Bonner, 2010 WL 1628989, at *6 (holding spontaneous statement admissible on similar facts).

Based upon the totality of the circumstances as shown in the record, we conclude that defendant's statements during the transport ride were spontaneous and were not in response to "interrogation" by words or conduct of any law enforcement officers that day. We find this case most analogous, on this issue, to the many cases collected above in group four, where the court suppressed an initial statement under Miranda but found a subsequent statement admissible as not the product of interrogation.

We find this case distinguishable from Burgess, supra, 350 F.3d 461, the one case we categorized in group five, where (as here) a defendant made arguably spontaneous statements after he had invoked his right to counsel but the police had renewed interrogating him.  The dispositive distinction between this case and Burgess is that defendant Burgess made the allegedly spontaneous statements while the police were actually still interrogating him, in the sense that they had him along on the search for him to answer their pending question:  Where was the body?  In those circumstances, as the

Court of Appeals rightly observed, "it is possible that these statements constituted an ongoing violation of his Fifth Amendment right to counsel because Burgess had still not been provided counsel at the time of the search." Id. at 470.  In this case in contrast, although the police did renew their questioning of Mr. Fautz shortly after he invoked his right to counsel and he did answer them with the one incriminating statement about the location of a gun, thereafter the police did not interrogate him further.  Unlike the "search ride" in Burgess, the "transport ride" in this case was conducted separate from any "interrogation," with no questions pending for Mr. Fautz to answer for a considerable time prior to the outset of the ride, and with the agents cautioning him not to make his spontaneous statements when he started making those statements in the car.

Courts have not condoned any general concept of a "continuing Fifth Amendment violation" to exclude allegedly spontaneous statements.  An instructive case in this regard is Cole, supra, 315 F.3d at 636, where the court admitted spontaneous post-arrest statements, ruling that "[A]side from Officer Jones's initial question, the police officers asked Cole no questions about gun ownership or possession, and they took no actions that were likely to elicit an incriminating response....  Cole clearly made multiple independent statements at the scene of his arrest, at the ... Police Department, and on the way to the jail, even if their content was similar.  The district court, therefore, did not err in finding that Cole made numerous statements, rather than one continuous statement, in which he admitted owning the gun."  Likewise in this case, based upon the facts of record, we reject

134

defendant's contention that his statements during the transport ride should be excluded as part of a "continuing violation" stemming from the original inadmissible pre-arrest statements.[56]

The other issue is whether defendant's post-arrest statements were "voluntary," as defined under Fifth Amendment due process standards.  The constitutional principles that frame this inquiry are well summarized in Jacobs, 431 F.3d at 108-09, quoted above in this section.  "If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary."  Schneckloth, 412 U.S. at 225-26.  "A suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry."  Jacobs, 431 F.3d at 108, citing Bradshaw, 462 U.S. at 1046.  "A necessary predicate to a finding of involuntariness is coercive police activity... [and] there must be some causal connection between the police conduct and the confession."  Id., citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986).

Defendant does not actually argue that his post-arrest statements were "involuntary" in violation of the Fifth Amendment.  (See dkt. 35; dkt. 39 (passim).)  The Court must still make the inquiry, according to our reading of the precedent.  "'Any

---

[56] Our finding that defendant's post-arrest statements were spontaneous and not the product of police "interrogation" renders inapposite the issue of "question first, warn later," two-stage police interrogation practices.  See Missouri v. Seibert, 542 U.S. 600 (2004) (plurality); United States v. Kiam, 432 F.3d 524, 531-32 (3d Cir. 2006).  For the same reason, defendant's post-arrest statements are not subject to analysis as a two-step Miranda-warned interrogation process.  See Oregon v. Bradshaw, 462 U.S. 1039 (1983) (plurality); United States v. Velasquez, 885 F.2d 1076, 1083-89 (3d Cir. 1989).

statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.'" <u>Mauro</u>, 481 U.S. at 520, quoting <u>Miranda</u>, 384 U.S. at 478. <u>See</u> <u>Abdulla</u>, <u>supra</u>, 294 F.3d at 836 (analyzing an allegedly spontaneous statement, stating, "[t]urning ... to whether [defendant]'s statements were voluntary despite the initial <u>Miranda</u> violation, we 'examine the surrounding circumstances and the entire course of police conduct.'"), quoting <u>Elstad</u>, 470 U.S. at 318.

We have found no element of police coercion in the entire course of police conduct leading to defendant's uttering of his post-arrest statements during the transport ride.  As we have found above, there was no express "interrogation" after defendant was placed under arrest; and no words or conduct of the agents during the post-arrest period constituted "interrogation" so as to elicit the statements defendant made in the transport car.  <u>See also</u> n.56 <u>supra</u>.

Significant facts that favor defendant in this analysis are that he had not yet received any Miranda warnings when he made the post-arrest statements, and he had invoked his right to remain silent and his right to counsel before the officers asked the renewed question about location of the gun prior to his arrest.  There is also the fact that whether prevented by the officers or not, he did not have a telephone conversation with his attorney while still at home.

All other relevant facts, however, point toward a finding of voluntariness as to his statements during the transport ride.  Mr. Fautz was a mature adult with normal

136

intelligence and, although his educational level does not appear in the record, he was the sole proprietor of an electronics component distribution business that he conducted by telephone and computer from his home office and rented storage area.  He reportedly had a heart condition and took various prescription medications, but he was found physically healthy and mentally "perfectly coherent and normal," by the EMT team, and he declined an offer for further medical evaluation at a hospital prior to the transport ride.  He was a convicted felon, having pled guilty to a federal false statements offense and been sentenced to three years of probation ten years prior, in 1997.  He had been the registered owner of at least twelve firearms in the years prior to that conviction.  At the time of this search warrant execution, he already had an ongoing relationship with his criminal defense counsel in this case, who had represented him as a prospective witness in a recent unrelated DCIS defense procurement fraud investigation in New York.  See n.21 supra and accompanying text.

The first thing defendant said when the agents entered his home and announced that they were there with a search warrant was that he did not choose to speak with them and he invoked his right to counsel.  Clearly, he knew his right not to speak and that anything he said could be used against him in a court of law, and the agents so understood.  We have found a Miranda/Edwards failure that requires suppression of his pre-arrest statements, but that does not obviate the fact that defendant knew about his Fifth Amendment rights, from the outset of the encounter with the officers that day.

Then, during the transport ride, knowing that the agents could hear everything he said, he made unsolicited spontaneous statements before, during, and after his open cell phone conversation with his lawyer.  He even continued making his verbal statements when cautioned by Agent Hatcher that they could not converse with him about the case.  True, he was nervous and agitated, and his shoulders hurt in the car because of the rear handcuff position, but Agent Schaeffer testified that he considered that necessary in part because of defendant's nervous demeanor.  Nor have the courts been willing to recognize as government coercion the "psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate."  Elstad, 470 U.S. at 311.

Given these circumstances, we cannot say that defendant's spontaneous post-arrest statements during the transport ride were involuntary under due process standards.  The Court hereby concludes that the government has met its burden of establishing by a preponderance of the evidence that the post-arrest statements were "volunteered" within the meaning of Miranda, 384 U.S. at 478.  Accordingly, we hold that those statements are not barred by the Fifth Amendment from being admissible at trial.

Defendant does have the right to challenge the voluntary nature and the evidentiary weight of any such statements that may be introduced by the government at trial.  See Third Circuit Model Jury Instructions (Criminal) § 4.32, and Comment, citing 18 U.S.C. § 3501(a); Crane v. Kentucky, 476 U.S. 683 (1986); Gov't of V.I. v. Gereau, 502 F.2d 914 (3d Cir. 1974).  The essence of the required jury instruction would be as follows:  "If,

138

after considering the evidence, you determine that such a statement was made voluntarily, you may give it such weight as you feel it deserves under the circumstances.  On the other hand, if you determine that the statement was not made voluntarily, you must disregard it."  Third Circuit Model Jury Instructions (Criminal) § 4.32.

## F.        PHYSICAL EVIDENCE:  THE FIREARMS AND AMMUNITION

Defendant relies upon his Fourth Amendment arguments in seeking suppression of the physical evidence seized during the search.  (Dkt. 35 at 46-49.)[57]  We have held, in Sections II.A.-C. supra, that the issuance, scope and execution of the search warrants were all consistent with the requirements of the Fourth Amendment.  This means that the law enforcement officers were lawfully on the premises and duly authorized and directed to search the designated locations for the specified materials.  The warrants, however, did not specify firearms among the list of items sought.  Here we address defendant's motion to suppress the firearms and ammunition seized in the apartment during the search.

---

[57]  To the extent that defendant's arguments for suppression of the physical evidence rely upon alleged violations of the Fifth Amendment or the Sixth Amendment, we have ruled in Sections II.D. and E. supra that there is no Sixth Amendment issue on this record, and that the only Fifth Amendment violation was a Miranda/Edwards failure requiring suppression of the pre-arrest statements.  It is the law in the Third Circuit that "the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before Miranda warnings are issued."  DeSumma, 272 F.3d at 180 (holding that although defendant's seized gun was obtained as a result of his non-Mirandized statement, it was properly admitted).  Accord, United States v. Patane, 542 U.S. 630 (2004) (combining plurality and Kennedy/O'Connor narrower concurrence).  The Third Circuit has also observed that "the Supreme Court has never held that 'fruits' of involuntary statements are inadmissible."  Lam v. Kelchner, 304 F.3d 256, 268 (3d Cir. 2002) (habeas review).  Nor to our knowledge has the Third Circuit had occasion to make a precedential ruling on that specific issue in a federal prosecution.  Cf. United States v. Latz, 162 Fed.Appx. 113, 118 (3d Cir. 2005).  The latter issue is not presented here, and accordingly we do not attempt to address it.  See n.52 supra.

139

We conclude that the admissibility of the physical evidence in this case is permitted under the inevitable discovery doctrine, as articulated in Nix v. Williams, 467 U.S. 431 (1984).  There, the Court ruled that although the Wong Sun exclusionary rule arose in the Fourth Amendment context and has been applied also to violations of the Sixth Amendment, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." Id. at 442-44.  "The government can meet its burden by establishing 'that the police, following routine procedures, would inevitably have uncovered the evidence.'" United States v. Stabile, 633 F.3d 219, 245 (3d Cir. 2011) (quoting United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998)), petition for cert. filed, No. 10-10825 (U.S. May 31, 2011).  See also United States v. Ross, 456 U.S. 798, 820 (1982) ("a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found."); Santiago, 2008 WL 4483803, at *6 (applying Ross).

Here, we have found no Fourth Amendment violation.  Even assuming such a violation, however, the evidence is uncontroverted that the systematic search warrant execution at defendant's apartment inevitably would have revealed the loaded firearm in the garment bag and the firearm in the dresser, both in his master bedroom.  It is also clear that following regular law enforcement procedures, with or without an additional search warrant, officers would have seized those items as contraband as to this convicted

140

felon.  That seizure would have occurred whether or not defendant was present in his apartment at the time the items were discovered.  Accordingly, we rule that the firearms and ammunition are admissible under the teaching of the inevitable discovery doctrine. The government has met its burden on this issue by a preponderance of the evidence.

## CONCLUSION

This suppression motion presents some interesting factual and legal issues, particularly under the so-called public safety exception to Miranda (see Section II.D. supra, especially n.51 and accompanying text), and with respect to allegedly volunteered statements as envisioned in Miranda (see Section II.E. supra).  The Court conducted an evidentiary hearing and has provided its findings and conclusions on those and all other suppression issues presented by the parties.  For the reasons stated, we will suppress defendant's first pre-arrest statement under Miranda and we will suppress his second pre-arrest statement under Miranda/Edwards; but we will deny the motion as to his post-arrest statements and the challenged physical evidence consisting of firearms and ammunition.

An appropriate order will accompany this memorandum opinion.


  s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

141